Marcus BRODY–JONES et al., Plaintiffs,

v.

Frank J. MACCHIAROLA et
al., Defendants.

No. 77 C 876.

United States District Court,
E. D. New York.

Nov. 14, 1979.

Nathaniel R. Jones, James I. Meyerson, National Association for the Advancement of Colored People, New York City, for plaintiffs.

Allen G. Schwartz, Corp. Counsel of the City of New York by Robert M. Katz, Steven G. Legum, New York City, for defendants.

## MEMORANDUM DECISION AND ORDER

SIFTON, District Judge.

In this action brought pursuant to 42 U.S.C. § 1983 and Title VI of the Civil

Rights Act, 42 U.S.C. § 2000d et seq. plaintiffs allege that defendant school officials have engaged in racially discriminatory and segregative policies and practices in Community School District # 24 ("District 24" or "the District") in the borough of Queens. Plaintiffs allege that District 24 as a whole constitutes a dual school system in which, broadly speaking, schools in the southern half of the District are predominantly "white" while schools in the northern half of the District are predominantly minority and that defendant school officials are legally responsible for creating and maintaining that dual school system. The main focus of the trial of this action, however, has been on the situation at the now predominantly minority Intermediate School 61 ("I.S. 61") in the northeastern part of the District and on defendants' actions and inaction in responding to the increasing minority composition and severe over-utilization of that school. Specifically, plaintiffs allege that the creation in September 1976 and the continued operation to this date of two "temporary" predominantly minority annexes to I.S. 61 in parts of two school buildings in Community School District # 25 ("District 25") in Queens,[1] to which the sixth-grade students of I.S. 61 are sent, unconstitutionally discriminates against the predominantly minority I.S. 61 students and has unconstitutionally created and maintained racial segregation in the District.

Plaintiffs are minor children, appearing by their respective parents and next friends who, at the time of the filing of the complaint, attended school at either the main building of I.S. 61 in District 24 or at the I.S. 61 annexes in District 25, and the Parent Association of I.S. 61. The action was designated as a class action on behalf of all students attending I.S. 61 or who are eligible to do so in the future and who were or will be subject to the policies and practices complained of in this action.

The defendants are individual members of the Community School Board of District 24, the Superintendent of District 24, and the Chancellor of the City School District of the City of New York, presently Frank J. Macchiarola. All of the defendants are named in their official capacities so that where there has been a change in the occupant of a particular office or position since the time of the filing of the complaint, this opinion treats both the past and present occupants of that office or position as parties to this litigation.

Before proceeding with findings of fact and conclusions of law made on the basis of evidence introduced at the trial of this action, this opinion will first address various post-trial motions made by plaintiffs to the extent that those motions do not come up for consideration elsewhere in the course of the opinion.

Plaintiffs' motions to join additional party defendants are denied. Plaintiffs' apparent concern that the presence of those additional defendants in the case is necessary to insure the court's ability to effect an appropriate remedy appears unfounded in view of the presence as a party defendant in this case of the Chancellor. That officer, as the official with ultimate responsibility for the operation of the City school system, as well as for other reasons indicated in the course of the subsequent findings, would appear to have ample authority to insure the effectuation of whatever remedy might be appropriate. Should that appraisal of the situation regarding the effectuation of an appropriate remedy subsequently appear erroneous, the motion to join the additional party defendants on that basis may be renewed.

Plaintiffs have also made various post-trial motions to supplement the record. Those motions are disposed of as follows: Plaintiffs' motion for leave to supplement the record with items identified as Plaintiffs' Exhibits 22, 122, 123, 124, 125, 125(a) and 126 is granted. Exhibits 22, 125 and 125(a) are considered solely as the type of general background information which a court properly may consider in a case presenting the sort of complex and difficult issues both

---

1. Hereafter in this opinion, after their initial mention, all Community School Districts are referred to simply as "District" followed by the appropriate number.

of fact and of law such as are presented by this case. Plaintiffs' motion to supplement the record with depositions of various party defendants not called as witnesses at trial is, on the other hand, denied. All indications are that the party defendants, whose depositions plaintiffs now seek to introduce into evidence were available and could have been called as witnesses at the time of trial. If the court were to grant plaintiffs' motion to supplement the record with those parties' depositions, it would feel compelled to re-open the trial to allow defendants' counsel to call those individuals as witnesses to rebut any negative inferences which those depositions might yield with respect to the defendants' position in this case. After reviewing the evidence already in the record and perceiving no difficulty in making findings both of fact and of law without resorting to the additional deposition testimony now proffered by plaintiffs, and in view of the fact that it would not appear to be in plaintiffs' own best interests to further prolong the instant proceedings prior to a determination of the underlying issues of legal responsibility, further protraction of the proceedings appears inappropriate. Accordingly, plaintiffs' motion to supplement the record with the depositions of party defendants not called as witnesses at trial is denied.

With regard to plaintiffs' post-trial motion for reconsideration of certain evidentiary rulings made at trial, that motion is denied for the reasons stated previously on the record. The scope of this action is broad enough and the issues sufficiently complex without considering evidence regarding the actions of school authorities elsewhere in the City school district not bearing directly on the situation in District 24 which is at the heart of the instant lawsuit. For further comments with specific regard to the evidence concerning the use of the annex policy in District 29, *see* note 24 *infra.*

With respect to so much of plaintiffs' post-trial motion dated May 14, 1979, as seeks to have this court consider evidence relating to the city-wide integration policy of the City school district of New York, that motion is denied as beyond the issues raised by the pleadings and by the evidence introduced at trial. Contrary to plaintiffs' assertions, this court finds the issues presented by pleadings and proof in the instant case to be very different from the issues presented in *Parent Association of Andrew Jackson High School v. Ambach,* 598 F.2d 705 (2d Cir. 1979). To the extent that questions of city-wide integration policy may be involved in this action, they would appear to become relevant at the remedy stage and thus may be deferred to that stage for consideration as and if necessary. Accordingly, this court denies plaintiffs' post-trial motion insofar as it seeks (a) to admit into evidence in this case the testimony given by various persons in the *Andrew Jackson* trial, (b) to introduce further testimony "in light of the Andrew Jackson decision," from various individuals who already have testified in this action, (c) to introduce further testimony from various individuals whose writings plaintiffs have previously introduced into evidence and which this court has considered as general background information, and (d) to have this court "consider consolidation of this matter with the Andrew Jackson matter [for further proceedings]."

The further request in plaintiffs' post-trial motion dated May 14, 1979, for additional discovery of information regarding school reading levels is denied, in view of the late stage in the proceedings at which that request is being made, as unnecessary to a determination of this action. In addition, the court denies and defers to the remedy stage of these proceedings for further consideration as and if necessary the request in that same motion for further discovery on information relating to the general question of utilization in the schools of District 24 as a whole. Plaintiffs' request, also in the May 14, 1979, motion, that the court admit into evidence an attached letter from Steven B. Legum, Esq., one of the attorneys who represented defendants in this action, to plaintiffs' counsel containing certain information regarding the number of special education classes in various school facilities within District 24, is granted.

Plaintiffs' counsel's request in a letter to the court dated June 25, 1979, that a copy of a report prepared by Michael Rosen, Esq. be received in evidence, is denied in light of the objections to any such action communicated to this court by Mr. Rosen in a letter dated June 28, 1979. In any event, the contents of that report as described by plaintiffs' counsel not only in the June 25 letter, but also in a subsequent letter dated July 3, 1979, would have been considered by this court only as general background information and in that respect would appear to be cumulative of information contained in other background reports which this court has admitted into evidence.

Plaintiffs' motion filed September 14, 1979, to supplement the trial record with a letter to defendant Macchiarola dated August 24, 1979, from the Office of Civil Rights of the Department of Health, Education and Welfare is denied for the reasons set forth in the transcript of the trial for rejecting evidence concerning the underlying situation in Community School District # 29 to which that letter is addressed.

Plaintiffs' motion filed September 19, 1979, to supplement the trial record with a newspaper article from *The New York Times* dated September 15, 1979, relating to the attitude of residents of the Ridgewood-Glendale area of Queens towards minority persons is denied as an offer of hearsay of little value in resolving the issues presented by plaintiff's complaint.

With the various "household" matters disposed of, this opinion will turn to the substantive issues raised by this action.

## FINDINGS OF FACT

### A. *Community School District 24*

Community School District 24 is located in the northwestern part of Queens. To the west and southwest, District 24 borders on Brooklyn, specifically on the Bushwick area of that borough; to the north, the District borders on Community School District # 30 in Queens; to the east, the District borders on Community School Districts # 25 and # 28 in Queens; and to the southeast, the District borders on Community School District # 27 in Queens.

District 24 covers various neighborhoods or communities. In the north, moving from east to west, are the communities of Corona, East Elmhurst, Elmhurst and portions of the communities of Woodside and Long Island City. Moving to the south, one comes to the communities of Maspeth to the west, and Middle Village to the east. In the southern-most part of the District are the communities of Ridgewood to the west, and directly bordering on Brooklyn, and Glendale to the east.

Certain of the communities in District 24 have racially identifiable characteristics. In the extreme northeastern corner of the District, the eastern part of Corona has always been a minority residential area. Beginning in the mid-1960's, that minority area began spreading slowly westward into the other part of Corona, which thereafter became known as East Elmhurst, and into Elmhurst. Maspeth is and always has been a predominantly white residential community which, however, has experienced some increases in its minority population in recent years. Middle Village, Ridgewood, and Glendale are today, as they have been in the past, predominantly white residential communities.

### B. *Segregation in District 24*

#### (1) *Difference between Racial Composition of Middle Level Schools in Northern and Southern Parts of District*

Altogether, there are five middle-level schools in District 24—three in the northern half of the District and two in the southern half of the District. There is a definite and marked contrast between the racial composition of the three schools in the northern half of the District and the two schools in the southern half of the District, the former all being predominantly minority, although to different degrees, and the latter being predominantly white or "other."

The three schools in the northern half of the District are I.S. 61[2] located in the northeastern Elmhurst-Corona area, Junior High School ("J") 125 located in the Woodside area and J 73 located at the northern edge of the Maspeth area. I.S. 61 has two annexes located in schools in District 25. As of 1978, I.S. 61 was 16% "other"[3] and 84% minority, and J 73 was 40% "other" and 60% minority. Figures for J 125 as of 1978 were not available, but the 1977 figures indicate that J 125 was 39% "other" and 61% minority at that time. A sizeable portion of the students attending J 125 reside in and come from nearby areas of District 30; these students from District 30 are predominantly "other."

2. In contrast to the traditional junior high school with its grade 7, 8 and 9 organizational structure, an intermediate school such as I.S. 61 houses grades 6, 7 and 8. The advent of the intermediate school was originally conceived as part of a transition to a "4–4–4" systemwide organizational structure of schools in which students would go to one school for grades 1 through 4, another school for grades 5, 6, 7 and 8, and then on to high school for grades 9, 10, 11 and 12. Apparently, the "4–4–4" system was thought to offer improved opportunities for integration at earlier stages of a child's education because middle schools draw their students from a wider geographic area than elementary schools theoretically containing a greater diversity of population, and the "4–4–4" system would place students in the middle school at an earlier point in their education than the traditional system under which students attend elementary school for grades K–6 and then first go on to junior high school for grades 7–9.
It should be noted that District 24 apparently contains at least two junior high schools—J 73 and J 125—which depart from the traditional grade 7 through 9 organizational structure for junior high schools and also house grade 6, making them grade 6–9 facilities.

3. Under present definitions, the category of "other" encompasses white pupils not of hispanic origin.

4. Evidence was also introduced at the trial indicating that in July 1977, in connection with an application for assistance under the Emergency School Aid Act ("ESAA"), the Department of Health, Education and Welfare ("HEW") found that District 24 had assigned teachers to its middle-level schools J 93, J 119 and I.S. 61 in such a manner as to identify those schools as intended either for minority or non-minority

The two schools in the southern half of District 24 are J 93 located in the Ridgewood area and J 119 located in the Glendale area. J 93 has an annex at J 77, also in the Ridgewood area. As of 1978, J 93 was 73% "other" and 27% minority and J 119 was 83% "other" and 17% minority.

## (2) *Segregation at J 93 and J 119*

In addition to the predominantly "other" composition of their student bodies, J 93 and J 119 are perceived, both in their immediate surrounding communities and in District 24 as a whole as "white" schools. These two factors combine to properly brand J 93 and J 119 as white segregated schools.[4]

students. Such a finding, at least with regard to I.S. 61, is supported by Defendants' Exhibit 5 which, contrary to the defendants' suggestions, indicates that as of 1977 I.S. 61 had a lower percentage of "other" and a higher percentage of "minority" members among its faculty than any other middle-level school in District 24. Apparently, after HEW made its findings District 24 indicated that it would remedy the situation and ultimately was successful in obtaining the desired ESAA funds. The testimony of Mr. Sanfilippo, who at the time of trial was the Superintendent of District 24, left it unclear whether the remedy adopted was entirely technical in nature so that in fact it is today still possible to identify these three middle-level schools as minority or non-minority by looking at the racial characteristics of the teachers assigned to those schools or whether the remedy adopted had some real impact on the ability to identify the racial composition of those three schools' respective student bodies by looking at the racial characteristics of a particular school's faculty. Plaintiffs introduced no further evidence clarifying the present status of the relationship, if any, between the racial characteristics of the faculty of those three schools and the racial characteristics of a particular school's student body. Nor is Defendants' Exhibit 5 of assistance on this point because the data contained therein only go up to the year 1977. Accordingly, this court makes no express findings as to the current pattern of teacher assignments, to those three middle-level schools while noting that the evidence is suggestive of a pattern of teacher assignment which would constitute yet another indicia of the segregated nature of all three of the middle-level schools mentioned in the HEW findings—J 93, J 119 and I.S. 61.

**(3)** *Segregation at I.S. 61 and its Two Annexes*

As indicated above, the racial composition of I.S. 61 as of 1978 was 16% "other" and 84% minority. I.S. 61 is and, for a number of years, has been perceived by those in District 24 as a whole as a minority school.

The evidence indicates that the instructional program of I.S. 61 includes all the traditional subjects. Special talent programs and a variety of shops are also made available to I.S. 61's students. The one representative of the I.S. 61 teaching staff who testified at the trial appeared genuinely interested in the education and well-being of the students. Although at least one of the plaintiffs' witnesses testified to what she perceived to be a failure to respond adequately and without outside parental pressure to the special needs of the I.S. 61 student population, the evidence indicates that I.S. 61's students are the recipients of various special programs intended to meet those students' particular needs; and although I.S. 61 apparently does have difficulty obtaining substitute teachers, that difficulty is ostensibly no greater than that at other Title I schools.

Still, whatever may be said about the quality of the education afforded students at I.S. 61 cannot change the fact, which this court finds, that, by virtue of the racial composition of its student body and the manner in which it is perceived in both the immediate and larger District 24 community, I.S. 61 is a predominantly minority segregated school.[5] All signs indicate that this segregation is increasing with each passing year.

Since September 1976, the sixth-grade students assigned to I.S. 61 have been transported by bus to two annexes in District 25—one annex at J 168, the other at J 218. The students who are sent to the two annexes in District 25 are drawn from the same geographic zone as the students who attend the main building of I.S. 61, and thus, their racial composition reflects the overwhelmingly minority composition of the main I.S. 61 building. In contrast, the racial composition of the students from District 25 assigned to J 168 and J 218 is much more evenly balanced. As of 1977, J 168 was 45% "other" and J 218 was 58% "other," as compared to 18% "other" for I.S. 61 that year.

Although housed in the same facility, the I.S. 61 sixth graders and the main population at each of the two District 25 junior high schools in which the I.S. 61 annexes are maintained and kept as separate groups with little informal and virtually no formal interrelationship. Organizationally and administratively, the I.S. 61 annexes are considered part of the main I.S. 61 facility, not of the two junior high schools in District 25. To facilitate day-to-day operations, each of the two annexes has its own administrative structure headed by an assistant principal who formerly worked at the main I.S. 61 facility. The teachers at the two annexes are considered part of the I.S. 61 teaching staff. It is made clear to the I.S. 61 sixth graders at the beginning of the school year that they are at the District 25 facilities temporarily for one year only because the main I.S. 61 building is overcrowded. The affected communities and students from I.S. 61 are simply using available space in the two District 25 junior high schools and are not actually part of the District 25 facilities. District 25 derives a benefit from making the space available to the students from I.S. 61 because without the I.S. 61 annexes each of the two involved District 25 junior high schools would be significantly underutilized, and there is a strong probability that one of the two junior high schools would be closed down and the two schools consolidated.

Although the I.S. 61 sixth graders in both annexes have use of facilities such as the cafeteria, auditorium and gymnasium, none of those facilities, not even the cafeteria, are used by the sixth graders from I.S. 61 at the same time as the regular District 25

---

5. *See* footnote 4 *supra* for reference to evidence regarding faculty assignments suggestive of an-

other indicia of the segregated nature of I.S. 61.

students. The separation of the two groups of students is evident from the commencement of the school day which for the regular District 25 students starts at an earlier hour than it does for the sixth graders from I.S. 61.

In J 168 the I.S. 61 sixth graders change classes and pass in the halls at a different bell than the regular District 25 students. The assistant principal in charge of the J 168 annex explained that practice as something which he, rather than anyone connected with the J 168 administration or community, initiated as a precautionary measure for the safety of the younger and smaller I.S. 61 annex students. The assistant principal in charge of the J 168 annex also testified, however, that by and large for most of the school day and most of the school week, the children bussed into the I.S. 61 annex at J 168 do not mix with the main body of students attending J 168.

In J 218, the I.S. 61 annex is housed primarily on the third floor where all of the classrooms used by the I.S. 61 sixth graders are located. However, the assistant principal in charge of the J 218 annex testified that the third floor was also used to some extent by the regular J 218 student body.

The I.S. 61 sixth graders have essentially the same instructional program available to them at the two annexes as they would at the main building of I.S. 61, with one exception. At the annexes, the sixth graders could not take typing which might have been available at the main building. However, the sixth graders do not have to forego taking typing altogether. They simply have to postpone taking that course until they return to the main I.S. 61 building. Otherwise, sixth-grade students at the annexes may still take two-year or three-year special progress classes ("SP's"), foreign languages, special talent classes, bilingual classes, remedial reading or math classes, and a number of shops. The distribution of the sixth-grade students between the two annexes, is to some extent, dictated by the classes the students choose to take. For example, if a student chooses to take the two-year SP program, he or she would have

to attend the J 168 annex where the one two-year SP class is offered, whereas a student choosing to take the three-year SP program would attend the J 218 annex where the two three-year SP classes are offered. A deliberate effort was made by the I.S. 61 administration in setting up the annexes to divide up the academic program fairly between the two annexes so that one annex would not have all the brighter children and the other, all the children needing special remedial attention. There is no evidence of any unusual concentration of white children in any one or more classes within either of the I.S. 61 annexes.

The I.S. 61 sixth graders have use of the library in the respective facilities in which they are housed, although, again, not generally at the same time as the regular District 25 students. I.S. 61 does assign a librarian to the annex who splits her time between the two buildings. I.S. 61 also assigns one guidance counselor to the two annexes who also splits her time between the two schools. The guidance counselor has, however, made adjustments in her schedule where necessary.

In terms of extracurricular activities, the sixth graders at both annexes are afforded an opportunity to work on the school newspaper and school magazine. However, to participate in these activities, a special effort is required on the part of the students who must catch an earlier bus and arrive at their respective schools a half-hour earlier than their fellow classmates. There appears to be no opportunity for after-school extracurricular activities for the I.S. 61 annex students.

The physical and organizational separation between the heavily minority I.S. 61 sixth graders and the less minority native student body at each of the annex facilities is apparent. That physical separation, together with the heavily minority composition of the I.S. 61 annex student bodies and the perception in both the District 24 sending community and the District 25 receiving community that no real interrelationship exists between the units housed within the same facility leads the court to find as a

fact that the two I.S. 61 annexes in District 25 are segregated facilities.

C. *Segregation in District 24 as Initially Related to the Neighborhood School Policy and Natural Demographic Changes*

The basic principle under which students in District 24 have historically been assigned to elementary and middle-level schools is the neighborhood school policy. Under such a policy, students are zoned to schools geographically according to the area in which the particular student resides and generally to the school at a particular level in closest proximity to the student's residence. When students are assigned to schools pursuant to a neighborhood school policy, the racial composition of the schools generally reflects the racial characteristics of the area in which the particular schools are located.

As a result of this policy, the difference in racial composition between the middle-level schools in the northern and southern halves of District 24 generally reflects the fact that there are very few minority students residing in the southern part of the District and many more minority students residing in the northern half of the District. The same explanation accounts, at least initially, for the segregated situations existing at J 93 and J 119 in the southern half of the District. Similarly, the increasingly minority composition of the student body at I.S. 61 from its opening in September 1966 reflects population changes in the surrounding Corona and Elmhurst areas.

The record in this case includes evidence introduced by defendants of every zoning and assignment change affecting or involving District 24 since February 1966 (Defendants' Exhibits 12 through 36). Excluding for the moment any actions by defendant schools officials occurring in or after September 1976, when the decision creating the two District 25 annexes to I.S. 61 became effective, none of the zoning or assignment changes shown appears as a deliberate device either to perpetuate, create or enhance racial segregation in District 24's schools. However, there was also testimony at trial suggesting that as a general matter there is a complex interrelationship between changes in the racial composition of the schools in a particular area and changes in the racial composition of that area's population so that it is possible that had defendant school officials taken specific and deliberate action at some point to stabilize the racial composition of I.S. 61 and its feeder schools, the population change in the surrounding areas might also have been lessened.

The roots of I.S. 61's segregation in the neighborhood school policy is confirmed by an examination of its feeder schools. The presently designated feeder schools to I.S. 61 are public schools ("P") 13, 14, 19 and 143, all located in the northeastern part of District 24 surrounding I.S. 61. P 13 is only a partial feeder to I.S. 61. Of the feeder schools, the two northernmost schools have the lowest percentage of "others" and highest percentage of minority students, with P 143 in the extreme northeast corner of the District having the lowest percentage of "others" and the highest percentage of minority students of all the I.S. 61 feeder schools. The following chart indicates the percentage of "others" and of minority students reported for the I.S. 61 feeder schools in 1977 and 1978.

| Year | Feeder Schools | % Others | % Minority |
|------|------|------|------|
| 1977 | 13 | 22 | 78 |
| 1978 | 13 | 16 | 84 |
| 1977 | 14 | 33 | 67 |
| 1978 | 14 | Data Missing | Data Missing |
| 1977 | 19 | 10 | 90 |
| 1978 | 19 | 9 | 91 |
| 1977 | 143 | 2 | 98 |
| 1978 | 143 | 1 | 99 |

The evidence also indicates that students in the fifth grade of P 206 in adjoining District 28 may choose to attend I.S. 61. The racial composition of P 206 as of 1977 was reported as 30% "other," 70% minority.

Evaluation of the present situation in District 24, and in particular of the situation presented by the two segregated District 25 annexes to I.S. 61 requires, however, that this court move beyond the fact

of the neighborhood school policy as the initial basis on which the District 24 Community School Board prefers to assign its students to elementary and middle-level schools. Defendant school officials in this case were presented not simply with a question of how to assign students residing within the District to school. In addition, the evidence establishes that defendant school officials were presented with a very serious and difficult problem of overcrowding in the District, particularly in the northeastern Corona-Elmhurst area which could not be resolved within the confines of the neighborhood school policy.

### D. *The Problem: District-Wide Overcrowding Especially Severe at I.S. 61*

At a time when many districts throughout the City are facing declining student populations and a large number of underutilized school facilities, District 24 is one of the few districts in the City in which the student population has been growing. That growth has affected all the middle-level students in District 24, but has had its most severe and tragic impact on I.S. 61 which has been laboring under a serious overcrowding problem ever since the school first opened in September 1966.

I.S. 61's utilization during its first year of operation was reported as 134%. The racial composition of the I.S. 61 student body during that first year was reported at 77% "other," 23% minority. However, at that time and continuing until 1968 a different definition of "other" was in use than is in use today. Prior to 1968, the term "other" included white, oriental, American Indian, and non-Puerto Rican hispanic pupils. Had the present definition of "other" been used in 1966,[6] the racial composition of I.S. 61 during that year would have been reflected at 57% "other" and 43% minority.

The overcrowding problem at I.S. 61 intensified over the ensuing years. At the same time, the percentage of minority students steadily increased. Both of these trends are indicated on the following chart which summarizes the utilization and racial

composition figures for I.S. 61 from the school year beginning September 1967 through the end of the September 1975 school year, after which the District 25 annexes were instituted.

| School Year (September) | % of Utilization | Racial Composition | |
|---|---|---|---|
| | | % Others | % Minority |
| 1967 | 138; 147 * | 74 | 26 (pre-1968 definition) |
| | | 54 | 46 (post 1968 definition) |
| 1968 | 138 | 52 | 48 |
| 1969 | 137 | 53 | 47 |
| 1970 | 143 | 49 | 51 |
| 1971 | 162 | 45 | 55 |
| 1972 | 163 | 42 | 58 |
| 1973 | 159 | 36 | 64 |
| 1974 | 146 | 31 | 69 |
| 1975 | 150 | 29 | 71 |

* Two utilization figures appear on chart because two different utilization figures were testified to during trial.

The severe overcrowding at I.S. 61 has had an adverse impact on the educational experience of the school's students almost from the start. After one year of operation, I.S. 61 was put on overlapping sessions. That meant that the normal school day was extended and that the use of the school facilities was somewhat staggered among the various grades with the seventh and eighth grades coming in to school two periods earlier than the sixth grade and leaving the school two periods earlier at around 2:30 p.m., while the sixth graders were held for later dismissal. In addition, teachers came into the facility at staggered times which overlapped.

I.S. 61 remained on overlapping sessions for eight years until September 1975 when, because of the strain imposed on the facility by the severe overcrowding, the school was placed on end-to-end sessions. At the time, all involved understood that the end-to-end sessions were to be a temporary expedient for one year only. Prior to placing I.S. 61 on end-to-end sessions, the testimony at trial indicates, the severe overcrowding produced considerable tension and increased disciplinary problems at the school, especially evident when students were moving in

**6.** *See* note 3 *supra.*

the hallways between periods at which time the sheer volume of students almost inevitably resulted in bumping and physical contact between students. The evidence also establishes that concern was legitimately expressed about the ability of all I.S. 61 students to evacuate the building in the event of a fire or some other emergency.

Under the end-to-end organization, different groups of students used the I.S. 61 facility at different times. The seventh and eighth graders reported to school at 7:00 a. m., began their school day at approximately 7:30 a. m., and were dismissed at noon. The sixth graders first reported to school at noon, when the seventh and eighth graders were dismissed, and left the school at approximately 4:30 or 5:00 p. m. In the September 1975—June 1976 school year, I.S. 61 was the only middle-level school in the entire City operating on end-to-end sessions.

The end-to-end sessions did result in some loss of educational time to the I.S. 61 students—approximately five instructional periods a week. Some of the lost periods would have been devoted to elective courses, but the lost time also included a reduction in the periods devoted to basic subjects such as English and Social Studies. As a result of the end-to-end sessions, I.S. 61 students also had virtually no opportunity to engage in extracurricular activities of any kind. In addition, the evidence indicates that many of the students who were eligible for free lunches did not avail themselves of that opportunity because it would have meant either staying in school an extra period after the conclusion of their school day or coming to school a period earlier than they otherwise would have had to do.

Dr. Irving Berchuck, former Superintendent of District 24 from the years 1970–1975, testified that I.S. 61's actual capacity was understated by the official statistics because available space in the school which was devoted to guidance and other special services was not included in the official capacity figures. Acceptance of this aspect of Doctor Berchuck's testimony, however,

might only change the statistical statement of the overutilization problem at I.S. 61, perhaps reducing somewhat the reported utilization figures. It does not, however, change the clear reality established by the evidence by an overcrowding problem at I.S. 61 so severe that substantial and ultimately drastic changes in the organizational structure of the school were required. Nor does it alter the fact that the overcrowding problem at I.S. 61 was so severe and the shortage of available space so acute that halls which had housed lockers for the I.S. 61 students were stripped of those lockers and converted into windowless classrooms, teachers' work rooms were converted into classrooms, and what was described by one witness as a "studio costume closet type of room" originally used in connection with the school's drama program was converted into two classrooms.

Towards the end of the 1975–76 school year, the Chancellor instructed the District 24 Community School Board that the end-to-end sessions at I.S. 61 could not continue beyond that school year and that some other solution would have to be found to the severe overcrowding at the school. The solution decided upon by defendant school officials beginning with the September 1976 school year was the two annexes in District 25 to which I.S. 61 sixth graders would be transported by bus. Those annexes continue in existence to this date.

E. *Historical Background to the Decision to Institute the Two District 25 Annexes*

(1) *Prior Actions and Inaction of Defendant School Officials in Response to the Overcrowding at I.S. 61*

(a) *Removal of P 89 from I.S. 61 Feeder Pattern Effective September 1967*

When I.S. 61 opened in September 1966, P 89 was included among its feeder schools. Effective September 1967, J 73, which as a grade 7–9 school had been significantly underutilized, was reorganized into a grade 6–9 school, and P 89 was rezoned to feed into J 73. In 1967, P 89 was reported to

have an 81% "other" student body, under the old definition of other, a percentage of "other" slightly higher than the percentage reported for I.S. 61. In 1968, under the new definition, P 89 was reported as having 49% "other" in its student body as compared to the 52% "other" reported for I.S. 61. According to the reported figures P 89 continued to have a slightly lesser percentage of "other" than I.S. 61 through 1973 when the figures reversed until they became identical in 1977 and again reverted to their former pattern in 1978 with P 89 reporting a slightly lower percentage of "other" than I.S. 61. In any event, the continuing overcrowding problem at I.S. 61 would certainly have been even worse had P 89 remained in the I.S. 61 feeder pattern.

(b) *Failure of the Community School Board to Take Any Direct Action to Relieve the Overcrowding at I.S. 61 Between 1970 and 1975*

Effective September 1970, decentralization was instituted in the New York City school system at the elementary and middle school levels. Under decentralization, responsibility for the assignment of students within particular districts to schools and for all matters of zoning rests initially with local community school boards. The Chancellor, however, retains the authority to supersede actions of the local community boards under certain circumstances and to act under certain circumstances when the local boards fail to act.

Community school board members are elected on a district-wide basis. *See* N.Y. Educ.Law § 2590–C (McKinney's Supp. 1978). The evidence indicates that their terms of office typically begin in June of the first year for which they are elected to serve. Theoretically, one might expect that board members would consider and be responsive to the needs of all parts of the district on an equal basis. In fact, the evidence in this case indicates many of the members of the District 24 Board approached the District's overcrowding problem in terms of the parochial interests of particular areas of the District with which they were most closely associated.

The District 24 Community School Board set up various committees to deal with different matters related to the education of the children within the District. The initiation and formulation of zoning proposals is the province of the Zoning Committee, chaired by one or more members of the Community School Board but open to participation by all members of the community. To be put into effect, however, Zoning Committee proposals have to be considered and formally adopted by the Community School Board as a whole. In addition, zoning resolutions adopted by the Community School Board are reviewed by the Central Board's Office of Zoning and Integration to insure that the proposals worked out in the community do not violate any policy of the Central Board. One of the policies of the Central Board of Education is to promote integration of the schools where feasible.

One of the witnesses called by plaintiffs was Barbara Shore, a member of the District 24 Community School Board and Chairman of the Zoning Committee from 1973–1977. Mrs. Shore testified that during the years of her chairmanship the Zoning Committee addressed itself primarily to the problem of overcrowding in District 24. She further testified that she was aware of the Central Board's policy to promote integration where feasible. Her testimony suggested, however, that the Central Board's policy regarding integration had not been a significant factor in determining the actions of the Community School Board during her terms of office.

The evidence indicates that the problem of the persistent and increasingly serious overcrowding at I.S. 61 was repeatedly brought to the attention of both the Zoning Committee and the Community School Board as a whole by concerned members of the I.S. 61 community and others throughout the period of the early-to-mid-1970's. The fact of I.S. 61's increasing minority population was also brought to the attention of defendant school officials during that time. However, the evidence indicates that, with one possible exception, no con-

crete proposals were adopted by the District 24 Community School Board during the 1970–1975 period to alleviate the overcrowding problem at I.S. 61.

The statistics indicate that between 1970 and June 1973, when a new Community School Board began its term of office, the magnitude and dimensions of the overcrowding problem at I.S. 61 significantly worsened. Nevertheless, during that period not a single resolution appears to have been passed by the District 24 Community School Board dealing with the situation at I.S. 61. Plaintiffs' witnesses, particularly Messrs. Susskind and Gertzulin, testified to repeated efforts by concerned parents and others during that 1970–1973 period to get school officials at both the local and Central Board levels to do something about the steadily worsening situation at I.S. 61, to no avail. Nor can the inaction of school officials during this early period fairly be explained, as defendants attempted to explain both their actions and inactions later on as due to the relief expected from the construction of I.S. 227, since actual construction on that facility did not begin until 1974, and it was known that the construction of that facility would take several years.

The one possible exception to the pattern of inaction during this early period was testified to by Mrs. Shore. She testified that when she first assumed her position on the Community School Board in June 1973 there was an option in effect pursuant to which fifth-grade students graduating from P 143 and P 19 could choose to go on to either J 73 or J 125 rather than to I.S. 61. The effect of the exercise of such an option would have been to alleviate to some degree the magnitude of the overcrowding that would otherwise have existed at I.S. 61. In addition, because P 143 and P 19 were the most overwhelmingly minority of the I.S. 61 feeder schools, the exercise of such an option theoretically should have reduced to some extent the percentage of minority students at I.S. 61.

Mrs. Shore testified that during the years she was on the Board about half the children graduating from P 143 opted to attend J 73 rather than I.S. 61 and that smaller numbers opted to attend J 125. She further testified that during the years of her tenure on the Board, the number of children from P 19 who availed themselves of the option was growing and that, as she recalls, in the last year of her Board membership, which would have been 1977, the number of children from P 19 who had opted to attend schools other than I.S. 61 was 72, a number which, when considered in terms of the three-year period for which those children would otherwise have been attending I.S. 61, Mrs. Shore characterized as "significant."

Although the record contains no documentary evidence of the adoption of the options testified to by Mrs. Shore, documents introduced at the trial and submitted by defendants after trial in response to an inquiry by this court to indicate that some students from P 19 and P 143 did attend J 73 and J 125 and contain references to options available to P 19 and P 143 students to attend these middle-level schools. However, the documents yield conflicting indications as to how long these opportunities for P 19 and P 143 students were in existence. On the one hand, the documents submitted by defendants after the trial indicate that some students from P 19 and P 143 went on to attend J 73 as early as September 1968 and that this practice continued at least through the 1978 school year. Those same documents also indicate the beginnings of some movement of P 19 graduates to J 125 in the 1973 school year and a small number of graduates from P 143 attending that middle-level school in the 1977 school year. Thus, these documents tend to suggest a long-standing option to P 19 and P 143 graduates to attend J 73 at least going back to the period before decentralization. On the other hand, the minutes of the April 26, 1973, Zoning Committee meeting (attachment to Plaintiffs' Exhibit 12) indicate that the District 24 Superintendent at that time *proposed, inter alia,* options of the sort described by Mrs. Shore suggesting that no such options were in existence prior to that time.

If the options described by Mrs. Shore went all the way back to 1968, prior to decentralization, then the District 24 Community School Board could not properly claim credit for the institution of those options as a measure for the relief of the overcrowding at I.S. 61 as the Community School Board might properly do if the options were not implemented until sometime after decentralization. For purposes of this opinion, this court will assume that the formulation of the options described by Mrs. Shore was the work of the District 24 Community School Board itself in response to the overcrowding problem at I.S. 61.

Operating under that assumption, certain observations are appropriate concerning the options extended to P 143 and P 19 students to attend either J 73 or J 125 rather than I.S. 61. First, the schools which students pursuing the options could attend were limited to schools in the northern, more minority, half of the District. In contrast to the present intradistrict optional assignment program detailed in Memorandum No. 191 dated June 2, 1978 (Defendants' Exhibit 10), under the terms of which fifth-grade minority students from P 143 and P 19, among others, are listed as having the option to attend J 93 and J 119 in the southern half of the District,[7] the options earlier available did not include any schools in the southern half of the District with their predominantly white student bodies. Mrs. Shore's explanation for the earlier failure to extend the options to permit students in the northern part of the District to attend the two southern area middle-level schools as well was that those two schools were organized on a grade 7 through 9 basis and did not have a sixth grade to which the fifth-grade graduates of P 143 and P 19 could be sent. However, that same situation apparently held true at the time the current intradistrict optional assignment program was developed and apparently was not seen as an obstacle to the present extension of an option to P 143 and P 19 students to attend J 119 or J 93. Instead, Memorandum No. 191

simply states that "[i]f enough fifth graders volunteer, grade six may be organized in J.H.S. 93 and/or J.H.S. 119." In fact, Mr. Elias, director of the Central Board's Office of Zoning and Integration, testified that as of September 1978 J 119 and J 93 each had one sixth-grade class because of the intradistrict optional assignment program. In addition, when in 1967 prior to decentralization P 89 was redesignated as a feeder school to J 73 instead of I.S. 61, J 73 was reorganized from a grade 7 through 9 to a grade 6 through 9 school, indicating that the initial absence of a sixth grade from a middle-level school does not pose an insuperable obstacle to use of the school to absorb students graduating from elementary schools terminating in the fifth rather than sixth grades.

From the standpoint of overcrowding alone, the statistics do not indicate any significant difference in the early 1970's between the ability of the northern area J 73 and J 125 middle-level schools and J 119 and J 93 in the south to absorb additional students under an optional program. The 1973 figures show J 93 as having a utilization of 126%, whereas J 73 and J 125 each had utilizations of 110%. J 119, however, with its annex at P 91 was shown as having a utilization of 94%. With respect to all of these utilization figures it should be noted that former District 24 Superintendent Berchuck testified that a middle-level school could operate effectively and would not be considered overcrowded until it reached a capacity of 120%. In 1973 only one middle-level school in District 24 was reported as having a utilization of considerably more than 120% and that was I.S. 61 with a reported utilization of 159%.

The testimony at trial was confused as to the provision of special bus transportation by the Board of Education to children opting to attend schools outside of their immediate neighborhoods under optional assignment programs in general and as to the assurance regarding the availability of such

---

7. Interestingly, Memorandum No. 191 does not list fifth-grade students from P 143 and P 19 as having an option to attend either J 73 or J 125.

Thus, the present status of the options described by Mrs. Shore is unclear.

special transportation which the Board of Education is able to give parents at the time they are asked whether they wanted to exercise an assignment option for their children. The evidence was even more inscrutable with respect to the availability of specially provided bus transportation in connection with the specific options to the students of P 143 and P 19. alone described by Mrs. Shore. That confusion highlights the reality apparent to the court and which should have been apparent to a reasonable and objective community school board at the time that, although clearly described optional programs might help to some extent in alleviating a problem of overcrowding, when compared to the magnitude of the overcrowding problem at I.S. 61, an optional program alone without some compulsory rezoning and reassignment of students at the middle school level could not satisfactorily resolve I.S. 61's overcrowding problem.

The use of options rather than compulsory rezoning measures rather clearly places the burden of action on the parents and children to whom the options are extended. Whatever may be said about the use of options by school officials to voluntarily afford students opportunities for improved integration, the purpose for which the optional assignment programs discussed later on in this opinion were avowedly developed, the use of options alone to deal with as significant a problem as severe overcrowding in a particular school, appears wholly inadequate.

The evidence indicates that the subject of the rezoning of District 24's middle-level schools—another and far more effective way of dealing with overcrowding—did come up for frequent discussion and consideration by the Zoning Committee at least as early as 1972. However, the evidence also indicates that, despite all the discussion and consideration given to that solution, the Zoning Committee was unable to come up with a single rezoning proposal which it could recommend to the District 24 Community School Board as a whole. In fact, through the nine years that decentralization has been in effect, the Zoning Committee has been unable to come up with one rezoning proposal directed to overcrowding at District 24's middle-level schools which was taken up for formal consideration by the Community School Board.

Among the examples in the record of early discussion and consideration of the possibility of rezoning are the following: The minutes of the April 26, 1973, Zoning Committee meeting indicate that there was a discussion "dealing with change of feeder patterns [and] step zoning [8] of junior high schools." (Attachment to Plaintiffs' Exhibit 12.) A memorandum dated May 3, 1973, advised all Zoning Committee members that there was to be a special Zoning Committee meeting on May 9, 1973, at which the agenda would be "step zoning to relieve overcrowding [at] I.S. 61." *Id.* No concrete plans or proposals emerged from either of these meetings.

**8.** Step zoning reshuffles the feeder patterns to particular schools by changing the outer boundary lines of the feeder patterns, but within those boundary lines, keeping contiguous geographic areas assigned to the same schools. Thus, for example, assuming a step zoning in a southerly direction, a piece from the southernmost area zoned to the northernmost school involved in the step zoning would be removed from the feeder pattern to the school and placed instead in the feeder pattern to the school most immediately to the south of the first school. That pattern could continue indefinitely, limited only by the number of capacity of the schools involved with a piece from the southernmost area zoned to the second school being removed from the feeder pattern to that school and being placed in the feeder pattern of a third school to the south of the second school, and so on.

Another type of rezoning measure testified to during the trial and referred to in the evidence is skip zoning. Skip zoning takes a geographic area not at the outermost boundary of the zone for a particular school and literally skips over contiguous geographic areas at or closer to the outer boundary line to assign that initial geographic area to another school farther away. Thus, where skip zoning as opposed to step zoning has been used, it is not possible simply to draw a circular or other similar line around adjoining geographic areas to locate all areas zoned to a particular school.

Minutes of a Zoning Committee meeting dated July 17, 1973, indicate that the Committee requested the district office to come up with a plan for rezoning of pupils. *Id.* In apparent response, Superintendent Berchuck, in a memorandum dated August 6, 1973, *id.,* submitted to Mrs. Shore as Chairman of the Zoning Committee step-zoning proposals which were essentially the same as the proposal which he had previously conveyed to the Community School Board in a memorandum dated June 21, 1973. *Id.*

Interestingly, the August 6, 1973, memorandum from Superintendent Berchuck begins with the following paragraph:

"Last year the Zoning Committee asked that a step zoning proposal be prepared by the Community Superintendent that would relieve overcrowding at I.S. 61 and more fully utilize existing middle school space in the Ridgewood-Glendale section of that district."

The paragraph indicates that the need for a step zoning of District 24's middle-level schools was, in fact, being discussed by the Zoning Committee as early as 1972. It also clearly links the perceived need for a step zoning plan to the overcrowding at I.S. 61. Finally, and perhaps most significantly, the memorandum indicates that in 1973 the middle-level schools in the southern half of the District were not perceived as having a utilization problem, but rather, were perceived as having available space which could be used as a resource in an attempt to relieve the continuing and worsening overcrowding problem at I.S. 61.

Nothing came of Superintendent Berchuck's step-zoning proposal. The minutes of the September 12, 1973, Zoning Committee meeting, *id.,* indicate that the Committee found that proposal "unacceptable." At that September 12 meeting a subcommittee was formed consisting of the junior high school principals and the Zoning Committee Chairman "to formulate a plan for the intra-district step-zoning of the junior highs." It was also suggested at that meeting that the Central Board of Education be asked to rezone the District's junior high schools, but that suggestion apparently was not acted upon. The minutes of the November 15, 1973, Zoning Committee meeting, *id.,* indicate that the junior high school principals met and agreed that the problem of I.S. 61 was "so vast that it would not be feasible to solve it amongst themselves." Again, the minutes indicate that a motion was made to ask the Central Board to solve the problem, but the motion was not seconded. Instead, another subcommittee was set up to study the feasibility of step zoning the District's junior high schools. Whatever the results of that subcommittee's study, they apparently did not include any rezoning proposals which were ever recommended to the Community School Board.

Turning to the second part of the 1970 through June 1975 period, Mrs. Ann Darby, another of plaintiffs' witnesses, a member of the District 24 Community School Board from 1973–1977 and the Chairman of that Board from 1975–1977, testified that during her first term on the Board from June 1973 until June 1975, and despite the glaring needs of I.S. 61 at that time, the main interest of the Board members was not the situation at I.S. 61 and the need for some action to alleviate that situation, but rather, the problems of schools in the southern half of the District. Whenever the problem at I.S. 61 was raised, Mrs. Darby testified, the response of the Board members was essentially to state that the still-to-be-completed I.S. 227 would be the answer to I.S. 61's problems. The effect of the Board's reliance on I.S. 227 was essentially to preclude any immediate relief for I.S. 61. At the same time, as discussed *infra,* in contrast to the Community School Board's failure during the entire 1970–1975 period, with the one exception previously noted, to adopt any resolution which might begin to have a real impact on the serious overcrowding at I.S. 61, the School Board during the period from 1970 until June 1975 adopted numerous resolutions dealing with the needs, even at the most minute level, of schools in the southern half of the District.

Defendants cite the extension of an option effective September 1974 to students from P 206 in District 28 to remain in P 206 for the sixth grade and then go on to J 157

in District 28 rather than I.S. 61 as an example of action which to some extent alleviated the overcrowding problem at I.S. 61. However, the evidence indicates that the option was extended at the initiative of the District 28 rather than District 24 Community School Board. The District 24 Community School Board simply concurred in the extension of this option which did remove some children from I.S. 61. Further, the extension of this option still left I.S. 61 with a serious overcrowding problem and in no way eliminated the need for action to relieve the overcrowding at I.S. 61.

Testimony in the record indicates that a desire not to aggravate the trend towards an increasing minority composition of I.S. 61 did play some part in the inability of the Zoning Committee and those involved in that Committee's efforts during this early period to formulate a rezoning plan for District 24. Mrs. Shore testified that the problem with step zoning to relieve the overcrowding at I.S. 61 was that the population in the southernmost portion of the I.S. 61 geographic zone, and thus the population that would have been removed from I.S. 61 under step zoning, was more predominantly white than the other parts of the I.S. 61 zone so that the removal of that population would have adversely affected the racial composition of I.S. 61. Continuing in this vein, Mrs. Shore testified that the areas of the P 143 and P 19 feeder schools supplied the most heavily minority concentration of students to I.S. 61, and that was why the options to students from those areas to attend J 73 and J 125 rather than I.S. 61 had been developed. The obvious question raised by this testimony is why no consideration was ever given by the Zoning Committee or the community's School Board itself to compulsory skip zoning[9] of students from either the P 143 or P 19 areas into other middle-level schools as a means of relieving some of the overcrowding at I.S. 61 while preserving racial integration. Such compulsory skip zoning had been effected, although on a very small scale, at the elementary school level prior to decen-

tralization by the Central Board of Education (Defendants' Exhibit 25).

Mrs. Shore's testimony that the reason for the inability to come up with a rezoning proposal in 1973 and 1974 was that the District as a whole did not have enough seats at the middle school level to deal with the problem is unconvincing since, as noted above, the documents themselves indicate that the middle-level schools in the southern half of the District were at the time perceived as having space available to absorb more students. *See, e. g.,* discussion of Doctor Berchuck's August 6, 1973, memorandum *supra.* Even if a rezoning plan would not have been the complete answer to I.S. 61's problem, the magnitude of the overcrowding problem at I.S. 61 suggests that even partial solutions would have been better than none and suggests further that some other factor or factors were at work in the failure of the Zoning Committee and Community School Board to adopt a rezoning plan. Plaintiffs produced several witnesses who testified that, based on their personal experience in trying to get some early relief for I.S. 61, the increasing minority composition of I.S. 61 was one, if not the primary, factor responsible for the inaction of school officials. Nothing in the testimony of defendants' witnesses nor in the record as a whole, including the persistent references to I.S. 227, as the ultimate solution to the problems of overcrowding, as discussed below, convincingly rebuts the inference which emerges from the record as a whole that the racial composition of the I.S. 61 student body and discrimination on the basis of race played a significant role in the failure of defendant school officials to take action to relieve the overcrowding at I.S. 61 between 1970 and June 1975.

(2) *Prior Actions of Defendant School Officials with Respect to I.S. 61's Feeder Schools Which May Have Had Some Effect on the Overcrowding at I.S. 61*

In 1967, prior to decentralization and in connection with the organization of a new

---

9. For an explanation of the concept of skip zoning and of the manner in which skip zoning

differs from step zoning, *see* footnote 8 *supra.*

facility, P 229, in District 24, students from the area of P 143 in the extreme northeastern corner of the District were skip zoned to P 229. The comments accompanying the report of this zoning change stated, *inter alia,* that "[a] degree of added integration is being achieved by the zoning of some pupils in the zone for P 143–Q." (Defendants' Exhibit 18.)

Also in 1967, an option was extended to all third-grade pupils in the area of P 19 to attend the new P 229. The report of that action estimated that a maximum of seventy third-grade students, all minority, might avail themselves of that option (Defendants' Exhibit 19).

Mr. Elias, present head of the Central Board's Office of Zoning and Integration, testified that when a student opts to attend an elementary school other than the elementary school to which the geographic area in which that student resides is zoned, the student typically follows the pattern of the majority of the children in the elementary school which he has opted to attend at the middle school level and attends the middle school which those children are zoned to attend rather than the middle school which children in his or her own geographic area are zoned to attend. Under that procedure, the exercise of an option by third graders in the P 19 area to attend P 229 would have the eventual result of removing some students from I.S. 61 because the students from the P 19 area would follow the majority of the P 229 students on to J 73 rather than go to I.S. 61.

It is not clear whether the skip zoning of children from the area of P 143 had the same eventual result of removing some students from I.S. 61. In the context of the discussion of a step-zoning plan, Mr. Elias testified in effect that, in contrast to the situation involving the exercise of an option, when the geographic area in which a student resides is simply shifted to a different elementary school, the assignment of that child to a middle-level school will still be effected on the basis of the geographic area in which the student resides. As this court understands Mr. Elias' testimony, that

means that, in the context of step-zoning plan as opposed to an optional assignment program, a change in the elementary school assignment of a student who would otherwise have attended an I.S. 61 feeder school would not necessarily mean that the student who still resides within the I.S. 61 geographic area would not attend I.S. 61 at the middle school level. If that principle is transferable from the step-zoning to the skip-zoning context, the skip zoning of students from P 143 to P 229, the majority of whose students go on to J 73, did not result in any corresponding reduction in the number of students attending I.S. 61.

(3) *Prior Actions of Defendant School Officials in Adjusting the Utilizations of Schools Other Than I.S. 61 and in Responding to the Needs of Schools in the Southern Half of the District*

In contrast to the failure of the District 24 Board during the period after the beginning of decentralization through June 1975 to initiate any action to relive the serious overcrowding at I.S. 61, that Board with the approval of Central Board officials did, during the same period, initiate a variety of measures to make rather fine-tuned changes in the utilization of other schools in the District, primarily in the southern half of the District and to respond to perceived needs of students residing in the southern half of the District.

Effective September 1972, a measure was instituted to relieve overutilization at J 119 in the southern half of the District through the reorganization of P 91, also in the southern half of the District, into an I.S./P school containing in one facility both a kindergarten through fifth-grade elementary organization and a grade six through eight I.S. organization. While I.S./P 91 thus relieved J 119 of some of its student population, it was not an annex to J 119 because the students attending the I.S. portion of the 91 facility were not drawn from the same geographic zone as the students attending J 119 and it is generally a requirement of an annex that it students be drawn from the same geographic zone as the main

facility. *See* discussion of annexes *infra.* Implementation of the I.S./P structure at P 91 was projected as reducing the utilization of J 119 from 122.5% to 114.4% and as increasing the utilization of P 91 from 87.4% to 107.8% (Defendants' Exhibit 23).

Also effective September 1972, as a means of relieving projected overutilization of J 125 in the northern half of the District, an option was granted to District 30 students zoned to J 125 to attend J 204 in District 30. It was projected that forty-five students, all minority, might avail themselves of this option. Apparently the reason it was projected that only minority students would avail themselves of this option was because J 204 is and was an overwhelmingly minority school. The projected impact of the extension of this option on the racial composition of the J 125 student body was an increase in the percentage of "others" (Defendants' Exhibit 24).

A third measure, effective September 1972, involved a step rezoning of six District 24 elementary schools "to relieve crowding and to more effectively use available space." The elementary schools involved, moving from the north to the south, were P 13, P 102, P 49, P 87, P 81, and P 68. The step rezoning involved the movement of very small numbers of students between the various schools—only fifty-three students altogether—and constitutes an example of very fine-tuned equalization of utilization levels among the various schools in the south. It is interesting to note that neither of the heavily minority I.S. 61 feeder schools, P 143 and P 19, was involved in this elementary school rezoning, nor was the I.S. 61 feeder school of P 14 involved in this rezoning measure (Defendants' Exhibit 25).

Effective September 1974, a measure was implemented to relieve overcrowding at P 81 in the southern half of the District by rezoning twenty-six pupils to P 71 and fifteen students to P 88, both of the receiving schools also being in the southern half of the District. As the comments accompanying the report of this action themselves indicate, the effect of this measure on con-ditions at P 81 was "miniscule statistically." However, the comments did state that the "[r]elief provided is meaningful at a practical level." (Defendant's Exhibit 27.)

Also effective September 1974, thirteen students from P 87 in the southern half of the District were reassigned to P 128 also in the southern half of the District "for the purpose of eliminating a hazardous crossing." Without in any way minimizing the importance of school officials making these kinds of adjustments, this court simply notes that evidence of this kind of keen concern for the well being of the students is rather lacking in the school officials' contemporaneous response—or, more appropriately, lack of response—to the situation faced by the increasingly minority students at the severely overcrowded I.S. 61 (Defendants' Exhibit 28). A third measure effective September 1974 was designed to alleviate overcrowding in J 93 in the southern half of the District by rezoning students residing in the P 68 area to attend J 119 or I.S./P 91 also in the southern half of the District. The projected effect was to reduce the utilization of I.S./P 93 from 124.0% to 112.2%; to reduce the utilization of I.S./P 91 from 117.0% to 104.8%; and to increase the utilization of J 119 from 95.0% to 101.0% (Defendants' Exhibit 29).

A fourth measure, effective September 1974, rezoned thirteen pupils from I.S./P 91 to P 113, both schools in the southern half of the District, "for the purpose of better utilization in both schools." This measure involved only the elementary part of I.S./P 91 and was projected as reducing that schools' utilization from 106.0% to 103.9% while increasing the utilization of P 113 from 83.0% to 86.0% (Defendants' Exhibit 30).

(4) *I.S. 227—Developments Prior to Decision to Institute District 25 Annexes to I.S. 61*

At some point in the later part of the 1960's, discussions began over the selection of a site for a new middle-level school to be located somewhere in either the north-northeastern part of District 24 or the

southeastern part of what is now District 30. The new school, designated as I.S. 227, was intended to relieve overcrowding in both Districts. The early documents reflect concern with serious overcrowding at I.S. 145 in what is now District 30 and concern as well for overcrowding at P 89 in District 24. Soon, as the serious overcrowding problem at I.S. 61 came to the fore and steadily worsened, I.S. 227 came to be viewed as an avenue of relief for the overcrowding at I.S. 61 as well.

The present site of I.S. 227 located in the southeastern corner of District 30 was authorized by the Central Board in November 1970. Thereafter, the Central Board went through its normal bidding procedure pursuant to which it entered into multiple contracts for various aspects of the work which had to be performed. Actual construction on I.S. 227 did not begin until sometime in 1974 after the site had been cleared.

From the beginning, the Central Board of Education indicated that it wanted I.S. 227 to open as an integrated facility. In fact, it appears that early on one potential site for the proposed new school was withdrawn by local school officials [10] because of the perceived difficulty of opening a facility at the location as an integrated school. Defendants have maintained and for purposes of this opinion I accept it as a fact that in the late 1960's it would have been possible to have opened I.S. 227 on its present site as a neighborhood school, zoning in children from the surrounding area, and at the same time to have had a fair degree of integration at that school. The situation, however, no longer held true by the time of a meeting between District 30 and District 24 officials in November 1973 regarding the tenanting of I.S. 227 which took place even before actual construction of the school had begun and at which District 30 officials are reported as stating that if I.S. 227 were zoned on a neighborhood school basis one would "end up with a black-Hispanic school." (Plaintiffs' Exhibit 97r.) Thus,

even before actual construction on the school began, it was apparent that I.S. 227 could not open both as a strictly neighborhood school and as an integrated facility.

Because I.S. 227 was physically located in District 30, but was intended to address the needs of students in both Districts 30 and 24, the two districts were required pursuant to the provisions of Special Circular 108 (Plaintiffs' Exhibit 14) to engage in interdistrict consultations with respect to the zoning of the new school. Ultimate responsibility for initiating and coordinating those consultations under the terms of the circular rested with District 30 as the district in which I.S. 227 was physically located. Special Circular 108 also provides that if two districts cannot agree on interdistrict zoning plans, the Chancellor should step in and resolve the differences between the districts.

From the beginning, the interdistrict consultations between District 30 and District 24 were marked by disagreement. The districts were able to agree in general terms that approximately 600 of the 1,800 seats in I.S. 227 should be reserved for students from District 24 with 200 seats being reserved for handicapped children and 1,000 seats for students from District 30. However, there was sharp disagreement as to the specifics of the tenanting of the new school.

It was the position of District 30, reiterated repeatedly, that under the policies of both the State Regents and the City Central Board of Education, I.S. 227, as a new school, would have to open as an integrated facility reflecting the racial composition of the two districts as a whole. For that reason, District 30 maintained that it would not be possible simply to open I.S. 227 as a neighborhood school. Rather, District 30 maintained, if I.S. 227 were to open as a zoned facility—i. e., a facility to which students were compulsorily assigned according to geographic zones rather than as a facility

---

**10.** The action referred to occurred prior to decentralization. Thus, the local school officials referred to are not members of Community School Board 24 as that body has been set up

under decentralization, but of the local District 24 School Board as that body (with far lesser powers than the present Community School Board) existed prior to decentralization.

to which students voluntarily chose to go because of a special program such as, for example, a magnet school, it would be necessary for District 24 to engage in internal intra-district rezoning so that District 24 could send a group of students reflective of the racial composition of District 24 as a whole to I.S. 227. For its own part, the documentary evidence accumulated largely in Exhibit 97 indicates that District 30 did, throughout the period of the mid-1970's, explore various ways of zoning students from District 30 to I.S. 227 which would provide racially mixed groups of students from District 30 to that school and involving rezoning of District 30 itself. District 30 also advanced a proposal to open I.S. 227 as a magnet school offering special programs to gifted and talented students and a special career education program to which students would voluntarily choose to go.

From the time of the first interdistrict consultations with District 30, District 24 resisted the notion of any internal rezoning of its own District so that it might send a group of students from District 24 to I.S. 227 representative of the racial composition of District 24 as a whole. By November 1975, District 24 had drawn up three possible plans for the zoning of students from District 24 to I.S. 227, designated Plans "A," "B," and "C." Plans "A" and "B" would have sent varying numbers of students from the areas of P 19 and P 143 to I.S. 227. Thus, the students sent to I.S. 227 under either of those plans would have been heavily minority. Plan "C" would have sent students to I.S. 227 from four schools in the northern section of District 24—P 143, P 19, P 89, and P 12. In the minutes of what appears to have been a District 30 Zoning Committee meeting at which representatives of District 24 were in attendance and held on November 20, 1975 (Plaintiffs' Exhibit 97aa), Plan "C" is described as also providing for an ethnically segregated school, although the statement of the plan as drawn up by District 24 itself indicates that the group of students provided by District 24 to I.S. 227 under Plan "C" might have included 30% "other."

Initially, in November 1975, it was Plan "C" which District 24 advanced in the interdistrict consultations as the plan according to which it wanted to zone students from its District to I.S. 227. At the November 20, 1975, meeting referred to above, District 30 indicated that it had problems with Plan "C" because that plan would impose a great burden on District 30 to single-handedly provide the integration factor for I.S. 227 by radically rezoning its own district and reaching far within District 30 for non-minority students to assign to District 30. District 30 also again raised the possibility of creating a magnet school at I.S. 227. District 24, however, adhered to its proposed Plan "C." Mr. Stewart, a member of the District 30 Community School Board, is reported in the minutes of the November 20, 1975, meeting as having stated that "there is a suspicion of many of the committee that District # 24 is trying to dump their minority children." According to the minutes, "[t]his was discounted by District # 24."

In January 1976, District 24 changed its position and instead of Plan "C," advanced Plan "B" as the plan according to which it wished to zone District 24 students to I.S. 227. The reason apparently given by District 24 for the change was that the areas of P 19 and P 143 were close to I.S. 227 and that the community near the I.S. 227 facility wanted to send their children to that school. The minutes of the District 30 Zoning Committee meeting held on January 20, 1976 (Plaintiffs' Exhibit 97jj), at which District 24's shift to Plan "B" was first reported, state that

"District 24 passed Plan B because it is close to 227 and said that it [sic] District 30's responsibility to balance the school. District 24 is not interested in racial balance. District 24 is sending us 600 children period. They are passing the responsibility to the Central Board for any changes in zoning. There is no need for further meetings because of District 24's attitude."

District 30 again brought up the possibility of a magnet school, but that idea was rejected by District 24.

Thus, an impasse was reached between District 30 and District 24 over the tenanting of I.S. 227. The Central Board's role up to this point in offering concrete suggestions and assistance with respect to I.S. 227 appears to have been negligible.

What prevented the impasse between District 30 and District 24 from having any obvious impact at the time was that I.S. 227 was not yet physically ready to open. In fact, because of the City's fiscal crisis, construction on I.S. 227 had been stopped in November 1975. District 24 officials, along with others, did exert considerable pressure on responsible officials to have construction on I.S. 227 resumed. An allocation for the continued construction of I.S. 227 was contained in the July 1, 1976, capital budget, but because of problems with the contractors, the actual construction of I.S. 227 did not resume until May 1977.

What is most striking about the impasse between District 24 and District 30 and about the course of the interdistrict consultations leading up to that impasse is the unyielding nature of District 24's position: its continued insistence that it wanted I.S. 227 to be a zoned school and that it would only send children from the northern and generally northeastern part of the District to I.S. 227. In the face of repeated warnings from District 30 that the Central Board would not accept I.S. 227 as a minority segregated school, District 24 steadfastly resisted any notion of internal rezoning of the District so that it might send a racially mixed group of students from District 24 to I.S. 227 taking the position that the racial balance of the new school, if there was to be such a balance, was the problem of either District 30 or the Central Board. Further, District 24 showed no signs of real interest in even exploring District 30's suggestion of a magnet school which District 30 felt might enable I.S. 227 to open as an integrated school without compulsory bussing of students.

This court finds that the position adopted by District 24 officials in the interdistrict consultations with District 30 with regard to the tenanting of I.S. 227, as detailed above, was influenced by the heavily minority composition of the student body in the north-northeastern part of District 24 and was, to a substantial degree, motivated by a desire to keep that heavily minority student body separate from the predominantly white student body in other parts of District 24. This court recognizes that there may be legitimate, racially neutral reasons why school officials and parents may embrace the concept of the neighborhood school. Some of those reasons, such as a preference for children walking rather than taking transportation to school, may also have been factors in District 24's position. However, the single-minded tenacity with which District 24 officials insisted that they would zone students to I.S. 227 only from the immediately surrounding and heavily minority area, even in the fact of repeated and reasonable assertions from District 30 officials that such a zoning plan would not be acceptable to the Central Board of Education, indicates to this court, together with the other evidence discussed in this opinion, that District 24's espousal of a neighborhood school zone in the context of the discussions concerning I.S. 227 was not a dispassionate position resulting solely from an evenhanded concern that all students should attend schools close to their home, but rather was to a substantial degree the expression of racial prejudice and of a desire to maintain the racial segregation which had been established in the schools of District 24 as the result of demographic patterns.

The difficult course of the negotiations between District 24 and District 30 with regard to I.S. 227 also places in a different perspective the persistent refrain of District 24 Board members between 1973 and 1975, already referred to, that the answer to the overcrowding problem at I.S. 61 was the still-to-be-completed I.S. 227. At the time the District 24 Board members were sidetracking other proposed solutions to the school's overcrowding, they knew that there was serious opposition from District 30 to their plan for tenanting I.S. 277, and they also knew that the concurrence of District 30 in District 24's tenanting plans was necessary unless both districts were to be su-

perseded by the Central Board of Education. Thus, in the 1973–1975 period, District 24 had no assurance that it would be able to send large numbers of minority children from the I.S. 61 area to I.S. 227. Nevertheless, in their response to the problem of overcrowding at I.S. 61, the majority of District 24 Board members acted as though they had absolute assurance of being able to zone students to I.S. 227 in that fashion and never seriously considered any alternative avenues of providing relief for even some portion of I.S. 61's overcrowding problem within District 24 itself.[11] This attitude by defendant local School Board officials again suggests not a dispassionate, evenhanded attempt to deal with a serious problem affecting the quality of the education of all children residing within the District, but a less rational response to overcrowding among the heavily minority students residing in the north-northeastern part of District 24 based on a desire to maintain the segregation of those students which residential patterns had produced.

### F. The Sequence of Events Leading up to the Decision to Institute the Two District 25 Annexes

#### (1) The role of J 77

J 77 is situated in the extreme southeastern portion of District 24 near its border with the Bushwick area of Brooklyn. Since September 1976, the J 77 facility had been used as an annex to nearby J 93, also situated in the southern part of District 24. It was also in September 1976 that the two District 25 annexes to I.S. 61 were instituted in order to terminate the end-to-end sessions at I.S. 61.

The two decisions—to use J 77 as an annex to J 93 and to institute annexes to I.S. 61 in District 25—were directly related. Prior to the opening of the J 77 facility as an annex to J 93 in the late spring and early summer of 1976, the District 24 Community School Board with the encouragement of Central Board officials advanced proposals to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61 by sending children from I.S. 61 to that facility for a one-year period beginning in September 1976. Those proposals were ultimately rejected by the District 24 Board, leaving the two District 25 annexes as the only other immediately available alternative for eliminating the end-to-end sessions at I.S. 61 and leaving the J 77 facility free to be opened as an annex to J 93. Thus, the reasons why defendant school officials rejected the proposals to send I.S. 61 students to J 77 are to a large degree the same reasons on the basis of which defendant school officials decided to adopt the two District 25 annexes as the means of eliminating the end-to-end sessions at I.S. 61 and are highly significant in determining the intent with which defendant school officials acted in establishing the District 25 annexes.

#### (2) Availability of the J 77 Facility and Initial Proposals for Its Use

Up until June 1975, the J 77 facility was used by District 32 in Brooklyn as a seventh-grade annex to one of its older schools pending the completion of a new facility to house all of the affected children in schools within District 32. Sometime in the spring of 1975, the District 24 Community School Board learned that the new facility in District 32 would be ready for use that coming fall and that District 32 would therefore be surrendering J 77 to the Central Board of Education. Thereupon, District 24 officials asked the Central Board to return the J 77 facility to their jurisdiction for use by their District. In initially requesting use of the J 77 facility, District 24 officials cited overcrowding in the southern part of the District. Interestingly, in at least one memorandum dated July 18, 1975, from District 24's Superintendent to a Central Board offi-

---

11. For example, rather than insist that I.S. 227 was the complete answer to I.S. 61's overcrowding problem, District 24 might have considered sending some students from the I.S. 61 area to I.S. 227 and others to other middle-level schools within District 24 itself with whatever further intra-district rezoning might then be required to equalize utilization of District 24's middle-level schools.

cial regarding District 24's desire to acquire the J 77 facility (Plaintiffs' Exhibit 13e), the only southern-area overcrowding cited was not at the middle school, but at the elementary school level.

At some point during the summer of 1975, Central Board officials approved the use of the J 77 facility by District 24. The Central Board also informed the District 24 Board, however, that District 24 would have to come up with a formal plan for use of the J 77 facility by October 15, 1975, or else pass a community school board resolution surrendering that facility. The October 15, 1975, deadline was subsequently extended to December 1, 1975. Still, District 24 was unable to come up with a plan for use of the J 77 facility by the deadline, and as a result, Central Board officials indicated that they might require District 24 to surrender jurisdiction of the J 77 facility to the City of New York.

The reason for the inability of District 24 officials to come up with a plan for the use of the J 77 facility by the initial deadlines is not explicitly established by the record. It appears that there was some concern as to the poor physical condition of the school and the consequent need for repairs. There was also testimony by Mrs. Darby suggesting that there may have been the beginnings of the factionalism which was to emerge more prominently later on in which Board members from the southern end of the District wanted J 77 to be used for the children residing in that part of the District while Board members from the Corona and Elmhurst areas wanted J 77 to be used to relieve the overcrowded conditions in those areas. But the primary conclusion which this court draws from the evidence regarding the failure of District 24 to come up with a plan for the use of the J 77 facility by the initial deadlines was that that failure was due not so much to any factionalism on the Board, as to a simple lack of any concrete ideas as to how to use the J 77 facility. That conclusion in turn suggests that, whatever overcrowding problems there may have been in the southern portion of District 24 where the J 77 facility was situated at the time of the initial discussions about

the use of the J 77 facility in the second half of 1975, those problems were not so acute that the J 77 facility was immediately thought of as providing a needed avenue of relief. Indeed, even later in a letter dated February 19, 1976, from the Chairman of the District 24 School Board to the Deputy Chancellor of the Board of Education (Plaintiffs' Exhibit 16y), the Chairman indicated that District 24 was considering using the J 77 facility "for special education or other programs which we shall determine" and said nothing about a need to use the J 77 facility to provide relief for any overcrowding in the southern part of the District.

It does appear, as defendants assert, that, notwithstanding the feelings of some individual Board members who believed the J 77 facility should somehow be used to relieve the situation at I.S. 61, in the early discussions at the local Board level the J 77 facility was viewed primarily in terms of use by the children in the surrounding area —i. e., the southern part of the District. That was true despite the fact that I.S. 61 was scheduled to go on end-to-end sessions in September 1975 and remained true even after construction on I.S. 227, the facility to which District 24 officials always referred as the solution to the I.S. 61 overcrowding problem, stopped in November 1975. With regard to I.S. 61, the majority of District 24's Board apparently took the position that I.S. 227 continued to represent the answer to I.S. 61's overcrowding problem.

By the late spring of 1976, District 24 officials had formulated a proposal to use J 77 as an annex to J 93. District 24 officials explained that such a use of the J 77 facility would "alleviate the significant overutilization in J–73, J–93 and J–119." (Plaintiffs' Exhibit 16kk.)

The evidence indicates that as of the beginning of the 1975–1976 school year, J 73 was utilized at 121% of capacity, J 93 was utilized at 123% of its capacity, and J 119 with its "annex" at I.S./P 91 was utilized at 98% of its capacity. None of these figures reflect an overcrowding problem anywhere

near the severity of the overcrowding problem indicated by the 150% utilization figure reported for I.S. 61 at this same period of time. Moreover, the reported utilization of J 119 with its "annex" was well below the 120% utilization at which Doctor Berchuck testified a middle-level school could operate effectively, and the reported utilizations of J 73 and J 93 were not very much above that figure.

The record does indicate that there were projections in the spring of 1976 that the utilizations of the three middle-level schools, J 73,[12] J 93, and J 119 in the southern half of the District, would increase in the coming years. Those projections were cited by District 24 officials in support of their plan to use J 77 as an annex to J 93. Some of the projected increase in utilization, however, was due to the proposed elimination, effective September 1976, of the I.S./P complex at I.S./P 91, the I.S. portion of which had originally been conceived as a means of relieving overutilization at J 119. Since at least February 1974, the Central Board had indicated to District 24 officials that it disapproved the operation of I.S./P 91 on a K–8 organizational basis, but that, if overutilization in the middle-level schools made it appropriate, a portion of the P 91 facility could be operated as a true annex to J 119 to which students would be assigned from the same geographic zone as J 119 and from which eighth graders would return to the main building to graduate with the rest of the J 119 ninth graders. In May 1975, Community School Board 24 indicated its intention to comply with the Chancellor's directive to terminate the K–8 organizational structure at I.S./P 91. That structure apparently continued unchanged, however, during the September 1975–June 1976 school year, but at some point was definitely slated to be terminated effective September 1976.

For a reason never explained by the defendants at trial, District 24 officials decided not to avail themselves of the alternative left open to them by the Central Board of using part of the P 91 facility as a true annex to J 119. Instead, those officials decided to use the available space in P 91 to house kindergarten children from P 89 in the extreme northern part of District 24 and bussed a considerable distance to attend the P 91 facility. As of 1976, the racial composition of the P 89 student body was reported at 23% "other."

It strikes this court as a rather peculiar departure from the District 24 Community School Board's general advocacy of a neighborhood school policy with its special emphasis on the virtues of having children walk to school that the Board chose to fill the available space at P 91 by taking predominantly minority children of the very young kindergarten age and bussing them from one end of the District to the other to attend school. The departure is particularly striking because the underlying decision was made just prior to District 24's rejection of similar proposals for the cross-district bussing to the J 77 facility of the also predominantly minority, but older I.S. 61 sixth graders, for whom the rigors and inconvenience of long-distance bussing ostensibly should have been easier to bear, on grounds which defendants assert included the difficulty and length of time involved in the cross-district transportation of students. It may be that the District 24 Community School Board devised its plan for using the space which would become available in P 91 upon the elimination of that school's K–8 structure with one eye upon the burgeoning controversy over the use of the J 77 facility. The plan, by not addressing what defendants assert was a looming problem of overcrowding at the southern area middle-level

12. In some of the testimony and documents, J 73 appears to be referred to as being in the southern half of District 24, whereas this court has presented J 73 as being in the northern half of the District. In fact, examination of the map of the Queens school districts (Plaintiffs' Exhibit 82) indicates that J 73 is located very close to the middle of the District, but more nearly in the northern than in the southern part. In any event, in terms of the decision which this court reaches in this opinion in which the status and conditions of J 73 do not figure very significantly, it appears largely irrelevant whether J 73 is referred to as being in the northern or the southern part of District 24.

schools, left those Board members who did not want the J 77 facility to be used for the predominantly minority children from the Elmhurst-Corona area with the argument that the J 77 facility was needed to relieve the prospective overcrowding at the southern area middle-level schools. The eventual use of the available space in P 91 further suggests that, given serious overcrowding problems at all levels in the schools in the predominantly minority northern half of the District, it was easier for the community in the southern half of the District to accept the presence in their area's schools of minority children from the northern half of the District when those minority children were of the very young kindergarten age rather than of the more advanced age of sixth graders and when those children would constitute only a very small segment of a larger facility.

In any event, as a result of the decision not to use any part of the P 91 facility as an annex to J 119, projected utilization figures compiled in the spring and summer of 1976 after the decisions with respect to I.S./P 91 had been made, but before the J 77 facility had been designated as an annex to J 93 would have recorded the middle school children in the southern part of District 24 who would formerly have been assigned to the I.S./P 91 school complex as assigned to one of the other junior high schools in the southern end of the District and would have reflected corresponding increases in the projected utilization of those middle-level schools.[13]

Thus, I find that in the spring of 1976 the middle-level schools in the southern half of District 24 were well utilized, but there was no significant overcrowding problem in those schools. I find further that there were projections in the spring of 1976 for further increases in the utilization of the southern area middle-level schools suggesting the beginnings of an overcrowding problem in those schools, but that because of available facilities, specifically the availability of part of P 91 for use to house middle-school level children, the dimensions of the anticipated overcrowding at the middle schools in the southern half of the District were not as great as examination of the figures, both prepared at the time and in connection with this litigation alone, might suggest.

(3) *Suggestions that the J 77 Facility be Used to Relieve the Overcrowding at I.S. 61 and the June 3, 1976, Meeting at the Central Board of Education*

In the spring of 1976, I.S. 61 was nearing the completion of its first, and what all those involved understood was to be its last, year on end-to-end sessions. However, the District 24 Community School Board had yet to come up with a plan for eliminating the end-to-end sessions at I.S. 61. It was in this context that suggestions to use the J 77 facility to relieve the overcrowding at I.S. 61 came to the fore.

Mrs. Darby, in particular, testified that she made known to other Board members her view that the J 77 facility should be used to alleviate the overcrowding problem at I.S. 61. There had already been discussions with District 25 about the use of facilities in that district as annexes to I.S. 61 to house I.S. 61's sixth graders, but those discussions had not yet resulted in any definite plan or even in a formal proposal. Mrs. Darby testified that it was her view, expressed to other Board members, that District 24 should first seek a solution to I.S. 61's overcrowding problem within the District rather than looking to solutions outside the District and that the J 77 facility represented a viable intra-district solution to the I.S. 61 problem. Mrs. Darby testified to the view which she expressed to other

---

13. The effect of the elimination of the K–8 structure at the P 91 facility and of the Community School Board's decision not to continue using that facility to house middle school level children is also reflected in the graph of the utilization of District 24 middle schools between 1975 and 1977 submitted by defendants as an exhibit at the trial, at least insofar as the graph shows that the utilization of J 93 in the school years beginning September 1976 and September 1977 had there not been an annex at J 77, would have been 153% and 166% respectively; and that must be and has been taken into account in evaluating the significance of those figures.

Board members regarding the use of the J 77 facility to relieve I.S. 61 in the following terms:

"[E]ach district, the way decentralization's set up, each district has its own integrity. It should take care of its own children, and it is responsible for those. We shouldn't be looking all over the map. They have their problems in other districts, and we have ours, and, if we have a solution, let's go for it."

Tr. 284–85. The view that I.S. 61's problem could and should be resolved within District 24 itself was also held by the I.S. 61 Parents Association.

On June 3, 1976, there was a meeting at the Central Board of Education attended by officials from the Central Board, some members of the District 24 Community School Board, the District 24 Superintendent and his assistants, and parent representatives from I.S. 61 and from some of the I.S. 61 feeder schools. The record does not clearly indicate the exact purpose for which the meeting was called—whether it was to discuss the use of the J 77 facility or plans for the elimination of the end-to-end sessions at I.S. 61, or both—but it is clear that in the course of the June 3 meeting the possibility of using the J 77 facility to house some students from I.S. 61 was raised.

The witnesses at trial testified to varying versions of the June 3 meeting and its outcome. The documentary evidence also presents a somewhat confused picture on that score. After considering all the testimonial and documentary evidence, assessing the credibility of the witnesses and considering also the subsequent course of events, this court makes the following findings with respect to the substance and outcome of the June 3 meeting:

At the June 3 meeting two alternatives were discussed for the relief of I.S. 61: (1) the acceptance of District 25's offer of space in two junior high school facilities in that district—J 168 and J 218—and (2) the use of J 77 in District 24 itself. District 24 officials indicated that they were inclined to reject District 25's offer of space because District 24 wanted any annex in District 25 to be housed in one facility rather than in two facilities, as District 25 had proposed, being of the view at that time that two separate annexes were unworkable and educationally inferior to one annex. Some of those present at the meeting both from the ranks of the Community School Board members and the parent representatives spoke favorably of the idea of using J 77 to provide relief for I.S. 61, but there were also statements made suggesting that such a use of the J 77 facility, even on a temporary basis, might meet with considerable resistance from the community in the area in which the facility was located.

As testified to by Mr. Gertzulin, Central Board officials stated that they could see that District 24 was hesitant to use J 77 for the relief of I.S. 61 and that they would not force District 24 to rezone its schools. Accordingly, Central Board officials indicated that they would recommend to the Chancellor that he direct that the end-to-end sessions at I.S. 61 be eliminated by the acceptance of District 25's offer of space in J 168 and J 218. At the same time, however, Central Board officials indicated that use of the J 77 facility was an acceptable alternative to the District 25 annexes and sought to encourage District 24 officials on their own to decide to adopt that alternative by indicating that if District 24 decided to use the J 77 facility to relieve the overcrowding at I.S. 61 a priority would be granted which, notwithstanding the strict monetary constraints imposed by the City's fiscal crisis, would make possible early basic repairs to the J 77 facility which would insure that the facility would be ready to house students beginning in September 1976.

On this last point especially, concerning the manner and terms in which Central Board officials indicated that the fate of the J 77 facility might be related to a decision to use that facility for the relief of I.S. 61, the record contains apparently conflicting evidence which the court has had to reconcile. In particular, two letters written in June 1976 by the same author, Alfredo Mathew, Jr., Executive Director of the Central Board of Education, appear at first glance to be somewhat contradictory. In a letter dated June 4, 1976, the day after the June 3 meeting at the Central Board, and

signed by Mr. Mathew, in his capacity as Chairman of the Building Review Committee, to the Chairman of the District 24 Community School Board and the District 24 Superintendent, Mr. Mathew states that "in light of the overutilization of your middle schools," District 24 may use the J 77 facility during the 1976–1977 school year but that "[w]e must remind you that no repairs other than those absolutely requested for health and safety will be made to the building." (Plaintiffs' Exhibit 16mm.) No mention is made in this letter about the specific overcrowding at I.S. 61 or about using the J 77 facility to relieve I.S. 61, an omission which defendants cited at the trial as indicating that Central Board officials had not set up any relationship between the making of basic repairs to the J 77 facility and the use of that facility to relieve I.S. 61. In a subsequent letter dated June 23, 1976, the day after the chaotic public meeting in District 24 on a resolution to use J 77 for one year to relieve the situation at I.S. 61, discussed below, addressed to District 24's Superintendent and with copies to District 24 Board members, among others, Mr. Mathew states:

"It has come to my attention that there is some discussion about using J. 77 for some purpose other than providing relief for I.S. 61 in September, 1976.

"*Granting J. 77 the priority that would make early basic repairs possible is predicated on the assumption that the school will be used to end the double sessions at I.S. 61.* If this is not the case, then J. 77 will have to await the designation of a new priority before even these minimal repairs can be made."

(Plaintiffs' Exhibit 16tt [emphasis added].) Plaintiffs at the trial cited this second letter as indicating that Central Board officials made the use of the J 77 facility to relieve I.S. 61 a condition precedent to the making of basic repairs to the J 77 facility necessary to permit its use by District 24 students in September 1976.

This court's findings as to the substance of the June 3 meeting resolve this apparent inconsistency in the evidence by determining that Central Board officials held out the promise of a grant of a priority for early basic repairs to the J 77 facility as an incentive to District 24 officials to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61 without going so far as to say that use of the J 77 facility to relieve I.S. 61 was made an absolute condition to the making of repairs on that building in time to render it habitable for the beginning of the September 1976 school year. It does not appear that Central Board officials indicated that under no circumstances would a priority for early basic repairs be given if the J 77 facility was not used for I.S. 61, but simply that Central Board officials gave an assurance of such a priority should District 24 decide to use the J 77 facility for I.S. 61, leaving it open to question whether in view of the serious fiscal crisis then faced by the City District 24 could similarly get a priority for early basic repairs such as would enable the J 77 facility to be used by the District in September 1976 if District 24 decided to use the facility in some other manner. The June 4 letter is reconcilable with this version of the facts if one views the letter's failure to refer to any use of the J 77 facility to relieve I.S. 61, or specifically to mention I.S. 61's overcrowding problem as a reflection simply of the writer's feeling that such references were unnecessary in light of the positions which had been expressed at the previous day's meeting which must still have been fresh in the minds of the addressees who had been in attendance at that meeting.

Because of further questions raised by the record, this court notes that it does not find that at the June 3 meeting Central Board officials suggested that District 24 might not get use of the J 77 facility at all if District 24 officials decided not to use that facility to eliminate the end-to-end sessions at I.S. 61. I assume for purposes of this opinion that District 24 would eventually have gotten use of the J 77 facility in any event. Rather, what was put in question at the June 3 meeting was whether District 24 would get a priority for early basic repairs to the J 77 facility, an important matter in light of the City's fiscal crisis, so that the District could use that facility as early as September 1976, or whether District 24 would have to wait until a later time before

basic repairs could be made and the facility used by District 24 students.

The significance of the Central Board's offer at the June 3 meeting with regard to the J 77 facility and its use to relieve I.S. 61 was that it represented an assurance to District 24 that it would, in fact, have extra seats within the District in which to place students as early as September 1976—an assurance which Central Board officials were only willing to give if District 24 decided to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61. If District 24 decided not to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61, the position taken by Central Board officials at the June 3 meeting suggested that in light of the City's existing financial crisis and in view of the poor and, indeed, hazardous physical condition of the J 77 facility at that time, local school officials would have had to consider the real possibility that early basic repairs would not be made to the J 77 facility and that that facility with its extra intra-district seating capacity would not be available for use by any District 24 students in September 1976.

Assuming, as defendants asserted throughout the trial, that the District 24 Community School Board was concerned primarily with maximizing the number of seats available for District 24 students and considering that the J 77 facility represented the elusive commodity of additional seating capacity within the District, one would have expected that the Central Board's offer would thus have been a significant inducement to action by the District 24 Board and would have figured prominently in subsequent deliberations at the Community School Board level about alternative courses of action to eliminate the end-to-end sessions at I.S. 61. Indeed, the record suggests that upon leaving and immediately after the June 3 meeting at the Central Board, the feeling among the District 24 Board members who had been in attendance and the impression of Mr. Mathew of the Central Board was that a majority vote of the District 24 Community School Board could be summoned in favor of a resolution to use J 77 to eliminate the end-to-end sessions at I.S. 61. Shortly thereafter, however, the evidence indicates the significance of the Central Board's guarantee and the initial hopes for a majority vote at the Community School Board level in favor of using J 77 to eliminate the end-to-end sessions at I.S. 61 were effectively submerged in a flood of community opposition to the prospect of a substantial group of minority children coming into the southern end of the District. Eventually, the District 24 Community School Board gave in to this community opposition.

(4) *Formal Resolutions Proposed to Use the J 77 Facility to Eliminate the End-To-End Sessions at I.S. 61—the Public Meetings of June 22 and June 28, 1976*

On the evening of June 22, 1976, a public meeting of the District 24 Community School Board was held at which the following resolution numbered 44 ("Resolution 44") was presented for consideration: [14]

"RESOLVED, that this school board accept J 77 Q. located at 976 Seneca Avenue, Ridgewood, for the purpose of eliminating end-to-end sessions at I.S. 61 Q. by September 1976, and be it further

"RESOLVED, that if for any compelling reason J 77 Q. is not ready for fall occupancy, this school board accepts space in J.H.S. 218 and J.H.S. 168, Community School District 25 for the same purpose as specified above.

"Explanation:

"This resolution is based upon the solution proposed by the Central Board of Education to temporarily relieve the overcrowded conditions at I.S. 61 Q. The Central Board's proposal is limited to the school year 1976/77 only.

"This school board acknowledges with appreciation the cooperation of members of our contiguous school board 25."

(Plaintiffs' Exhibit 13aa.)

As the explanation of the resolution itself indicates, Resolution 44 was the outgrowth

---

14. In order for a resolution to be formally accepted, it had to be passed by a majority vote of the Community School Board at a public meeting.

of the June 3 meeting with officials from the Central Board of Education. Further, approximately ten days prior to the public meeting the Chancellor had communicated with District 24 officials that he definitely did not want the end-to-end sessions at I.S. 61 to continue in the coming school year beginning September 1976. However, the June 22 public meeting, rather than representing the successful culmination of the proposal to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61, instead marked, as stated by Mrs. Darby in her testimony, the point at which "the whole thing fell apart."

Before proceeding to a consideration of the June 22 meeting, it is worthy of note that the terms and organization of Resolution 44 suggest that as of this point in late June 1976 a majority of the members of the District 24 Board perceived use of the J 77 facility as preferable to the use of the two District 25 annexes as the means of eliminating the end-to-end sessions at I.S. 61.[15] Only if "for any compelling reason" the J 77 facility was not ready for fall occupancy did Resolution 44 contemplate acceptance of the offer of space in two facilities in District 25.

Several witnesses testified to what happened at the June 22 public meeting. The meeting was held at P 143 in the Corona community, and situated in the extreme northeast corner of District 24. It was a very hot night. Residents of the Ridgewood-Glendale area at the opposite end of the District appeared in large numbers to attend the meeting and constituted the largest group of people in attendance at the meeting. The large number of people from the Ridgewood-Glendale area did not traditionally attend public meetings of the Community School Board. The meeting was packed with people standing in the aisles. As described by Mrs. Darby, the people "were just waiting, tearing at the leash, waiting to speak. . . . They were there to protest the fact that I.S. 61 children were going to 77." (Tr. 310.)

The meeting proceeded under chaotic conditions. People in the audience yelled out their respective views which for the most part broke down along residential community lines. The view from the audience which received the loudest and most raucous exposition was against sending children from I.S. 61 to J 77.

At some point during the meeting the minutes (Plaintiffs' Exhibit 103) reflect that certain School Board members read letters never identified during the trial to the assembled crowd. In one of the letters read the Chancellor appears to have advised the District 24 School Board that he did not want the end-to-end sessions at I.S. 61 to continue in the September 1976 school year. The minutes also reflect that there were formal speakers in favor and against Resolution 44. The speakers who indicated opposition to Resolution 44 were identified with the Ridgewood-Glendale area of the District. The speeches did not, however, establish any kind of dialogue between those of differing viewpoints on Resolution 44 or between the speakers and the School Board. Speakers simply stated their position in whatever terms and manner they chose, and the audience responded with loud boos and hisses to those speakers with whose viewpoint that particular segment of the audience disagreed.[16]

---

**15.** The testimony at trial indicated that in general, in order for a resolution to be placed on the agenda of a District 24 Community School Board public meeting, it had to receive a majority vote of the Board members at a prior executive board meeting.

**16.** Some of the testimony at trial alternated between describing the District 24 Community School Board meetings during the relevant periods of time in general terms and rendering accounts of particular Community School Board meetings such as that of June 22, 1976. Thus, the fact of the audience responding to speakers with whom it disagreed with loud boos and hisses appears to have been a general practice and to have occurred at many of the Community School Board meetings at which ways to alleviate the overcrowding situation at I.S. 61, the fate of the J 77 facility, and ways of dealing with utilization problems in District 24 was a whole were discussed. This court has

The meeting grew so raucous and the conditions so chaotic that the District 24 Board members called what was supposed to be a five-minute caucus to discuss what to do. That scheduled five-minute caucus was extended considerably in time, and Board members were beseiged by individuals seeking to get across their strong opposition to the use of the J 77 facility to eliminate the end-to-end sessions at I.S. 61.

Generally, those who spoke in favor of Resolution 44 stressed the severe overcrowding at I.S. 61 which had forced that school to go on end-to-end sessions and the need for immediate relief for that situation. Those who opposed Resolution 44 maintained that, because of overcrowding in the southern end of the District, the J 77 facility was needed by the children in the immediately surrounding Glendale and Ridgewood communities. The opposition was resistant to any discussion of the comparative severity of the overcrowding problems at I.S. 61 and the middle-level schools on the southern end of the District. Similarly, the evidence suggests that the opposition generally ignored the fact that the proposal to send I.S. 61's children to J 77 was specifically limited to the 1976–77 school year only (apparently out of the belief that I.S. 227 would be available by September 1977).

Some of the people from the Ridgewood-Glendale communities who opposed Resolution 44 expressed concern about their children being bussed to school and stated a general anti-bussing position. In response, at least one of those who spoke in favor of the resolution, Mrs. Helen Marshall, pointed out that Resolution 44 did not envision the bussing to school of any children from the predominantly white Glendale and Ridge-

wood communities, but only contemplated the bussing of the minority children from I.S. 61.

The record suggests that the members of the District 24 Community School Board took a rather passive stance at the June 22 meeting. Other than calling the caucus, there is no indication that the Board members did anything to attempt to gain any control over the meeting or to give any rational shape to the discussions. Specifically, there is no indication that the Board members attempted to respond to any of the express statements or obvious sentiments of those who opposed Resolution 44, a resolution which the Board itself had, after all, drawn up and advanced as the preferred means by which to eliminate the end-to-end sessions at I.S. 61.

Ultimately, what the School Board members decided on at the June 22 meeting was to table Resolution 44 until the following week when another public meeting would be held "to allow further discussion and vote to be taken." (Plaintiffs' Exhibit 103.) The site of the following week's meeting was set at P 87, a school in the southern end of the District in the Glendale area.

Prior to the following week's public meeting, a special executive board meeting [17] was held on Friday, June 25, 1976. At that meeting the District 24 Community School Board, still apparently regarding the proposal to use J 77 to relieve I.S. 61 as a viable one, approved the following revised version of Resolution 44 for the upcoming public meeting:

"RESOLVED, that this school board accept J 77 Q. located at 976 Seneca Avenue, Ridgewood, for the purpose of elimi-

attempted, based on a review of all the testimony and all the documentary evidence, to place various occurrences and statements which were testified to during the trial in the context of particular meetings. It is possible that, in one or two instances, some statements or audience sentiment, which this court cites as having been made at a particular meeting, was, in fact, made at a different meeting. However, with respect to those statements or sentiments, which this court has deemed it appropriate to note, the important thing is not so much the particular meeting at which the statement was

made or the sentiment exhibited, but the fact that the statement was made and the responses, if any, by defendant school officials to that statement or sentiment expressed.

17. A special executive board meeting differs from a regular public meeting in that at the former, although members of the community are allowed to attend and observe, they are not allowed to participate in the actual discussions. At a regular public meeting the public is allowed to attend, observe, and actually participate in the ongoing discussions.

nating end-to-end sessions at I.S. 61 Q. by September 1976 and be it further

"RESOLVED, that the use of J 77 Q. for the purpose of eliminating end-to-end sessions at I.S. 61 Q. be limited to one year and be it further

"RESOLVED, that plans for district-wide step zoning of our intermediate and junior high school grades be initiated immediately for implementation September 1977.

"Explanation:

"This resolution is based upon a solution proposed by the central board to temporarily relieve the conditions at I.S. 61 Q. This central board proposal is limited to the school year 1976/77 only. Our zoning plans, however, will be based upon the presumption that J 77 Q. remains under our jurisdiction and administration through September 1977."

(Plaintiffs' Exhibit 13cc.) The record contains no explanation of the significance of the revisions made by the District 24 Board in Resolution 44.

On Tuesday evening, June 28, 1976, a special public meeting was held at P 87 to resume consideration of the now-revised Resolution 44. Again, the minutes of the meeting (Plaintiffs' Exhibit 104) indicate that individuals spoke in favor of and in opposition to the resolution with many of the speakers being the same as those who had spoken at the June 22 public meeting. The minutes of the meeting also indicate that Mrs. Darby read the previously cited June 23 letter from Mr. Mathew to District 24 Superintendent Sanfillipo in which Mr. Mathew states, *inter alia*, that

"Granting J 77 the priority that would make early basic repairs possible is predicated on the assumption that the school will be used to end the double sessions at I.S. 61. . . ."

It apparently was at this June 28 public meeting that Mrs. Shirley Hughes, the then-President of the I.S. 61 Parents Asso-ciation, explicitly and publicly stated to the members of the District 24 Board her belief that racial concerns were the basis for the community's reluctance to send children from I.S. 61 to the J 77 facility. There was no response to Mrs. Hughes' statement from the community or the School Board members either in the form of a specific denial or in the form of authoritative statement by those presiding over the meeting that racial antagonisms have no place in deliberations on school policy and are not the basis upon which local school board decision can legally be made.

When Resolution 44 came up for a vote, it was defeated by a margin of three in favor and four against.[18] The minutes reflect that thereafter

"Mrs. Darby instructed Mr. Quinn to send a mailgram to Chancellor Anker immediately indicating that this board has not decided on an alternative to discontinue end-to-end sessions at I.S. 61 by the deadline date established by the Chancellor."

Two of the Community School Board members who voted against Resolution 44, Mrs. Ueckerman and Mr. Tucker, were quoted at the trial as having stated that they voted against the resolution because their communities in the southern end of the District would not "accept" I.S. 61's children (e. g., Tr. 1409, 1413). Another Board member, Mr. Rich, who was absent at the June 28 meeting, was quoted at the trial as having concluded that the resistance to using J 77 to relieve I.S. 61 was due to the fact that the predominantly white residents of the southern end of District 24 did not want minority students in their community (Tr. 1409–10).

This court finds that the failure of the District 24 Community School Board to adopt Resolution 44 was the direct result of the vociferous opposition to that resolution expressed by certain residents and representatives of the southern half of the Dis-

---

18. One of the members of the District 24 Community School Board, Mr. Rich, is recorded as having been "absent, excused" at the June 28 meeting. The ninth member of the Board, Mr. Connors, had previously resigned in the middle of June even prior to the June 22 public meeting, leaving a vacancy for which the remaining Board members were unable to agree on a replacement.

trict in which the J 77 facility was located. Further, this court finds, based on the evidence as to what occurred at this meeting and others discussed below, that a principal component of this expressed opposition to Resolution 44 was racial prejudice. Finally, this court finds that in this instance as in others detailed in these findings and taking into account the entire history of the Board's efforts to deal with overcrowding at I.S. 61 both before and after June 1976, the Board, by accepting and acquiescing in the racial prejudice of certain members of the community, intentionally discriminated against plaintiffs and the class they represent on the basis of race. In this connection, I take note of the testimony of Mrs. Darby that the whole mood of the debates on Resolution 44 had a racial character and that "everyone there knew it. I knew it—" (Tr. 311–12). In light of the entire record, I can only interpret statements such as those attributed to some Board members to the effect that the communities of Ridgewood and Glendale simply would not accept I.S. 61's children as a reference to the predominantly minority racial composition of I.S. 61's student body and to a consequent negative attitude of those students by the residents of the Ridgewood and Glendale communities in which the Board members determined to acquiesce.

Defendants have sought to advance various non-racial explanations for District 24's decision to eliminate the end-to-end sessions at I.S. 61 by sending that school's sixth graders to two annexes in District 25 rather than to the J 77 facility. However, I find that none of those explanations figured significantly, if at all, in the defeat of Resolution 44.

Specifically, I note that there is no evidence that, at any point prior to the defeat of Resolution 44 at the June 28, 1976, special public meeting, anyone, whether one of defendant local school officials or a concerned resident of District 24, brought up the comparative travel times or ease of transportation routes between the I.S. 61 area and the District 25 annexes, on the one hand, and the J 77 facility on the other. Nor does the evidence indicate any expression of concern during this period by the

District 24 Board over the prospect of having to rezone District 24's middle-level schools in two consecutive years. Nor is there evidence of any discussion to the effect that, by using the J 77 facility for middle school children in the southern end of the District and using the two District 25 annexes to eliminate the end-to-end sessions at I.S. 61, the District would maximize the total number of additional seats available to house its students in the 1976–77 school year. Indeed, as previously indicated, as a result of the City's fiscal crisis and with the situation regarding the priority for repairs such as it was, District 24 officials could not be assured of the availability as of September 1976 of the additional seating capacity in the J 77 facility unless they decided to use that facility to relieve I.S. 61. Further, prior to the defeat of Resolution 44 at the June 28 special public meeting, the District 24 Community School Board continued to advance the plan to send I.S. 61 children to the J 77 facility as a viable and, indeed, the preferable solution for eliminating the end-to-end sessions at I.S. 61 and exhibited no doubts as to the fundamental soundness of the plan. Similarly, rather than expressing a desire to avoid having to rezone District 24's middle-level schools in two consecutive years, the revised version of Resolution 44 specifically embraced the concept of a rezoning of the middle-level schools effective September 1977. Thus, even assuming that it was realistic for some Board members to anticipate that I.S. 227 would be available by September 1977, there is no evidence in the record that anyone at the time of the meetings on Resolution 44 saw that availability as a reason *not* to temporarily house some students from I.S. 61 in the J 77 facility. In addition, the record reflects that, although, because of its poor physical condition, the J 77 facility may actually have been able to house only 400 students when it opened in September 1976 as an annex to J 93, that fact was not foreseen in June 1976 at the time of the discussions on Resolution 44 and was not a factor in the defeat of the resolution.

Thus, none of the neutral, non-racial explanations suggested by defendants at trial

for the School Board's ultimate decision to eliminate the end-to-end sessions at I.S. 61 by using the two annexes in District 25 withstands analysis as a significant factor in the School Board's failure to adopt Resolution 44, leaving this court with its finding that the School Board's action on Resolution 44 constituted intentional discrimination against plaintiffs and the class they represent on the basis of race.

(5) *Continued Discussions During the Summer of 1976 Regarding the Elimination of the End-To-End Sessions at I.S. 61 and the Use of J 77—the July 12, 1976, Resolution to Use the District 25 Annexes*

With the defeat of Resolution 44 at the June 28 special public meeting, the District 24 Community School Board remained without any official plan either to eliminate the end-to-end sessions at I.S. 61 or for the use of the J 77 facility. Attempts to reach an official determination on either or both of these matters were complicated by a vacancy in the District 24 Community School Board which often found the Board members evenly split four-to-four in their deliberations, unable to command the majority vote necessary for official action. Further, throughout the summer of 1976 and because of the controversy over the use of the J 77 facility, the Board members also found themselves unable to agree on a choice to fill the vacant Board position.

District 24 scheduled a special public meeting for July 12, 1976, at P 87 in the southern part of the District. The agenda printed on the notice of that meeting included yet another resolution, resolution numbered 10 ("Resolution 10"), proposed by Community School Board member Mr. Rich and specifically listed as such,[19] to use the J 77 facility for the 1976–77 school year only, to eliminate the end-to-end sessions at I.S. 61. However, Resolution 10 was not even to come to a formal vote.

On the evening of July 12, before the special public meeting, the District 24 Board held a special executive board meeting. At that special executive board meeting, individuals from the Ridgewood-Glendale area spoke against the proposed Resolution 10. The record is vague as to the grounds of opposition expressed at the special executive board meeting, although it appears that the opposition was presented generally in terms of the overcrowding in the southern half of the District and the need of the children in the southern half of the District for the J 77 facility. In any event, as a result of what transpired at the special executive board meeting, Mr. Rich indicated that he would withdraw Resolution 10 at the public meeting, which he did.

Another resolution was, however, passed at the July 12 public meeting. That was a resolution to accept District 25's offer of approximately 300 seats in J 218 and approximately 400 seats in J 168 effective September 1976. The resolution indicated that the use of the two District 25 annexes were to be a temporary measure in existence for one year only.

There is no evidence in the record that between the time Resolution 44 was advanced and defeated in late June 1976 and the time the resolution to use the two District 25 annexes was adopted in mid-July there had been any reappraisal by the District 24 Board of the fundamental merits of the two alternative proposals for eliminating the end-to-end sessions at I.S. 61. Specifically, whatever justifications defendants may today advance for their actions, there is no evidence of any contemporaneous concern over transportation problems from the I.S. 61 area to J 77 or of any of the other concerns which this court has found did not significantly affect the prior rejection of Resolution 44. Instead, this court finds that the adoption of the resolution to use the two District 25 annexes was a direct consequence of the Board's failure to adopt

---

19. The specific listing of Resolution 10 as a proposal made by Mr. Rich apparently distinguished it from the majority of resolutions which, the testimony indicated, as a general matter only appear on the agenda of a public meeting after having received a majority vote at a prior special executive board meeting of the Community School Board. *See* footnote 15 *supra.*

Resolution 44 and of the racially discriminatory animus in certain segments of the community which had been largely responsible for that failure.

However, even after the adoption of the resolution to use the two annexes in District 25 to eliminate the end-to-end sessions at I.S. 61, the record indicates that the matter was not regarded as finally settled. There were still those among the District 24 Community School Board members, at the Central Board, and in District 24 generally who sought to obtain use of the J 77 facility as the preferable means for eliminating the end-to-end sessions at I.S. 61.

On July 21, 1976, there was a meeting at Central Board offices to discuss "the utilization of facilities to relieve overutilization in Corona." A memorandum concerning that meeting written by Alfredo Mathew, Jr. to Chancellor Anker indicated that

"[t]he three Members of the School Board who were present, the parents, the Superintendent, and the Principal of I.S. 61 [20] all expressed a strong preference for housing any annex of I.S. 61 at J.H.S. 77 as opposed to the plan approved by District 24 to house these pupils in annexes in District 25."

(Plaintiffs' Exhibit 16ddd.)

Mr. Mathew's memorandum also referred to a serious problem of overcrowding in P 19 in the Corona area and indicated that those at the meeting discussed possible ways to relieve that problem. Specifically, one of the possibilities that was discussed in the event District 24 adhered to its plan to relieve I.S. 61's overcrowding problem by using the two annexes in District 25 was to use the J 77 facility to relieve the overcrowding at P 19. Returning to the subject of priority for repairs which figured so prominently at the June 3 Central Board meeting, the memorandum states that "[r]epair of J.H.S. 77 would have a high

priority if the relief of P.S. 19 were involved." Of course, using the J 77 facility to relieve P 19 again would have meant use of that facility, even if only temporarily, by predominantly minority children.

The July 21 Central Board meeting had no apparent impact on the use of the J 77 facility. With regard to the relief of P 19, the notes of a special executive board meeting held that same night, July 21, 1976, indicated that a resolution was proposed to relieve the overcrowding at that predominantly minority northern area school not by using the J 77 facility, but by establishing an annex to P 19 at P 205 in District 26 and sending approximately 350 P 19 first graders to that District 26 annex. P 205 was located quite a long distance away from the P 19 area, and adoption of that Board proposal accordingly would have entailed the bussing of the P 19 first graders over a very long distance.

Ultimately, a solution to P 19's overcrowding problem very similar to the solution proposed at the July 21 executive board meeting was adopted. Instead of using P 205 in District 26, an annex to P 19 was set up at P 179 also in District 26, and approximately 300 P 19 first graders were bussed to that school effective September 1976, the same time the two District 25 annexes to I.S. 61 were started. Although P 179 was somewhat closer to the P 19 area than P 205, it was still quite a distance from the P 19 area and meant long-distance bussing for the P 19 first graders. At the time they were sent to the P 179 annex, the predominantly minority P 19 first graders were the only students housed at the otherwise empty facility and thus, were effectively isolated as a group unto themselves. Use of the District 26 annex to P 19 continued for two years until its elimination effective September 1978 when a rezoning within District 24

20. The testimony given at the trial by the then and present principal of I.S. 61, Mr. Cook, suggested that, because of what he viewed as the relative ease of transportation from the I.S. 61 area to the District 25 annexes as compared to J 77 and because of the poor physical condition of the J 77 facility, he had favored use of the two District 25 annexes over the J 77 facility to

eliminate the end-to-end sessions at I.S. 61. That testimony appears inconsistent with the reference in the cited memorandum to the principal of I.S. 61 having expressed a strong preference for the use of the J 77 facility as opposed to the two District 25 annexes to eliminate the end-to-end sessions at I.S. 61.

was implemented, and some children were reassigned from P 19 to the also predominantly minority P 143 to relieve the overcrowding at the former school.

The story of the District 24 Board's implementation of the District 26 annex to P 19 effective September 1976 represents yet another example of the failure of the Community School Board to act positively on a suggestion by Central Board officials in the summer of 1976 that the J 77 facility in the southern, predominantly white section of District 24 might be used to relieve serious overcrowding at a predominantly minority school in the northern part of District 24 with a guarantee of a high priority for early basic repairs if the facility were so used. As such, and because of the significance as previously noted of a repair priority guarantee in a time of fiscal crisis, the circumstances of the implementation of the P 19 annex lend further evidentiary support to the conclusion that, in rejecting the use of the J 77 facility to eliminate the end-to-end sessions at I.S. 61, the District 24 Board was influenced by the predominantly minority racial composition of the students involved.

Late in July 1976, District 24's Superintendent, Mr. Sanfilippo, drew up various plans for using the J 77 facility in September 1976 to relieve the projected overcrowding at the southern area middle-level schools. At the trial, Mr. Sanfilippo testified that no consideration was ever given to simply opening J 77 as a new zoned junior high school, independent of any existing facility, as opposed to opening the facility as an annex to J 93 as it eventually was. However, the documentary evidence clearly indicates that one of the plans drawn up by Mr. Sanfilippo and submitted to the Community School Board contemplated that facility's opening as a new, independent zoned school with a predominantly "other" racial composition. (*See* Plaintiffs' Exhibit 16ppp.)

The significance of opening J 77 as a new, independent zoned school rather than as an annex to an existing facility would have been that, whereas the formal terms of the Central Board's annex policy allow an annex to open reflecting the racial com-

position of the parent school, Central Board guidelines require all independent *new* schools to open up as integrated facilities reflecting the racial composition of the district in which a particular school is located as a whole, unless such integration is not "feasible." Thus, had J 77 opened as an independent zoned school rather than as an annex to J 93, District 24's plans for the tenanting of that facility with predominantly "other" students from the immediately surrounding area in the southern part of the District, not reflective of the racial composition of District 24 as a whole, might well have met with greater opposition from Central Board officials than they did.

Mrs. Elias of the Central Board's Office of Zoning and Integration testified that J 77 could have opened in September 1976 on a limited basis as a new zoned school and would then have been subject to a more stringent review in terms of the integration of its student body than actually took place. Mr. Sanfilippo testified that J 77 opened as an annex to J 93 rather than as a zoned school because the rather small number of students initially assigned to the J 77 facility made such an arrangement appear more sound from an organizational standpoint. However, the discrepancy between Mr. Sanfilippo's testimony at trial that no consideration was ever given to opening J 77 as a new zoned facility and the documentary evidence which he himself prepared indicating that just such a possibility was considered suggests that District 24 officials were more aware of the implications of the organizational structure of the J 77 facility in terms of the racial composition of its student body and in terms of Central Board approval of that racial composition than the local community school officials now care to admit.

Throughout much of the month of August 1976, the deep split in the District 24 Board manifested itself by the fact that four, but only four, members of the Board, Messrs. Tucker and O'Keefe and Mss. Ueckerman and Shore, continued to meet for the purpose of working out a plan for the use of the J 77 facility effective September 1976 by the middle school children in the sur-

rounding southern part of the District. Finally, as discussed immediately below, in September 1976 the necessary votes were obtained to pass a formal resolution designating the J 77 facility for use to relieve overcrowding in the schools in the predominantly white southern part of the District, and the predominantly minority sixth graders from I.S. 61 were bussed to the two annexes in District 25.

(6) *The Flurry of Activity in Late August and Early September 1976 Leading to the September 10 Resolution to Use the J 77 Facility to Relieve Overcrowding at the Southern Area Middle-Level Schools*

In late August the Chairman of the District 24 Board advised Central Board officials that a resolution numbered 12 ("Resolution 12") to use the J 77 facility to relieve overcrowding at the southern area middle-level schools commencing in September 1976 was on the agenda of the Community School Board's August 31 public meeting. However, with the deep division in the Board and in the District at large persisting, the proposed resolution did not pass at the August 31 meeting.

At that point, the Central Board put increased pressure on the Community School Board to come up with a plan for the use of the J 77 facility effective September 1976. Apparently, during the summer of 1976 and notwithstanding the fact that the District 24 Community School Board had not yet come up with an official plan for the use of the J 77 facility, the Central Board had invested $50,000 in the repair of the J 77 facility and was now understandably concerned that the facility be put to actual use.

A meeting to vote again on Resolution 12 was scheduled for September 3, but was cancelled by the Chairman of the District 24 Board because of an alleged procedural illegality in the manner in which the meeting had been called.

A special public meeting was then scheduled for September 8, 1976, at P 87 in the southern part of the District. At that meeting a proposal authored by Mrs. Shore pursuant to the suggestions emanating from a meeting with Central Board officials several days earlier was advanced. The proposal contemplated the shared use of the J 77 facility by some students from I.S. 61 and some students from the southern part of the District. Under the terms of this proposal, approximately 300 I.S. 61 sixth graders who had tentatively been scheduled to go to the annex at J 218 in District 25 would instead be sent to the J 77 facility where approximately 450 seventh graders from the southern area schools of J 93 and J 119 would also be housed. Inasmuch as the predominantly minority children coming to the J 77 facility from the northern part of the District would be on a different grade level than the predominantly "other" children from J 93 and J 119, the shared use proposal would not have resulted in integrated classes at J 77. But the shared use proposal at least would have signalled some effort at an intra-district solution to the overcrowding problem at I.S. 61 as well as the acceptance of a large group of predominantly minority children by a predominantly white area of District 24.

Mrs. Hughes testified that she spoke on behalf of the I.S. 61 community in favor of the shared use proposal indicating in her words that "we were willing to go in there [J 77] first, last, go in there and share the school with you," but pleading with her listeners, "please do not send students out of the district." (Tr. 1412.) This last part of Mrs. Hughes' statement testifies to the significance generally attached to the notice of attending school in the school district in which one physically resides [21] and suggests that students and parents alike feel a stigma and a sense of rejection at being themselves or seeing their children compulsorily

21. The evidence in this case also illustrated an exception to this general proposition. When students reside at the border of a district in an area which has historically been zoned to a school in another district just across the border, as the evidence indicates has been the case with a number of children physically residing in District 30 who attend J 125 in District 24, no stigma or feeling of rejection is attached to the fact of being compulsorily assigned to school in a district other than the one in which the student physically resides.

bussed to school outside of the district in which they physically reside. Mrs. Hughes' also testified that at one point one of the School Board members, Mr. Tucker, indicated publicly that he could accept the shared use proposal, but that after speaking to other persons attending the meeting Mr. Tucker publicly reversed his position.

Witnesses testified that both Mr. Tucker and Mrs. Ueckerman indicated again that their communities simply would not accept the children from I.S. 61. In addition, two witnesses testified to the following statements made by Mr. Tucker: "I want [to keep] my area as is. If that's called racist, [if] that's racist, then I am a racist." (Tr. 108, 1415.)

The shared-use proposal was not adopted. Defendants at trial advanced several explanations for the rejection of the shared-use proposal. First, defendants cited the fact that when J 77 finally opened, because of its poor physical condition, it would only accommodate 400 children whereas the shared-use proposal contemplated housing a total of 750 children in the J 77 facility. In addition, defendants noted that the shared-use proposal did not provide for the housing of all the I.S. 61 sixth graders. Thus, even had the shared-use proposal been adopted, it would have been necessary either to retain several hundred sixth graders in the overcrowded main building at I.S. 61 or to open one District 25 annex for I.S. 61 sixth graders effective September 1976 to house those sixth graders who would not be sent to J 77.[22]

But, once again, the record does not indicate that the explanations now being offered by plaintiffs actually figured in the rejection of the shared-use proposal. There is no indication in the record, for example, that the subject of J 77's physical capacity

as of September 1976 actually was mentioned during the discussions preceding that rejection. Instead, the record indicates that the primary consideration which emerged during the discussions regarding the shared use proposal and the consideration in direct response to which the District 24 Board failed to adopt that proposal was that the communities in the southern half of the District were not willing to accept the predominantly minority children from I.S. 61.

No formal action of any kind was taken at the Chairman of the Community School Board again was of the opinion that there had been some procedural illegality in the manner in which the meeting was called. At 11:30 p. m. five of the Board members voted to schedule another special public meeting two days later on September 10, 1976, at 11:30 p. m. to pass a resolution to use the J 77 facility for students in the southern part of the District only. The reason for the unusual 11:30 p. m. starting time was that the Community School Board's by-laws required that 48 hours' notice be given for a special public meeting. At the time the vote to schedule the September 10 meeting was taken, two of the District 24 Board members, Messrs. Simeone and Rich, were no longer at the meeting. For that reason, Board Chairman Darby apparently felt that the scheduled September 10 meeting was also illegal, all of the District 24 Board members not having been given the requisite 48 hours notice. In a setting of obvious turmoil and dissension, Mrs. Darby gave instructions that the September 10 meeting be cancelled, but those instructions were not carried out when the five Board members who had voted to call the September 10 meeting persisted in their demand that the meeting be held.

---

**22.** On this point, there was some discrepancy between Mrs. Shore's testimony on cross-examination at trial and the documentary evidence introduced into the record.

The latter indicates that the shared-use proposal contemplated opening one District 25 annex to J 168 to house those I.S. 61 sixth graders who could not be accommodated at the J 77 facility; whereas Mrs. Shore testified on cross-examination that under the shared-use proposal those I.S. 61 sixth graders who couldn't be

accommodated at J 77 would have had to remain in the main I.S. 61 building. There is also a discrepancy between Mrs. Shore's testimony and the documentary evidence as to which of the two proposed District 25 annexes it was that would be placed by the J 77 facility under the shared-use proposal. These discrepancies, however, have no relevance to any of this court's factual findings; and accordingly, this court has not sought to resolve those discrepancies in this opinion.

Thus, it was that at the September 10, 1976, special public meeting of the District 24 Community School Board, starting at 11:30 p. m. with only five Board members in attendance and under a procedural cloud, Resolution 12 was adopted. The resolution provided

"that this school board approve a plan, as presented, for the utilization of J.H.S. 77/Q to relieve overcrowding at J.H.S. 73, 93 and 119 . . . ."

Resolution 12 further provided, "that the duration of the plan hereby approved is for one year only, commencing September 1976 and terminating June 1977."

The specific plan implemented for the J 77 facility effective September 1976 contemplated its use as an annex to J 93. With the J 77 facility thus otherwise occupied, pursuant to the fallback resolution which had been adopted in July of that year, the I.S. 61 six'h graders were bussed to the two annexes in District 25, also effective September 1976. Both of these arrangements have continued in existence to the present day.

Again, the evidence does not indicate that there was any substantive reevaluation of the merits of the alternative proposals for the elimination of the end-to-end sessions at I.S. 61 between the time Resolution 44 was advanced and defeated in late June 1976 and the time in September 1976 when Resolution 12 was adopted and the I.S. 61 sixth graders sent to the two annexes in District 25. What the evidence does indicate with respect to this period of time is that the opposition in the Ridgewood-Glendale communities to the presence of children from I.S. 61 in their area's schools continued unabated, that this opposition continued to have a significant racial component, and that the community School Board members deliberately chose a racially discriminatory course of conduct principally, if not exclusively, to appease this racially based opposition. The evidence also indicates that during this period of time the divisions among the Community School Board members deepened with positions becoming quite intransigent and leading to the turmoil and confusion surrounding the adoption of Resolution 12 in September 1976. Rounding out the picture is the suggestion of procedural irregularities which punctuate the evidence regarding the September proceedings of the Community School Board. All of these factors lead this court to find that the September actions of defendant school officials in adopting a resolution to use the J 77 facility to relieve anticipated overcrowding in southern-area middle schools and thereafter sending I.S. 61's sixth graders to the two annexes in District 25 were influenced by the same racial considerations and antagonisms which had resulted in the defeat of Resolution 44 and, indeed, were part of one uninterrupted course of conduct beginning, at least, at the time Resolution 44 was defeated.

G. *Postscript to the Decision to Institute the Two District 25 Annexes*

(1) *The Role of the Central Board*

As evidenced by the several meetings held at Central Board offices, Central Board officials were very much aware of the difficulties District 24 was having in deciding on a use for the J 77 facility and on the means for eliminating the end-to-end sessions at I.S. 61. Further, the evidence indicates that Central Board officials knew that the difficulties District 24 was experiencing were traceable to serious divisions among the various communities in that District and that those officials knew as well that there was a significant racial component to those divisions. But Central Board officials apparently did not regard these circumstances as warranting their intervention in the decision-making process either by taking a direct hand in formulating or selecting plans, or by taking steps at least to insure that race prejudice did not become a part of the decision-making process in the District.

The posture assumed by Central Board officials was that, although they would hold themselves available to render services of a supportive and consultative nature, the responsibility for coming up with plans to deal with these various problems in District 24 lay with the Community School Board. In that connection, Central Board officials

refused to indicate their comparative judgments as to various plans under consideration by the Community School Board, subject only to a rather narrow review of those actions for compliance with formal integration guidelines. In that manner, the Central Board and the Chancellor, as the highest-level official of that Board, sanctioned the actions which District 24 officials took in bussing the I.S. 61 sixth graders to the two District 25 annexes and using the J 77 facility solely and from the outset for the southern part of the District, knowing at the time that those actions were the end result of decision-making at the local Community School Board level explicable solely on the basis of race prejudice.

In addition to the several meetings previously noted, the record contains significant additional evidence that Central Board officials were aware of District 24's problems. There were numerous written communications, some of which have also previously been noted, between officials of the Central and Community School Boards regarding the use of the J 77 facility and the elimination of the end-to-end sessions at I.S. 61. Even before the June 3 meeting at Central Board offices, Mr. Elias, as head of the Central Board's Office of Zoning and Integration, had been invited to attend and had attended District 24 Zoning committee meetings. In that connection, Mr. Elias received indications from those involved in District 24 school affairs, especially from the head of the District 24 Zoning Committee, Mrs. Shore, that there were deep divisions within the community which were impeding the District's ability to take any effective action to relieve its utilization problems. Further, at various points during the summer of 1976 representatives of the I.S. 61 community and, on at least one occasion, Mrs. Shore appealed to the Chancellor and other Central Board officials to supersede the Community School Board in order to make the type of changes in zoning and school assignment which would make possible effective intra-district relief for I.S. 61's severe overcrowding. None of these entreaties was acted upon by representatives of the Central Board.

In a letter dated July 18, 1976, the members of the self-styled "Corona Coalition," consisting of members of the Parents Associations of P 19, P 14, P 143 and I.S. 61, wrote to Chancellor Anker complaining about the actions of the District 24 Community School Board in failing to use the J 77 facility as a temporary measure to eliminate the end-to-end sessions at I.S. 61 specifically characterizing those actions as racist (Plaintiffs' Exhibits 16bbb, 18y). The letter asked the Central Board to intervene on behalf of the minority children in the Elmhurst-Corona area. The record contains no evidence of any response or action by Chancellor Anker or anyone else at the Central Board to the Corona Coalition's letter in general or to its specific charge of racism in the actions of the local Community School Board.

The record does, however, contain testimony by Central Board officials which echoes the Corona Coalition's sentiment that racial considerations and antagonisms affected the Community School Board's actions regarding use of the J 77 facility and the elimination of the end-to-end sessions at I.S. 61. Although Mr. Elias in his testimony at trial appeared reluctant to acknowledge the existence of racial considerations expressly, his testimony strongly suggested an awareness on his part that such considerations did affect the course of events in District 24. In addition, Mrs. Hughes testified to the circumstances of one particular conversation she had with Mr. Elias in which, in response to her request that Mr. Elias intercede and recommend to the Chancellor that the J 77 facility be used for I.S. 61 either alone or on a shared basis with students from the southern half of the District, Mr. Elias referred to the fact that he, too, was a member of a minority group and stated, "I know what they do to minorities."

(2) *Focus on the Annex Policy: The Use of Annexes as Creating and Maintaining Racial Segregation*

The evidence regarding District 24's use of annexes as set forth in the preceding findings of fact indicates that, coming on

top of an existing pattern of racial segregation in the District's schools, those annexes created additional segregated educational facilities and made possible the maintenance of existing racial segregation in the schools within the District in the face of changes which might otherwise have been necessary in order to solve the overcrowding in I.S. 61. The use of annexes removed large numbers of predominantly minority children from District 24 altogether, thereby enabling the basic pattern of school assignment within the District to remain essentially intact.

As defined by Mr. Elias in his testimony at trial,

"an annex is a facility that is not contiguous with the facility that it's annexed to or from; that draws pupils from an identical zone as the parent building; that is under the direct supervision of the supervisory staff of the parent building. It is within the chain of command of the parent building. The teachers, the staff involved, are all within the seniority system and the teacher organization, teacher organizational [sic] for seniority and other purposes of the building and the annexes [are] administered and run by the parent school."

Tr. 979–80. The critical feature of an annex as thus defined which causes it to perpetuate existing racial segregation in the schools of a particular district and to create additional segregation in that district and elsewhere is that it "draws pupils from an identical zone as the parent building" to which it is designated an annex.[23] That feature assures that if there is racial segregation at the parent building because of, among other things, the use of a neighborhood school policy, that racial segregation will be perpetuated and created anew in the annex facility.

Thus, the use of available space in the two junior high schools in District 25 as annexes to the predominantly minority I.S. 61 required that the students sent to those annexes would attend school in the same segregated environment that existed at I.S. 61 and created new racial segregation at the two annex facilities. Similarly, the organization of P 179 in District 26 for a two-year period as an annex to the predominantly minority P 19 reproduced at the P 179 facility the segregation existing at P 19, just as the ultimate decision to open the J 77 facility as an annex to the predominantly "other" J 93 insured that the J 77 annex would mirror the segregated nature of the J 93 parent building. In other words, the segregated nature of each of the above annex facilities followed directly from the decision to organize that facility as an annex.

Further, District 24's establishment of two annexes to I.S. 61 in District 25 and its establishment of an annex to P 19 at P 179 in District 26 maintained the racial segregation with District 24 by removing large groups of predominantly minority children from the District altogether once it appeared that those children could no longer satisfactorily be accommodated in their neighborhood schools. Moreover, in the context of the neighborhood school policy, the annexes, which used the basic geographic concept on which the neighborhood school policy is based to select predominantly minority children from the northern part of the District to bus to school facilities at quite some distance from their immediate neighborhoods, in effect, denied those chil-

---

**23.** Plaintiffs at trial sought to introduce evidence of a situation in Community School District 29 in Queens in which, as represented by plaintiffs, school officials established an annex to a racially mixed facility, but contrary to Mr. Elias' testimony as to the contours of the annex policy, did not tenant that annex with students drawn from a geographic zone coextensive with the geographic zone of the parent building, instead carving out students from a particular portion of the overall geographic zone to attend the annex and resulting in an annex facility that was predominantly "other." This court adheres to its ruling at trial that it will not consider that evidence of what, according to plaintiffs' description, appears to have been a departure from the official annex policy in District 29 because that evidence is unrelated to the issues before this court regarding defendant school officials' actions with respect to students residing in District 24 and denies plaintiffs' post-trial motion seeking to have this court reverse its previous ruling and admit the evidence regarding the situation in District 29.

dren the purported benefits of the neighborhood school policy, while preserving those purported benefits to the students who remained within the District to attend school. In summary, the use of annexes presents a significant potential for manipulation of the neighborhood school policy.

This is not to say that there is something intrinsically wrong with the use of annexes. Under certain circumstances, the use of annexes may be entirely warranted. For example, Mr. Elias testified to three circumstances under which an annex might be created: (1) "when there is an overutilization problem that does not seem susceptible to resolution by rezoning in the immediate area;" (2) as a technique "to temporarily solve a problem that might eventually go away or . . . might only be a short duration;" or (3) "to provide . . . a setting for alternative curriculum." (Tr. 980.) Any one of these circumstances, the first two of which appear applicable to the two District 25 annexes to I.S. 61, either singly or in combination, might justify the use of an annex in a particular instance *so long as not accompanied by any racially discriminatory or segregative intent.* However, the considerations set forth above suggest a need for close examination of circumstances and motivations when the annex organization is employed to determine whether a *discriminatory or segregative* intent is present as a factor in the decision to use that particular organizational solution to the problem.

In the case of the creation of the two District 25 annexes to I.S. 61, this court finds that, notwithstanding the fact that some school officials may originally have viewed those annexes as "temporary" in nature, the decision to establish those annexes was based on a determination by defendant school officials to acquiesce in and adopt as their own the racially motivated community sentiment of the residents of the southern half of the District. This court further finds that at the time they established the District 25 annexes, defendant school officials created those annexes as segregated facilities. Moreover, this court finds that defendant school officials, by removing the predominantly minority I.S. 61 sixth graders from District 24 altogether, maintained a status quo within the District in terms of the existing racial composition of the schools. This latter finding is, in the view of this court, supported by the parallel action which defendant school officials took in creating a predominantly minority annex to P 19 at P 179 in District 26.

Finally, with regard to the continued maintenance as opposed to the creation of the two District 25 annexes, this court notes that with the imminent completion of I.S. 227, discussed *infra,* the overcrowding problem at I.S. 61 would now appear to be susceptible to resolution by rezoning in the immediate area although some more far-reaching rezoning beyond the immediate area may also be required. Nevertheless, the evidence indicates that present policy contemplates the continued existence of these annexes in the immediate future so that today, three years after their establishment and despite the stated initial premise behind their creation, the District 25 annexes can no longer properly be considered as temporary, but rather deliberately maintained segregated facilities.

(3) *Disproportionate Impact of Actions on Minority Children Residing in District 24*

The result of the decision by defendant school officials to relieve the overcrowding and to eliminate the end-to-end sessions at I.S. 61 by establishing the two annexes in District 25 was that the predominantly minority I.S. 61 sixth graders became the only middle school children residing in District 24 to be bussed to school under a compulsory school assignment program. Compounding that distinction was the fact that the schools to which the I.S. 61 sixth graders were, and today are continuing to be, bussed are not within the geographic boundaries of the school district in which they reside, but rather are located well within the boundaries of another Queens school district, District 25.

Thus, I.S. 61 sixth graders alone, among all the middle-level school children residing in District 24, have been deprived of the

purported benefits of attending a neighborhood school, if only for one year of their middle school education, and have been compulsorily subject to what are said to be the disadvantages of riding a bus to school. Moreover, even with the scheduled opening in September 1977 of the long-awaited I.S. 227 repeatedly heralded in the past as the answer to the overcrowding problem in the I.S. 61 area, it now appears that the District 25 annexes to I.S. 61 will remain intact, and this situation will continue in the future.

### H. *Continued Maintenance of the District 25 Annexes to I.S. 61*

(1) *Continued Failure of District 25 to Devise any Intra-district Remedies for the I.S. 61 Overcrowding—The Swift Demise of the "153 Plan"*

In the fall of 1976 after the first class of I.S. 61 sixth graders had been sent to the two District 25 annexes, District 24's Board instructed the District Superintendent to come up with rezoning plans which would better equalize the comparative levels of utilization of the various schools within the District and would afford some intra-district relief for the extreme overcrowding at I.S. 61. That action was in keeping with the initial understanding of all involved that the two annexes in District 25 were to be temporary and not permanent solutions for I.S. 61's serious overcrowding problem.

Pursuant to the Community School Board's directive, the District 24 Superintendent and his staff prepared what came to be known as the "153 Plan." Essentially, the idea behind that plan was to use some of the underutilized elementary school space within District 24 to relieve the overcrowding at the middle school level in general and at I.S. 61 in particular.

At the center of the plan was the use of the P 153 facility, the location of which is described as bordering on the communities of Maspeth, Ridgewood and Middle Village. The racial composition of P 153's student body at the time was predominantly "other" with one set of figures for 1976 placing the percentage of "other" at 85.1%. Reported figures for 1976 also indicate that P 153 was at that time an underutilized facili-

ty with utilization being reported as 82% of capacity.

Under the terms of the 153 Plan, underutilized P 153 would have been emptied of its grade K–5 population and transformed into a sixth-grade annex to J 73. Those kindergarten through fifth graders who otherwise would have attended P 153 would go instead to P 71, another underutilized elementary school with 1976 utilization reported as 75% of capacity and located on the other side of Metropolitan Avenue in the Ridgewood community at a distance of approximately ten to twelve blocks from P 153. Joining the indigenous sixth-grade population of the P 153 facility, at which under the terms of the plan would have been the sixth-grade annex to J 73, would have been the sixth-grade students from the predominantly "other" P 229 situated in the Woodside community, the existing sixth-grade population of the J 73 facility with a student body reported as 45.6% "other" in the 1976 school year, and several hundred sixth-grade students from the predominantly minority I.S. 61. The result accordingly should have been an integrated sixth-grade student body at the J 73 annex. Further, witnesses testified that the P 153 building had facilities such as gymnasiums which were suited to the needs of a sixth-grade student population.

From the standpoint of I.S. 61, adoption of the 153 Plan would have hopefully eliminated one of the annexes in District 25. It would also have meant the absorption of a large number of the predominantly minority I.S. 61 sixth graders within District 24 itself although it would not have eliminated the need for the bussing of those students to school. It would have meant in addition an opportunity for the I.S. 61 sixth graders and for the other students, both minority and "other," who would have attended the sixth-grade annex at the 153 facility as well, to attend school in an integrated environment. To the extent that the 153 Plan would have required the bussing of some students other than the predominantly minority I.S. 61 sixth graders, it would also have meant an equalization of the burden of dealing with the District's overcrowding

problem among various elements of the District 24 population as a whole.

However, the 153 Plan never advanced to the stage of being presented as a formal resolution for consideration by the District 24 Community School Board. The plan encountered heavy opposition from the affected communities at its initial public airing and as a direct result of that community opposition was never formally considered by the District 24 Community School Board.

The initial public airing of the 153 Plan occurred at the December 14, 1976, public meeting of the District 24 Community School Board held at I.S. 61. On the previous night there had been a meeting at the P 153 facility itself at which angry opposition to any plan to alter the status of P 153 and to make the facility an annex to J 73 had been expressed. Only one member of the District 24 School Board, Mr. Tucker, attended the meeting at P 153; the other Board members apparently did not know about that meeting until the day of the December 14 public meeting when the previous night's meeting at P 153 was mentioned and a press release concerning that meeting was issued by Mr. Tucker.

A review of the contents of Mr. Tucker's press release entitled, "P.S. 153 Parents Up in Arms" (Plaintiffs' Exhibit 15a), as well as consideration of its general tone, suggests that the primary purpose of that release was not to communicate information or to contribute to a rational decision-making process, but rather to stir up less rational considerations in opposition to the proposed 153 Plan. The title itself is provocative. In addition, the press release, after noting "the tentative proposal is only a proposal" and listing the tactics and efforts being contemplated by those opposing the plan, ends with a reference to the highly charged subject of bussing.

As for indicating the basis of the opposition to the 153 Plan, the press release states in summary fashion that, "[t]he sentiment was that P.S. 153 should remain as it is." That statement indicating a desire to maintain the status quo without any supporting particulars in the entire context of the District's history of dealing with the I.S. 61 problem, reflects a continued desire not to disturb the racial composition of the student bodies at various schools which stood to be affected under the proposal. Such an interpretation is bolstered by the fact that the terms of the 153 Plan as stated in the press release do not correspond in all their details to the terms of the plan as presented at trial, a circumstance which again suggests a basic, deep-seated opposition to the general notion behind the plan, regardless of any specifics.

The press release does take cognizance of the overcrowding problem faced by the students of I.S. 61. In that connection, the release cites "both parents and civic leaders at the meeting" as having voiced the view that I.S. 227 was the appropriate solution for the problems of I.S. 61. The release further reports that "[t]he need was stressed . . . for the mounting of a campaign by parents and community leaders to force the city to release funds for [I.S. 227's] completion." However, the conjunction of this perception of a need to press for efforts to complete I.S. 227 with the emergence of the 153 Plan may, as noted below, only suggest concern with matters other than the relief of I.S. 61 behind the call to action with regard to the 227 facility.

Turning to the December 14 public meeting itself, the evidence suggests several similarities to the June 22 and 28 and July 12 public meetings previously discussed in this opinion. The December 14 meeting was heavily attended by residents and representatives of the predominantly white communities which would be affected by the 153 Plan, people who did not typically attend Community School Board meetings in such numbers. The number of people present at the December 14 meeting was characterized by Superintendent Sanfilippo as "dramatic." (Tr. 1280.) The audience came to the meeting, again in the words of Mr. Sanfilippo, "very, very intent on speaking its piece" (Tr. 1281)—mostly in strong opposition to the 153 Plan. The decorum at the meeting was not conducive to reasoned debate or rational discussion of the merits of the 153 Plan.

Witnesses testified to two overtly racial remarks made in the presence—and in one instance, specifically addressed to a member—of the District 24 School Board. Mrs. Hughes testified that a woman stood up in the audience and indicated that, in Mrs. Hughes' words, "If they sent the Corona children over, they would burn the busses," and that "[they didn't] want Corona's children." (Tr. 1417.) Mrs. Darby testified to a statement specifically addressed by a male member of the audience to her fellow Board member, Mr. O'Keefe, and quoted the individual as having said: "We don't want those 'spics' in our area. You [pointing at Mr. O'Keefe] promised us you are not going to send them there." (Tr. 381.)

As with the other meetings previously discussed, the witnesses testified that there was no response by any Board member to either of the overtly racial remarks cited above to indicate that the Board would not allow itself to be influenced by the kinds of racial considerations evidenced by those remarks. No one said in words or substance that the entry of racial considerations into the Board's deliberations would render its decisions illegal, unconstitutional or invalid. No one ruled such remarks out of order or called upon the group to consider the merits of the proposal under consideration without reference to race, color or national origin. Further, District Superintendent Sanfilippo could not remember even one member of the Board, at whose behest he and his staff had undertaken the efforts resulting in the 153 Plan, noting the good-faith, professional effort that had gone into the preparation of that plan or attempting to point out its positive aspects.

Defendants suggest that there was some opposition in the I.S. 61 community itself to the 153 Plan because that plan would not have afforded the students of that community a neighborhood school. In addition, defendants note that there were some expressions of concern by those in the community surrounding the P 153 facility over the prospect of children having to cross Metro-politan Avenue to get to P 71. Defendants also note that another source of concern to those in the communities which stood to be affected by the 153 Plan was the physical obstacle presented by Mount Olivet Cemetery which, according to testimony elicited by defendants, could have meant an addition to ten or eleven blocks to the distance which students would have had to travel to school under the 153 Plan. Examination of the map of District 24 suggests that the existence of Mount Olivet Cemetery would have presented a physical obstacle, which would have had to be circumvented, only to a portion, not all of the students who would have been reassigned to the 153 facility under the 153 Plan.

In any event, real as though some of these concerns and observations may have been, the evidence does not indicate that these were the factors that resulted in the swift demise of the 153 Plan. Rather, the evidence suggests that, as was the case with respect to the other meetings previously discussed, the vehement community opposition to the 153 Plan voiced at the December 14 meeting had an expressly racial component. The evidence further indicates that the racial component to that community opposition was apparent to everyone at the December 14 meeting, including the District 24 Community School Board members,[24] and that in direct response to this community opposition, the District 24 Board decided to drop any further consideration of the 153 Plan.

No other plan for intra-district rezoning with the I.S. 61 situation in mind ever came up for formal consideration by the District 24 School Board after the demise of the 153 Plan. Indeed, although the witnesses testified that the Zoning Committee kept working on the problem, no other clearly defined plan of the sort which the Superintendent and his staff had drawn up involving the 153 facility ever emerged from the Zoning Committee.

---

24. Mrs. Darby, for example, testified to her perception that the position being taken at the December 14 meeting by the opponents to the 153 Plan was that "they did not want the children from the northern part of the district moving any further into their area, 153. They just wanted to stop them at their border." (Tr. at 372.)

The inference is strong that the same factors responsible for the swift demise of the 153 Plan—including acquiescence in racially motivated community opposition—figured prominently in the inability of the District 24 Board to come up with any intra-district rezoning plans to relieve some of the overcrowding at I.S. 61. Although the evidence does suggest that, because of the district-wide overcrowding, no intra-district changes by themselves would have resulted in the complete elimination of both of the District 25 annexes, the evidence also suggests that there was sufficient flexibility within the District to have allowed changes which would have made possible the elimination of at least one of the two annexes. Nor, in view of the resistance which District 25 was encountering from District 30 with regard to its plans for the proposed tenanting of I.S. 227, discussed below, can any asserted reliance on I.S. 227 as the complete answer to I.S. 61's problems satisfactorily explain the failure of District 24 to implement intra-district zoning changes to address the needs of the I.S. 61 community.

Thus, as the temporary status of the two District 25 annexes to I.S. 61 became increasingly less temporary, the completion of I.S. 227 became the only prospect held out by the District 24 Board for the elimination of the District 25 annexes.

(2) *I.S. 227—Developments After the Decision to Institute the District 25 Annexes*

(a) *Continued Intransigence of District 24 Leads Ultimately to the Return of Jurisdiction Over the 227 Facility to the Central Board*

The actual institution in September 1976 of the two District 25 annexes to I.S. 61 with the corresponding compulsory bussing of the large group of predominantly minority I.S. 61 sixth graders out of the district in which they resided did nothing to moderate the intransigent position which District 24 had previously displayed towards the tenanting of the still-to-be-completed I.S. 227. Thus, District 24's actions continued to suggest a subordination of the District's legitimate need for additional seating capacity on the middle school level to a deliberate effort to maintain the existing racial segregation within the District.

The record indicates that after September 1976, at the same time as responsible officials were expressing hopes for the early completion of the 227 facility, there were fewer meetings between representatives of Districts 24 and 30 regarding plans for the tenanting of that facility than there had been in the period to September 1976 when completion of the 227 facility was farther away. District 24 continued to advance its plan to tenant all of the 600 seats allotted to it in I.S. 227 with students from the minority area of P 19 and P 143. The record also indicates that the District 24 Board showed some interest in the idea of changing district lines so as to bring I.S. 227 physically within District 24's rather than District 30's jurisdiction. The attraction of such a change in district lines presumably was that it would remove the obstacle presented by District 30 to District 24's plan to tenant I.S. 227 with predominantly minority students leaving only the Central Board to decide whether to veto such a plan once adopted by District 24. District 30, on the other hand, without any input from District 24, because of the latter's resistance to the concept, developed a proposal to open I.S. 227 as a magnet school eventually adopting a resolution in May 1977 to implement that proposal. The magnet school proposal, as developed by District 30, contemplated special programs for academically gifted pupils, for pupils talented in art, music, dance and theatre, and for pupils expressing a desire to explore career opportunities. As previously indicated, the magnet school proposal drawn up by District 30 also envisioned an integrated student body and to that end, contemplated housing special progress students in the I.S. 227 facility.

By letter dated June 9, 1977, with copies to Central Board officials, the Chairman of the District 24 School Board, Mr. Darby, formally notified the President of the District 30 School Board that the magnet school concept which District 30 had adopted was unacceptable to District 24. The

reason given in the letter for District 24's opposition to the magnet school concept was that a magnet school would not meet the need "to relieve overcrowding specifically in the Corona, Elmhurst area." The letter concludes with the statement that "[o]ur [District 24's] priority is the relief of I.S. 61." (Plaintiffs' Exhibit 97sss.)

This court finds that, contrary to the assertions in Mrs. Darby's June 9 letter, with an appropriately positive and flexible attitude on the part of District 24 officials, the magnet school concept adopted by District 30 would have afforded an opportunity to relieve the overcrowding problem in District 24 in general and in the I.S. 61 area in particular. What District 30's magnet school proposal would *not* have afforded was an opportunity to relieve the specific problem in the I.S. 61 area in such a manner as to leave the status quo and racial segregation in the rest of District 24's schools unchanged. The magnet school proposal as originally drawn would have afforded District 24 the same additional 600 seats on the middle school level which the District would have gotten under its proposal to send to I.S. 227 from District 24 a large group of predominantly minority students from the surrounding area. However, under the magnet school proposal relief for I.S. 61 would have required more extensive rezoning within District 24 itself to place students from the predominantly minority Corona-Elmhurst area into seats in the southern part of the District freed up by white students electing to attend the new magnet school. Of course, the prospect of the magnet school's success in relieving I.S. 61's serious overcrowding problem would have depended largely on a sufficient number of white students from the southern part of District 24 electing to attend the new I.S. 227 facility. That eventuality could have been significantly influenced by the attitude of the District 24 School Board and would have been enhanced by the contemplated plan to place many if not all special progress classes, at least of the two-year variety, in the new facility. Further, the failure of that eventuality could have been overcome by backup plans for compulsory assignment of white students from the southern part of the District to the new school—backup plans of the sort which Chancellor Anker subsequently directed Central Board officials to prepare.

During that period of time when Districts 24 and 30 were each going their separate ways with regard to plans for I.S. 227, there were increasing entreaties especially by District 24 to Central Board officials for intervention by the Central Board in the formulation of plans for the tenanting of the 227 facility. In turn, the record indicates conflicting positions taken by Central Board officials with regard to the respective proposals advanced by the two district school boards. A letter dated November 21, 1977, from Chancellor Anker to the President and Superintendent of District 30 (Plaintiffs' Exhibit 97aaaa) suggests an attitude of acceptance of District 24's proposal to tenant its allotted 600 seats in the I.S. 227 facility with predominantly minority children from the I.S. 61 area. However, a subsequent letter dated January 5, 1978, again from Chancellor Anker to the President and Superintendent of District 30 (Plaintiffs' Exhibit 97bbbb) indicates a conditional acceptance of District 30's magnet school plan. Moreover, the January 5 letter states, *inter alia*, that "up to half of the available seats [at I.S. 227] in the entering and subsequent classes must be reserved for District 24." That a number of seats would have represented an increase over the 600-seat allotment for District 24 which had consistently been discussed in the past. In addition, the January 5 letter included a condition which the author of the magnet school proposal, District 30 Superintendent Silver, testified posed something of a problem for the successful implementation of the magnet school plan. That condition was that "[t]he plan must operate in such a way that there shall not be any reduction in the number of percentage of white pupils in any school that is below the district average for white pupils at the middle school level." According to the testimony presented at trial, this condition resulted from the Central Board's interpretation of Judge Weinstein's decision in *Hart v. Community School Board of Brooklyn, New York School*

*District # 21*, 383 F.Supp. 699 (E.D.N.Y.), *appeal dismissed*, 497 F.2d 1027 (2d Cir. 1974), *aff'd*, 512 F.2d 37 (2d Cir. 1975). The January 5 letter also indicated that the Chancellor had "directed the Office of Zoning and Integration to devise a back-up design for the geographic zoning of I.S. 227 in the event that the magnet plan does not produce acceptable results by March 20, 1978."

The minutes of a special executive meeting of the District 30 Community School Board held on March 22, 1978, and attended by Mr. Elias, as Director of the Office of Zoning and Integration (Plaintiffs' Exhibit 97nnnn), confirm many of the particulars of Chancellor Anker's January 5, 1978, letter regarding the Central Board's conditional acceptance of District 30's magnet proposal. Further, with regard to the fallback geographic zoning plan, the minutes report Mr. Elias as stating:

"My instructions are, from the Chancellor, that we should design a plan that will zone a 50–50 population, zoning white children from your two whiter junior high schools and minority children from the neighborhood and the same from District 24 so as to result in a 50–50 balance."

On this same subject, Mr. Elias is also quoted as stating:

"Can the fallback plan make 227 an all minority school? It is not going in that direction. In some instances the Board of Education has opened schools in all minority areas and they became all-minority schools when they opened. You can't make a comparison between heavy impacted minority population and the population in Districts 24 and 30. You are close to being an integrated district."

These statements by Mr. Elias suggest that as of this time in March 1978 it was the Central Board's determination that I.S. 227 should open as an integrated facility. Further Mr. Elias' statements suggest that as of this time the Central Board was of the view that integration of the I.S. 227 facility was "feasible" as that term is used in the general statement of Central Board policy. However, a reading of Mr. Elias' complete remarks as reported in the March 22 minutes suggests a distinction in Central Board policy depending on whether a plan for the zoning of the new I.S. 227 facility emanated from the affected local districts themselves or from Central Board offices as the result of the inability of the local districts to agree on a plan for the tenanting of the school. The distinction suggested was that the Central Board would apply a narrow standard of review in acting on a plan emanating from the local districts themselves, thus possibly approving a plan which would result in the creation of a minority-segregated school if the local districts stated a belief that such a plan was necessary to preserve "community stability," whereas the Central Board itself would only advocate a plan resulting in an integrated rather than a predominantly minority school. When coupled with Mr. Elias' repeated statements at the March 22 meeting and on other occasions that he wished the two local districts could, between themselves, work out a plan for the tenanting of I.S. 227 so as to relieve him of this "hot potato," a policy distinction of the sort outlined above acted as an invitation by the Central Board for local community school boards to continue to implement school policies affected by a racial animus.

In any event, Mr. Elias' statements at the March 22, 1978, meeting are significant because they indicate again that Central Board requires that plans initiated by the Central Board be drawn to promote integration where feasible and indicate as well that as of March 1978, as viewed by the Central Board, integration of the I.S. 227 facility was "feasible." As detailed below, subsequent events eventually led to the return of primary jurisdiction over the I.S. 227 facility to the Central Board of Education so that policies of the sort indicated by Mr. Elias' statements could have been pursued by the Central Board had it chosen to do so.

The record indicates that Central Board officials in fact drew up four alternative plans (Plans "A," "B," "C" and "D") for the use of the new I.S. 227 facility as fallback plans to District 30's magnet school propos-

al. Plan "A" (Plaintiffs' Exhibit 97pppp) provided for the geographic zoning of I.S. 227 so as to result in an integrated student body by establishing six discrete I.S. 227 attendance zones in Districts 24 and 30 including two enclaves from the areas of J 93 and J 119 in the southern part of District 24. Plan "B" (Plaintiffs' Exhibit 97qqqq) essentially provided for the geographic zoning of the new I.S. 227 facility on a neighborhood school basis with options extended to pupils to apply for open admissions assignment to J 10 or J 141 in District 30 or J 93 or J 119 in District 24. Plan "B" would not have resulted in an integrated student body at the I.S. 227 facility. Plan "C" (Plaintiffs' Exhibit 97rrrr) provided that District 30 would cede the I.S. 227 facility to the Central Board of Education for use as an annex to Newtown High School and that thereupon the existing annex to Newtown High School would be turned over to District 24 for use as an annex to I.S. 61. Plan "D" (Plaintiffs' Exhibit 97ssss) provided that District 30 would cede the I.S. 227 facility to District 24 for use as an annex to I.S. 61.

Hampered by the opposition and lack of cooperation of District 24, District 30's magnet school plan got no farther than outlined above. In April 1978 the District 30 Community School Board rescinded its earlier resolution adopting the magnet school concept for I.S. 227. This court makes no findings regarding the circumstances within District 30 leading to the rescission of the magnet school resolution because those circumstances are beyond the scope of the subject matter at issue in this case.

At the same time in April 1978 that District 30 rescinded its earlier resolution adopting the magnet school concept for I.S. 227, District 30 endorsed Plan "C" of the four fallback plans prepared by the Central Board of Education. By endorsing Plan "C," District 30 in effect indicated its desire to relinquish jurisdiction over the I.S. 227 facility to the Central Board. Although there were subsequent efforts within District 30 to reconsider the matter of that District's jurisdiction over the I.S. 227 facility and although the documents indicate that the new Chancellor, Mr. Macchiarola,

at least twice delayed formal action on a resolution officially transferring jurisdiction over the I.S. 227 facility from District 30 to the Central Board for subsequent transfer to the high school division, Chancellor Macchiarola testified at trial, and all the evidence indicates, that the matter of the fate of the I.S. 227 facility is now and has, for some time, been the primary responsibility of the Chancellor and his staff at the Central Board of Education.

As the two local Community School Boards, before him, the Chancellor and his office were for a time relieved of pressure to come up with an immediate plan for the use of the I.S. 227 facility because of continued delays in the expected completion of the facility. A letter dated July 14, 1978, to Chancellor Macchiarola from the President of the District 30 Community School Board (Plaintiffs' Exhibit 97jjjj) does indicate that the Chancellor had rejected Plan "B" of the four fallback plans prepared by the Central Board staff under the auspices of his predecessor "because of its segregation implications." This confirms again that presently applicable Central Board policy would require I.S. 227 to open as an integrated facility. The evidence also indicates that in the latter part of August 1978 representatives of District 24 met with Central Board officials to discuss the possibility contemplated by Plan "C" of turning the existing Newtown High School annex over to District 24 for use of an annex to I.S. 61. A memorandum to the Chancellor describing that meeting (Plaintiffs' Exhibit 114) and a letter dated August 21, 1978, from Chancellor Macchiarola to officials of District 24 (Plaintiffs' Exhibit 97ooooo) both indicate that it was the Chancellor's position that he would only approve a proposal which provided for the opening of the annex facility on an *integrated* basis. According to the memorandum, District 24 officials in attendance at the August meeting appeared receptive to the notion of an integrated annex with possible skip zoning of white and minority pupils.

The testimony of Mr. Sanfilippo appears to capture the essence of what transpired among District 24 officials with regard to

the proposal to turn the then-Newtown High School annex over to that district's jurisdiction. Apparently, when that proposal was first presented in terms simply of using the then-Newtown High School annex as an annex to I.S. 61, District 24 officials thought that, in conformity with the traditional annex policy which provides that an annex draws its students from the same geographic zone as the parent school, as discussed above, they would be able to tenant the Newtown High School annex facility simply with the predominantly minority children from the I.S. 61 area. When the Chancellor subsequently indicated that before turning the Newtown High School annex facility over to District 24 he would require a plan to populate that facility on an integrated basis, District 24 officials, in the words of Mr. Sanfilippo,

"felt [that] the terms of their understanding had been changed . . . . [T]hey . . . argued that an annex does not have that problem. It is an annex to a school and they take their children."

(Tr. at 1293.)

Thus, this court finds that District 24 quickly lost interest in the possible use of the additional seating capacity of the Newtown High School annex when it became apparent that the District could not have both use of this additional seating capacity and maintain the existing racial segregation within the District. As such, the actions and inactions of District 24 with regard to the proposed use of the Newtown High School annex are part of the previously noted pattern of subordinating the District's need for additional seating capacity on the middle level school to an intent to maintain the racial segregation within the District. Inasmuch as those actions and inactions were also part of District 24's response to the basic problem of the severe overcrowding at I.S. 61, they furnish additional evidentiary support for this court's findings that the earlier decision in response to the I.S. 61 overcrowding problem to establish the two District 25 annexes to I.S. 61 and the subsequent maintenance of those annexes were influenced by an intent to maintain, as well as to create, racial segregation.

Thus, even after primary responsibility for the use of the I.S. 227 facility was turned over to the Central Board of Education, the racial considerations which had blocked all efforts to resolve the overcrowding problem at I.S. 61 remained essentially unchanged; and despite the fact that as this case came to trial the I.S. 227 facility apparently was nearing actual completion, those racial considerations continued to preclude an early end to the two segregated District 25 annexes.

(b) *Present Plans for the Tenanting of the I.S. 227 Facility*

After District 24, despite the intimations of the August 1978 meeting, failed to come up with any proposal for use by that District of the Newtown High School annex, the Central Board returned to the original concept of using the I.S. 227 facility as a middle-level school. Chancellor Macchiarola testified at the trial to a plan to open the I.S. 227 facility as an intermediate school affiliated with Queens College and offering a somewhat special program for its students (Tr. 1694–1705). Although the terms of the special offering contemplated for I.S. 227 were rather vaguely presented, they appear to involve greater emphasis on the guidance function in the middle-level schools, development of what it was hoped will be a model program of bilingual education, and exploration of the untapped potential of middle school—as opposed to elementary or high school—education. The last feature in particular appears to stem from the interest and involvement of Queens College in the plans for the I.S. 227 facility.

Chancellor Macchiarola testified that under the plan assignment to I.S. 227 would be on a voluntary basis and that applications for admission would be accepted from the entire borough of Queens. However, he also testified that initially, in deference to the overutilization in District 24, students from that District would be given a preference for a substantial number of seats, possibly for as many as three-fourths of the approximately 1,800 seats in the facility.

The Chancellor testified that he expected I.S. 227 to open as an integrated facility with a student population reflecting the racial composition of the two immediately surrounding districts. Districts 24 and 30 are both approximately 45% "other", 55% minority on a district-wide basis. He expressed the hope that as a result of the contemplated special program the school would be regarded positively and as an asset both by the surrounding community and by people elsewhere in Queens so that an integrated student body could be obtained from applicants voluntarily choosing to attend I.S. 227. The Chancellor did not indicate that there were any backup plans for the geographic zoning of I.S. 227 if, contrary to his hopes, the voluntary admissions program did not produce the desired integrated student body, as there had been fall-back plans to District 30's magnet school proposal.

According to the Chancellor's testimony, the proposal described by him for I.S. 227 would not result in the immediate elimination of the two District 25 annexes. The Chancellor could not say with any specificity just how long one or both of the two District 25 annexes might be expected to continue after the opening of the new I.S. 227 facility.

The Chancellor testified concerning the process by which the proposal for the use of I.S. 227 was arrived at as follows. Apparently, the Chancellor was contacted by the President of Queens College who asked him whether there was some activity or program in the City school system in which the College could get involved. At the time of that request, Central Board officials were tackling the "hot potato" of what to do with the I.S. 227 facility, and Chancellor Macchiarola apparently seized on the possibility of using Queens College to set up some type of special program at I.S. 227. In the words of Chancellor Macchiarola:

"Saul [Cohen, President of Queens College] wanted to get even more involved and since we were looking at Queens College as a resource, we came upon the 227 idea. It was a brand new school. When we opened it, given the controversy we had, it probably wouldn't have opened to anybody's satisfaction, so I tried to find a way to take advantage of the opportunity given to us by Queens College and open a school that would be regarded by the people in the community as an asset."

Tr. 1698. Thereafter, the Chancellor testified that he consulted with various groups who stood to be affected by the use of the I.S. 227 facility.

The testimony outlined above suggests that, although the proposal for I.S. 227 described by Chancellor Macchiarola was influenced by a positive desire to take advantage of an opportunity offered by Queens College to develop a special educational program at the middle school level, that proposal was also influenced by, and was a response to, the same racial considerations which in the past had surrounded attempts to deal with overcrowding at the I.S. 61 facility. As previously noted, racial antagonisms and a desire to maintain racial segregation lay at the bottom of the community conflict, which had prevented earlier solutions to the problem from being effective, a reality of which this court has also found that Central Board officials were well aware. In this context the Chancellor's proposal to open I.S. 227 as a special non-zoned, voluntary assignment school appears simply to represent another knowing and intentional concession to segregative and discriminatory forces in the community.

The Chancellor's testimony further suggests that he feels rather strongly that the system of decentralization requires sensitivity and concessions to community sentiment. But the community sentiment involved is race prejudice, and the price of those concessions in the instant case appears at a minimum to be abandonment of the promise repeatedly held out to another portion of the entire community, the parents, and the students of I.S. 61 that the opening of the I.S. 227 facility would mean the complete solution to the serious overcrowding problem at that school and the prompt elimination of the two District 25 annexes. In addition, as discussed below, evidence submitted to this court in affidavit

form since the conclusion of the trial of this matter strongly suggests that a further price of those concessions may well be abandonment of the earlier determination that I.S. 227 should open as an integrated facility.

As a practical matter, from the standpoint of additional seating capacity alone, there appears to be no reason why the two District 25 annexes could not be eliminated effective with the opening of the I.S. 227 facility.[25] Nonetheless, even with the ample additional seating capacity represented by I.S. 227, plans have been developed which contemplate the continued maintenance of the two District 25 annexes. The suggestion is difficult to resist that more is at work here than a simple question of proper utilization of facilities and that, consistent with the past pattern of action and in action herein detailed, what is at work is an intent, in deference to sentiment in the white communities of District 24, to maintain the racial segregation in the District's schools.

Affidavits submitted by both sides since the conclusion of the trial updating available information as to the present plans for the I.S. 227 facility indicate that the board, not as of then finalized, outlines of the proposal for I.S. 227 testified to at the trial by Chancellor Macchiarola have now been officially approved and adopted by the New York City Board of Education. It also appears that certain details of the proposal testified to by Chancellor Macchiarola may no longer be accurate—in particular, the affidavits appear to cast doubt upon the suggestion in the Chancellor's testimony that with the opening of I.S. 227 District 24 may get immediate or even eventual use of an additional three-fourths of 1,800, or 1,350, seats.

Further, with specific regard to the question of the integrated nature of the I.S. 227 facility, the post-trial affidavits suggest that there has been considerable difficulty in eliciting applications to I.S. 227 from white students in general and from the white student population of District 24 in particular. Defendants' post-trial affidavit on the status of the plans for I.S. 227 indicates that one of the guidelines which is now being implemented in the processing of applications to attend I.S. 227 is that:

"No non-minority student will be accepted for I.S. 227 if the intermediate or junior high school which he or she would otherwise attend has a smaller percentage of non-minority students than the district-wide average. For example, non-minority students who would otherwise attend I.S. 61 are not being accepted at I.S. 227."

This means that integration of I.S. 227 in general and of the District 24 component of the I.S. 227 student population in particular will depend on getting applications to attend that school from white students in the southern part of District 24. However, the post-trial affidavits strongly suggest that such applications simply have not been forthcoming in any meaningful numbers. Nor was there really any reason to expect that such applications would be forthcoming since, however great the "asset-value" of a Queens-College-assisted I.S. 227 might be, there is no reason to think, given the past history of the District, that the white community will be influenced by such rational considerations where contact with minorities is involved.

Thus, the present plans for I.S. 227 appear to do nothing to reverse the pattern of official acquiescence in and adoption of local race prejudice exhibited throughout the long history of the actions and inaction of school officials with regard to I.S. 61's severe overcrowding problem. Moreover, by reneging on the long-heralded proposition that, when I.S. 227 opened the two District 25 annexes would be eliminated, the present plans for I.S. 227, regardless of whether they eventually permit the gradual phasing out of the two District 25 annexes,

**25.** The evidence suggests that District 30 may no longer have as great a need for the additional seating capacity represented by I.S. 227 as it once did. That fact under ordinary circumstances would be expected to mean that more seats would be available to District 24, if needed, so as to insure that the two District 25 annexes could be eliminated effective with the opening of the I.S. 227 facility.

perpetuate intentional segregation for the foreseeable future.[26]

### (3) Optional Assignment Programs Do Little to Relieve Utilization Problems

The Central Board of Education, in order "to improve integration in the public schools of New York," has instituted open enrollment programs now operating city-wide at both the elementary and middle school levels which afford children in heavily minority schools an opportunity to choose to attend schools with a student population having a high percentage of "others." The programs also include a "reverse" open-enrollment component under which students in schools with a more than 80% population of "others" may choose to attend school in a more predominantly minority setting. In addition, District 24 has its own intra-district optional assignment programs at the elementary and middle school levels which mirror the basic concepts of the city-wide programs, but extend the options to a wider range of schools and students within District 24. Both the city-wide and District 24 programs contemplate the provision of bus transportation to students who choose to avail themselves of those programs although as previously indicated the extent to which and circumstances under which bus transportation is actually made available is not entirely clear.

Under both the city-wide and District 24 programs, P 19 and P 143 are designated as "sending schools." The other I.S. 61 feeder schools are designated as "sending schools" under District 24's, but not under the Central Board's optional assignment program.

There was a good deal of questioning at the trial directed to the subject of how the various optional assignment-integration programs have worked out in fact. It appears that the programs have not been participated in by large numbers of students considering the base student population. It further appears that of those students who have availed themselves of these optional assignments programs most have been minority. Thus, plaintiffs' claim, and an argument can be made out, that the optional assignment programs place the burden of bringing about improved integration in the City's schools on minority students.

However, the critical fact about the various optional assignment programs from the standpoint of this case is that, because of their entirely voluntary nature because they were developed with integration, not utilization, in mind—and because of the relatively small numbers of students who thus far have availed themselves of those programs, they have had virtually no impact on the serious overcrowding problem at I.S. 61 and on the continuing need for the District 25 annexes. Moreover, because it is clear that none of these programs were specifically developed in response to the situation at I.S. 61, the fact of their espousal of the goal of promoting integration does not negate this court's previous findings that the specific responses of school officials to the overcrowding problem at I.S. 61 were affected by discriminatory and segregative intent.[27]

---

26. Plaintiffs have made several requests for a further evidentiary hearing with regard to the present plans for I.S. 227 as they have developed and their details fleshed out since the conclusion of the actual trial. However, because this court finds that the details of the present plans for I.S. 227 are not dispositive of this action, but rather are more significant in terms of how they fit into the pattern of actions and inaction previously detailed with respect to the I.S. 61 overcrowding and the creation of the District 25 annexes, this court has not convened a further evidentiary hearing at this time. Additional evidence concerning the present plans for I.S. 227 may be warranted in connection with this court's consideration of the question of remedy.

Similarly, this court at this time denies and defers until consideration of the question of remedy plaintiffs' request for further discovery concerning present plans for I.S. 227 as set forth in plaintiffs' post-trial motion dated May 14, 1979, and in an affidavit by plaintiffs' counsel dated June 22, 1979.

27. Before proceeding to set forth the conclusions of law, I note some of the matters as to which evidence was introduced during the course of the trial, but about which no factual findings have been made.

No findings have been made regarding the housing policies and practices of various governmental agencies or of private citizens because none of the named defendants in this action can properly be held responsible for those policies and practices. See Austin Independent School District v. United States, 429 U.S. 990, 994, 97 S.Ct. 517, 50 L.Ed.2d 603

## CONCLUSIONS OF LAW

### A. *Overview of Applicable Legal Principles*

■ In its decision in *Keyes v. School District No. 1, Denver, Colorado,* 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973), the Supreme Court dealt for the first time with the subject of racial segregation in the context of a northern school system which had no history of statutorily mandated or authorized separation of the races. Previously, in its landmark decision in *Brown v. Board of Education of Topeka,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), that court had held that segregated educational facilities mandated or authorized by state laws violated the equal protection guarantee of the fourteenth amendment, notwithstanding the fact that those facilities might be equal in terms of their physical aspects and other tangible factors. In *Keyes, supra,* the Supreme Court indicated that northern officials operating school systems without a background of statutorily based separation of the races would also be held legally responsible under the equal protection clause for segregated school conditions, but only where that segregated schooling was shown to be *de jure* as opposed to *de facto* in nature. The *Keyes* court defined the essential elements of *de jure* segregation as "a current condition of segregation resulting from intentional state action," 413 U.S. at 205, 93 S.Ct. at 2696, and emphasized that the differentiating factor between *de jure* segregation for which northern school officials would be held legally responsible and

de facto segregation for which they would not is "*purpose* or *intent* to segregate." *Id.* at 208, 93 S.Ct. 2686 (emphasis in original). That dichotomy between *de jure* and *de facto* racial segregation set forth by the Supreme Court in *Keyes, supra,* continues to establish the framework for judicial consideration of racial segregation in the context of northern school systems. Further, in assessing the claims of equal protection violations in the instant case, that dichotomy focuses attention squarely on the critical question of whether the various conditions of segregated schooling identified in the findings of fact resulted from a purpose or intent to segregate on the part of defendant school officials.

In assessing the existence of a purpose or intent to segregate, this court has been guided by substantive and evidentiary principles indicated in several recent Supreme Court opinions which have discussed the requirement of discriminatory purpose as a necessary component of an equal protection violation. Specifically, the Supreme Court opinions relied on are those in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); and *Personnel Administrator of Massachusetts v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870 (1979).

In *Washington v. Davis, supra,* the Supreme Court held that discriminatory purpose was the key to the existence of an equal protection violation and that racially

(Powell, J. concurring): "discrimination in housing—whether public or private—cannot be attributed to school authorities." In contrast to *Hart v. Community School Board of Brooklyn, supra,* no governmental housing agency or larger governmental entity properly chargeable with responsibility for governmental housing policy was joined as a party in this action. Nor were any of the named defendants in this action shown to have had any control or influence over the practices of private parties in the selection of housing. Failure to make these kinds of specific findings of course does not preclude consideration of the extent to which defendant school officials by their actions and inaction may deliberately have sought to build upon and enhance the effects of existing residential segregation within District 24.

No factual findings have been made with regard to what plaintiffs designate as "the Note" written by Mrs. Shore to Mr. Elias (Plaintiffs' Exhibit 18). As a result of Mrs. Shore's own past membership on the District 24 Board, the Note does suggest that there may have been a persistent pattern of conduct by the Community School Board pursuant to which the members camouflaged the real motivations of many of their actions. However, because the context in which the subject matter regarding which the Note was written was never clarified at the trial, this court deems itself unable to make any findings as to the specific significance of the Note with respect to the matters here at issue.

disproportionate impact alone, without regard to whether that disproportionate impact reflects a racially discriminatory purpose, is insufficient to make out a violation of the equal protection clause. However, as an evidentiary matter, the *Washington v. Davis* court indicated that it was appropriate to consider the fact of disproportionate impact, if shown, as one of several factors bearing on the existence of racially discriminatory purpose or intent. Elaborating on the relevant evidentiary principles, the *Washington v. Davis* court stated:

> "Necessarily, an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another. . . . Disproportionate impact is not irrelevant, but it is not the sole touchstone of an invidious racial discrimination forbidden by the Constitution. . . ."

426 U.S. at 242, 96 S.Ct. at 2048–49.

■ In *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra,* the Supreme Court, citing its decision in *Washington v. Davis, supra,* again stated that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." 429 U.S. at 265, 97 S.Ct. at 563. However, the *Arlington Heights* court indicated that there was no further requirement that plaintiff[s] establish that the racially discriminatory intent or purpose was in some sense "dominant" or "primary" before an equal protection violation may be found:

> "*Davis* does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes. Rarely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern, or even that a particular purpose was the 'dominant' or 'primary' one. In fact, it is because legislators and administrators are properly concerned with balancing numerous competing considerations that courts refrain from reviewing the merits of their decisions, absent a showing of arbitrariness or irrationality. But racial discrimination is not just another competing consideration. When there is a [sic] proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified."

*Id.* at 265–66, 97 S.Ct. at 563 (footnotes omitted). Thus, in the instant case I have not considered it part of plaintiffs' burden to establish that an intent to segregate was the sole or primary purpose behind defendants' actions—regarding plaintiffs' burden instead as being satisfied by a showing that a purpose or intent to segregate was among the factors which brought about a particular course or particular action. At the same time, however, it is necessary to bear in mind the further statement in *Arlington Heights, supra,* that once plaintiff[s] has [have] established a *prima facie* case of an equal protection violation based on a showing of an invidious and impermissible purpose defendant[s] may then rebut that *prima facie* case by "establishing that the same decision would have resulted even had the impermissible purpose not been considered." 429 U.S. at 271 n.21, 97 S.Ct. at 566.

Addressing the concept of discriminatory intent or purpose not only as a substantive requirement for an equal protection violation, but also as an evidentiary matter, the *Arlington Heights* opinion sets forth what it designates as a non-exhaustive summary of "subjects of proper inquiry in determining whether racially discriminatory intent existed." *Id.* at 268, 97 S.Ct. at 565. Specifically, the subjects of proper inquiry noted are: (1) the impact or effect of official action, in particular including the racially disproportionate impact, *id.* at 266, 97 S.Ct. 555; (2) the historical background of a particular decision, "particularly if it reveals a series of official actions taken for invidious purposes," *id.* at 267, 97 S.Ct. at 564; (3) the specific sequence of events leading up to a challenged decision, the court stating in that connection that departures from the normal procedural sequence and substantive departures from the normal decision-making process may be indicative that improper purposes are playing a role, *id.*; and (4) the legislative or administrative history of particular actions or conduct with special sig-

nificance attached to contemporary statements by members of the decision-making body, minutes of its meetings, or reports, *id.* at 268, 97 S.Ct. 555. This court has freely utilized the *Arlington Heights* checklist of "subjects of proper inquiry" in conducting its own evidentiary analysis of the existence of a discriminatory intent in the actions and conduct of defendant school officials.

The Supreme Court decision in *Personnel Administrator of Massachusetts v. Feeney, supra,* once again reaffirms the critical role of an impermissible purpose in establishing an equal protection violation. That opinion also elaborates on the sense in which impermissible purpose must be shown:

> " 'Discriminatory purpose,' . . . implies more than intent as volition or intent as awareness of consequences. . .
> It implies that the decision maker . . selected or reaffirmed a particular course of action at least in part 'because of' not merely 'in spite of,' its adverse effects upon an identifiable group."

442 U.S. at 279, 99 S.Ct. at 2296.

Before proceeding with a statement of legal conclusions on the issue of purpose or intent to segregate,[28] it is well to note the basis in the case law for the factual findings that J 93, J 119, I.S. 61, and the two District 25 annexes to I.S. 61 are all segregated facilities. The factual findings of segregation in each instance are based on the racial and ethnic composition of the student bodies in the respective facilities[29] and on the community attitudes towards the respective schools. The Supreme Court has specifically recognized such factors as indicia of segregated schools in its opinion

in *Keyes, supra.* *See* 413 U.S. at 196, 93 S.Ct. 2686.[30]

This opinion's legal conclusions with respect to the issue of discriminatory intent will be set forth in two parts. First, the opinion will set forth the legal conclusions on that issue with regard to the two segregated District 25 annexes to I.S. 61. Then, the opinion will set forth the legal conclusions on that issue with regard to the other segregated conditions within District 24 identified in the findings of fact.

This kind of division in the legal analysis of the evidence is, in the opinion of this court, warranted and, indeed, required because the evidence itself indicates that the two areas of segregation—the one at the District 25 annexes and the other elsewhere at the middle-level schools within the boundaries of District 24—arise essentially out of different contexts. The segregated annexes to I.S. 61, the evidence shows, were established in the context of defendant school officials' response to a specific problem of overcrowding focused upon one particular middle school in District 24, I.S. 61, which could not satisfactorily be resolved by following established methods and policies of school assignment. On the other hand, the evidence indicates that the other segregated conditions at the middle school level within District 24 identified in the findings of fact developed essentially and for the most part precisely as the result of the application of established methods and policies of school assignment and, to a significant extent, were already in existence by the time the two District 25 annexes to I.S. 61 were created.[31] This difference in the

28. As used in this opinion, the "issue of purpose or intent to segregate" refers *not only to* the existence of such impermissible purpose or intent, but also to the causative relationship between such purpose or intent, if any, and the challenged action or conduct.

29. Pursuant to the instruction of *Keyes, supra,* this opinion treats blacks and hispanics together as one group for purposes of determining the racial composition of particular schools and of defining segregation. *See* 413 U.S. at 197, 93 S.Ct. 2686.

30. The *Keyes* opinion also mentions as another indicia of a segregated school, "the racial and

ethnic composition of faculty and staff." 413 U.S. at 196, 93 S.Ct. at 2691. *As noted, there* were suggestions in the evidence of a discriminatory policy of faculty assignment in the past ° and possibly also in the present.

31. For a discussion of the particular situation of the J 77 annex to J 93 which constitutes an exception to this general statement of the context in which segregated District 24 middle school conditions other than the two District 25 annexes to I.S. 61 emerged, *see* footnote 36 *infra.*

contexts out of which the two areas of segregated conditions emerged leads to a difference in outcome in terms of defendants' legal responsibility for the segregation conditions in the District.

## B. *Defendants' Legal Responsibility for the Racial Segregation at the Two District 24 Annexes*

■ The evidence establishes that the actions of defendant school officials in creating and maintaining the two District 25 annexes to I.S. 61 in response to I.S. 61's severe overcrowding problem were motivated and affected, at least in part, by a segregative and discriminatory purpose or intent. That conclusion is required, in the view of this court, by the factual findings previously made in this opinion, the most salient of which are highlighted below in terms and according to categories suggested by the applicable case law.[32]

### (1) *Historical Background of the Decision to Institute the Two District 25 Annexes*

Aside from one action taken prior to decentralization (the removal of P 89 from the I.S. 61 feeder pattern effective September 1967) and one action which, for the purpose of this opinion, this court has assumed is attributable to the local Community School Board (the implementation of an option to P 143 and P 19 students to attend J 73 or J 125 rather than I.S. 61), the evidence concerning the historical response of defendant school officials to the severe overcrowding problem at I.S. 61 establishes a complete failure of effective action. Further, the evidence including that relating to the circumstances and terms of the option of the P 143 and P 19 students, establishes that the reason for the essential historical failure of

action in response to I.S. 61's overcrowding problem included, at least in part, the fact of the increasingly minority racial composition of the I.S. 61 student body and an unwillingness on the part of the defendant local Community School Board to implement rezoning measures which might upset the existing racial distribution of students among the various middle-level schools within the District.

Further, the evidence establishes a differential and discriminatory response on the part of defendant school officials to the plight caused by the overcrowding conditions at their school of the predominantly minority children of I.S. 61 as compared to the response of those same officials to the needs and problems faced by the predominantly nonminority children in the southern half of the District. Specifically, the evidence establishes that during the same period that defendant school officials essentially failed to take any effective action in response to the severe overcrowding problem at I.S. 61, those officials acted promptly and with attention to the finest nuances and details in response to the needs and problems faced by students in the southern half of the District.

Perhaps the most significant facts in the historical background of the establishment of the two District 25 annexes bearing on the issue of intent are those relating to the tenanting of I.S. 227. The evidence in that connection indicates that by the time construction on the I.S. 227 facility started it was foreseeable that the student body of that school, if zoned on a neighborhood-school basis to relieve overcrowding in I.S. 61, would be predominantly minority. However, because of the questionable evidentiary and legal significance under the

---

**32.** The following section highlighting the findings of fact on this issue could not and does not purport to begin to encompass all of the factual findings relevant to this court's ultimate legal conclusion. In the circumstances of this case, especially with regard to the creation and maintenance of the two District 25 annexes, the issue of the existence of "purpose or intent to segregate" is a mixed question of fact and law. It would serve little purpose to summarize all of its previously made findings of fact

which bear on this issue, and thus, the following section should be viewed simply as an indication of some of the factors which have influenced this court in reaching its ultimate legal conclusion. The section is not a substitute for examination of the findings of fact themselves as an indication of the basis for this court's ultimate legal conclusion that the creation and maintenance of the two District 25 annexes were affected by a segregative and discriminatory purpose or intent.

present state of equal protection law of objective foreseeability alone, *see Arthur v. Nyquist,* 573 F.2d 134, 142 (2d Cir.), *cert. denied,* 439 U.S. 860, 99 S.Ct. 179, 58 L.Ed.2d 169 (1978), I have not attributed determinative probative value with respect to the issue of intent to the segregative effect of the decision to proceed with the construction of I.S. 227. Of greater probative value on the issue of segregative purpose or intent are the terms and flexibility of District 24's plan for the tenanting of its allotted share of the seats in the new I.S. 227 facility. Specifically, I conclude that the nature of District 24's unyielding position regarding the tenanting of I.S. 227 was influenced in substantial part by a desire to maintain the racial segregation within the District which had been established by demographic patterns.

(2) *Specific Sequence of Events Leading up to the Decision to Institute the Two District 25 Annexes*

The evidence with respect to the sequence of events leading up to the establishment of the two District 25 annexes contains numerous instances of procedural departures from the normal decision-making process. Moreover, on numerous occasions the factors which one normally would have expected to be substantially significant in a rational decision-making process were either ignored or rejected despite the fact that they militated in favor of a decision other than the one actually reached. *See Arlington Heights, supra* 429 U.S. at 267, 97 S.Ct. 555. Procedural irregularities appear throughout the series of School Board meetings in September 1976 culminating in the September 10, 1976, meeting starting at the unusual hour of 11:30 p. m. and with only the minimum five members of the District 24 School Board in attendance at which the resolution approving the use of the J 77 facility for students in the southern half of the District was adopted. As one instance, among many, of apparent substantive departure from a rational decision-making process, there is the District Board's attitude to-

wards the Central Board's guarantee of a priority for early basic repairs to the J 77 facility if that facility were used to relieve the serious overcrowding problem at I.S. 61. Especially in the context of the serious fiscal crisis then faced by the City, one would have expected a guarantee of the sort proffered by the Central Board to have been considered very important by the decision makers at the local School Board level and to have strongly favored a decision to use the J 77 facility in some fashion to relieve the overcrowding problem at I.S. 61. Instead, this consideration as well as numerous other arguments for a different response to I.S. 61's overcrowding was either ignored or rejected without rational explanation.

In my view, the sequence of events leading up to the establishment of the two District 25 annexes, especially the series of School Board meetings, commencing with the June 22, 1976, public meeting on Resolution 44 and continuing through the summer of 1976 until the September 10, 1976, meeting referred to above and culminating in the action of sending the I.S. 61 sixth graders to the two District 25 annexes, can only be explained in terms of an intent on the part of defendant school officials to maintain and create segregation in the District as a price they were willing to pay in order to avoid facing up to the real problems posed by race hatred in the white communities of District 24. As defendant school officials came to learn, any action which would bring a significant number of predominantly minority students from the northern part of District 24 into the southern part of the District or disturb the segregated status quo of the distribution of the student population within the District would otherwise have required the school officials to undertake the difficult and painstaking job of eradicating deep-seated racial prejudice.[33] This type of intentional discrimination, as a concession by school officials to discriminatory sentiment in the white community, not with any ulterior ob-

---

**33.** The court does not wish to minimize the courage and devotion to principle which would have been required for defendant school offi-

cials to face up to the racial prejudice in their District.

jective in mind such as promoting greater integration or as a demonstrated last alternative means of avoiding a greater evil in the community, but simply in order to avoid facing up to discrimination in the community, constitutes a violation of the equal protection clause. *Cf. Monroe v. Board of Commissioners*, 391 U.S. 450, 459, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); *United States v. Scotland Neck Board of Education*, 407 U.S. 484, 490–91, 92 S.Ct. 2214, 33 L.Ed.2d 75 (1972) (both cases in which the court held that "white flight" could not be used as a justification for measures that would lead to resegregation in school systems under a duty to dismantle the effects of the past operation of a dual school system). *See also* the discussion of "white flight" as a justification for the actions of defendant school officials in *Parent Association of Andrew Jackson High Schoo. v. Ambach*, 598 F.2d 705 (2d Cir. 1979), and specifically, the statement that "white flight may be a compelling concern when it is not advanced to thwart mandatory desegregation (*or to perpetuate segregation*), but rather to promote a wider integration." at 720 (emphasis added). In this case, defendants' actions in establishing the two District 25 annexes to I.S. 61, by defendants' admissions, were not concerned with the promotion of a wider integration. Rather, as this court's factual findings indicate, the deference to the racially motivated community sentiment in this case was purposefully designed to perpetuate racial segregation in the schools. In *Arlington Heights, supra*, the Supreme Court, in holding that no equal protection violation had been established, emphasized the explicit finding of the trial court that the evidence did not warrant the conclusion that community opposition to minority groups motivated the actions of the defendants. *See* 429 U.S. at 269, 97 S.Ct. 555. That option provides a further indication that, where, as in this case, particular actions were motivated by deference to community opposition to minority children, the predicate of an equal protection violation is established.

(3) *Administrative History*

(a) *Contemporary Statements of Defendant School Officials*

Statements by school officials, both at the local and Central Board levels, made during the relevant period in the summer of 1976 when the subject of how to eliminate the end-to-end sessions at I.S. 61 was being debated and when the wheels leading to the ultimate creation of the two District 25 annexes were being set in motion indicate the influence of racially discriminatory and segregative motives on the decisions being made by District 24. Particularly noteworthy are the statements made by Mrs. Ueckerman and Mr. Tucker that their respective communities simply would not accept I.S. 61's children and the statement of Mr. Elias referring to his own minority status and concluding "I know what they do to minorities."

(b) *Trial Testimony of School Officials Involved in the Decisions at Issue*

On several occasions Mrs. Darby, Chairman of the District 24 Community School Board during much of the period relevant to this action, expressed the opinion, based on her long and deep personal involvement in the relevant school affairs, that racial factors and considerations had affected the actions of the Community School Board with regard to providing relief for the severe overcrowding at I.S. 61 in general and the creation of the two District 25 annexes to I.S. 61 in particular.

(4) *Disproportionate Impact of School Officials' Actions on Minority Children Residing in District 24*

Minority children residing within District 24 have been so far the only children residing within that District who have been compulsorily bussed to schools outside their immediate neighborhoods and who for any part of their basic education have been subjected to the purported disadvantages of compulsory bussing and have been denied the purported advantages of attending a neighborhood school. The disproportionate impact of defendant school officials' actions

on District 24's minority children has been compounded in the case of I.S. 61 annexes by the circumstance that the facilities to which the affected predominantly minority children were and are being bussed are not within the geographic boundaries of District 24 at all, but are in another district entirely, at quite some distance from the District in which the children actually reside.

(5) *Circumstances Surrounding the Continued Maintenance of the District 25 Annexes*

The same pattern of deference to racially discriminatory community sentiment and the same purpose to maintain the segregated status quo of the educational facilities within the District which led to the creation of the two District 25 annexes in the first place have also been factors in the continued maintenance of those annexes. Particularly significant in this connection are the swift demise of the "153 Plan" and the continued inability of District 24 officials to come up with any sort of rezoning measures addressed to the equalization of utilization among the schools within the District and the developments with respect to I.S. 227 since the creation of the two District 25 annexes up to and including the present plans for the use of the I.S. 227 facility.

In addition to indicating the existence of segregative and discriminatory purpose or intent as a factor in the creation and maintenance of the two District 25 annexes, the evidence, as this court views it, fails to establish the defense premised on *Arlington Heights, supra,* 429 U.S. at 271 n. 21, 97 S.Ct. 555, that these same actions would have resulted even had the impermissible discriminatory and segregative purpose not existed. To establish such a defense, the evidence would have to show either (1) that as a factual matter there was no other way defendants could have responded to the overcrowding problem at I.S. 61, or (2) that other factors relied on by defendants either in taking the actions which they did or in failing to act at various times so clearly militated in favor of the course of conduct which they took that the existence of discriminatory and segregative purpose and intent could not have made a real difference in determining the ultimate course of conduct taken. The evidence establishes neither of these propositions.

With respect to the question of whether as a factual matter there were other ways defendants could have responded to the overcrowding problem at I.S. 61, the evidence indicates that there were. Specifically, the evidence establishes that timely action by defendant school officials early on might have prevented the I.S. 61 overcrowding problem from getting as bad as it did.[34] The evidence further indicates that use of the J 77 facility was at one time a viable alternative to the creation of the two District 25 annexes as a means of eliminating the end-to-end sessions at I.S. 61. In that connection, I note defendants' argument that, however it may once have been perceived, the J 77 facility was not in fact a viable alternative to use of the two District 25 annexes because, when the J 77 facility opened in September 1976, its physical condition was such that it could only accommodate 400 students. However, given the fact that the Central Board was prepared to offer a guarantee for a priority for early basic repairs to the J 77 facility if that facility were used to relieve the overcrowding at I.S. 61 and given the fact that, without any prior understanding at all as to how the J 77 facility was to be used, $50,000 was expended on repairs to that facility, there is no reason to believe that, had District 24 officials early on in the summer of 1976 communicated to the Central Board a desire to use the J 77 facility to relieve the overcrowding at I.S. 61, the Central Board would not have been prepared to expend an amount of money above $50,000 sufficient to permit the J 77 facility to accommodate the necessary number of students from I.S. 61 effective September 1976. Moreover,

---

**34.** In that connection, the evidence indicates that in the early 1970's the middle-level schools in the southern part of the District were not overcrowded and did have available seating capacity which might have been used as a resource to equalize the utilizations in the middle-level schools throughout the District.

the evidence establishes that, even had the J 77 facility by itself been unable to accommodate all the overflow students from I.S. 61 effective September 1976, use of the J 77 facility in combination with other intra-district changes in zoning and use of educational facilities would have constituted a viable alternative response to the I.S. 61 overcrowding problem without imposing undue hardship on other District 24 students.

Insofar as the continued maintenance of the two District 25 annexes is concerned, the evidence, particularly with regard to the "153 Plan," establishes that there is at present additional seating capacity within District 24, although in facilities not presently being used for middle school education which might have been used to relieve at least to some extent the overcrowding problem at I.S. 61. Further, the evidence establishes that the contemplated opening of I.S. 227 effective September 1976 would have made it possible as a physical matter to eliminate the District 25 annexes,[35] but that the Central Board instead has put forward a plan which contemplates the continued existence of one or both of those two annexes.

With respect to the question of whether other factors relied on by defendants so clearly militated in favor of the course of conduct which they took, that the existence of discriminatory and segregative purpose or intent could not have made a real difference in that conduct, the evidence casts considerable doubt on the extent to which defendants at the relevant times actually took into account the various "other factors" such as relative ease of transportation and overall maximization of utilization at the middle school level which they now advance as justifications for their action in creating the two District 25 annexes. Further, the evidence establishes the existence of countervailing factors to those now advanced by defendants including (1) the initially expressed preference for an intra-district remedy, if possible, (2) the initially stated belief that only a one-year stop gap

measure was required, and (3) perhaps most significantly, the Central Board's guarantee of a priority for early basic repairs to the J 77 facility if that facility were used to relieve the overcrowding at I.S. 61. The existence of these countervailing considerations preclude a conclusion that the existence of the discriminatory and segregative purpose or intent shown by the evidence did not have an important and real impact on the defendants' actual course of conduct. Similarly, with respect to the continued maintenance of the District 25 annexes, especially now with the imminent opening of I.S. 227, the evidence, in the view of this court, would not support a finding that the state of affairs in the District has not been affected in a real sense by, and would not be any different were it not for, the existence of the discriminatory and segregative purpose or intent.

Accordingly, this court finds that defendant school officials are legally responsible under the principles of the equal protection clause for the racial segregation at the District 25 annexes to I.S. 61. Before turning to the question of the appropriate remedy, however, this court must address the issue of the defendants' legal responsibility for other segregated conditions at District 24's middle-level schools.

### C. Defendants' Lack of Legal Responsibility for Other Racial Segregation at Middle Schools in District 24

■ At the outset, it bears noting once again that there is a difference in the context in which segregated middle school conditions in District 24 itself have developed and the context in which the two segregated District 25 annexes to I.S. 61 emerged. The segregated conditions discussed in this section of this opinion already existed at the time the District 25 annexes were created. These conditions emerged as a result of the application of established methods and policies of school assignment, a matter lying at the very foundation of the organization and

---

**35.** Nor has it been shown that use of the I.S. 227 facility in such a manner as to eliminate the need for the District 25 annexes would violate any stated policy of the Central Board of Education.

structure of any school system. In contrast, the District 25 annexes were created as a response to a particular problem of overcrowding at a specific school facility, I.S. 61, under circumstances in which a satisfactory solution required some departure from the established methods and policies of school assignment which had theretofore guided the basic organization and structure of the District 24 school system.[36] At the same time, this court concludes that the present segregated conditions at all of the middle schools in District 24 has been enhanced to some degree by the defendant school officials' actions in creating and maintaining the two District 25 annexes as their response to the overcrowding problem at I.S. 61. That added degree of segregation is also properly viewed in terms not of the application of established methods and policies of school assignments, but in the same context as that in which the two District 25 annexes to I.S. 61 were created and have been maintained.

This court concludes that, insofar as these segregated conditions existed prior to the creation of the two District 25 annexes to I.S. 61 and insofar as these segregated conditions would, in any event, have remained even after the creation and despite the maintenance of the two District 25 annexes, plaintiffs have failed to establish that the segregated conditions in middle-level schools in District 24 in general are the result of intentional segregation on the part of defendant school officials. Accordingly, this court finds that plaintiffs have failed to establish an equal protection violation with regard to those other segregated school situations, except to the extent that

the creation and maintenance of the two District 25 annexes enhanced segregation throughout the District. To the extent, however, that the creation and maintenance of the two District 25 annexes enhanced the degree of the segregated middle school conditions within the geographic boundaries of District 24, defendant school officials are legally responsible for that added degree of racial segregation pursuant to the same principles and based upon the same evidentiary analysis which required the finding of defendants' legal responsibility for the segregated District 25 annexes.

The remainder of the discussion in this section of this opinion sets forth the basis for this court's conclusion that defendant school officials are not legally responsible for the general condition of racial segregation at the middle schools within the geographic boundaries of District 24. The ensuing discussion thus does not take any further account of the enhanced effect on the degree of present segregated conditions of the creation and maintenance of the two District 25 annexes, leaving any further discussion of the significance of that enhanced effect until consideration of the issue of remedy.

The evidence at trial traced the differences in the racial composition of the schools in the northern and southern halves of District 24 and the specific racial segregation at J 93, J 119 and the main I.S. 61 facility essentially to two interrelated factors: (1) District 24's use of a neighborhood school policy to assign students to school, and (2) natural demographic changes and presently segregated residential population

---

**36.** The one other segregated school within the boundaries of District 24 which did not emerge in the context of the application of established methods and policies of school assignment, but in the context of an asserted overcrowding problem in the schools in the southern half of the District is the J 77 annex to J 93. This court has considered the circumstances leading to the use of the J 77 facility as an annex to J 93 as an evidentiary matter bearing on the intent with which defendant school officials acted in creating the two District 25 annexes. The evidence presented at trial, although suggestive, is, in the opinion of this court, insufficient to permit a further legal determination as

to the existence of segregative purpose or intent behind the decision to open the J 77 facility as an annex to an existing southern area school rather than as a new zoned facility once the decision not to use the J 77 facility to relieve the overcrowding at I.S. 61 had been made; and accordingly, this court has not, in this opinion, made any legal determination on that question. Ensuing references in the body of this opinion to segregated middle school conditions within the boundaries of District 24 should be interpreted as excluding any consideration of the situation posed by the present J 77 annex to J 93.

patterns which are reflected by the neighborhood school policy in the racial composition of the schools in the various sections of the District. Nothing in the evidence introduced by plaintiffs demonstrated the use by defendant school officials of any of the classic segregative devices which have been traditionally cited as indications of the existence of segregative purpose or intent, such as "the intentionally segregative use of the optional attendance zones" to permit white students to transfer away from and avoid predominantly minority schools,[37] *Columbus Board of Education v. Penick*, 443 U.S. 449, 475, n. 8, 99 S.Ct. 2941, 2948, 61 L.Ed.2d 666 (1979); the establishment of discontiguous attendance areas "when neighborhood schools would have tended to desegregate the involved schools," *id.* at 477, n. 9, 99 S.Ct. at 2949, n. 9; deliberate manipulation of feeder and school attendance zones to remove white students from predominantly minority schools, and vice versa, *see, e. g., Hart v. Community School Board of Education, New York School District # 21*, 512 F.2d 37 (2d Cir. 1975), adoption of a sham transfer program such as the "language transfer" program in *Arthur v. Nyquist, supra*, to enable white students to transfer away from predominantly minority schools; or the intentional selection of school sites to perpetuate racial segregation, *see, e. g., Keyes, supra*, 413 U.S. at 201–02, 93 S.Ct. 2686.[38] To the contrary,

the evidence demonstrates that at least prior to September 1976, when the two District 25 annexes were created, none of the zoning or assignment changes which affected or involved District 24 were used as deliberate devices either to perpetuate, create or enhance racial segregation in District 24's schools.

Of the two interrelated factors to which the segregated middle school conditions within the boundaries of District 24 were shown to be causally related, the one over which defendant school officials had and have the most obvious control and for which they can most clearly be charged with responsibility as a factual matter is the use of the neighborhood school policy. With respect to natural demographic changes and presently segregated residential patterns, the only basis suggested by the evidence for charging defendant school officials with even a part of the responsibility for those phenomena is the failure of those school officials to take action to reverse the trend especially evident in the northern part of the District of increasing segregation in the schools. That such failure of action might, in part and to some extent, have lead to the present residential segregation and accelerated past and present demographic changes is suggested by the evidence of a two-way interaction in which increasing segregation in particular public schools leads to an ac-

---

**37.** Although plaintiffs' counsel at one point elicited testimony suggesting that some white students attending elementary school in the southern part of the District had used the optional assignment program to transfer to a school with a slightly higher percentage of "others" than the school they were transferring from, the evidence suggests that this was an isolated instance and that a similar situation could not result under the existing optional assignment programs as presently constituted. Moreover, the record contains no evidence suggesting that the current optional assignment programs are anything other than good-faith efforts to afford students an opportunity to attend school in a more integrated environment and does not indicate that the current optional assignment programs constitute a subterfuge designed to perpetuate segregated school conditions. Indeed, this court's only difficulty with the current optional assignment programs was not with their stated underlying purpose to promote integration, but with the fact that they

were essentially inadequate to relieve the overcrowding problem at I.S. 61 and had done nothing to bring about the quick elimination of the two District 25 annexes.

**38.** With respect to the site for I.S. 227, this opinion has already commented on the fact that by the time actual construction on that site began it was foreseeable that the school would be a predominantly minority one if zoned on a neighborhood school basis. Actual selection of the site had been completed several years prior to the commencement of construction. There is no indication in the record that the actual selection of the site was motivated by segregative intent or was based on anything other than an accurate perception of where the need for a new school facility was greatest. Accordingly, the selection of the site for I.S. 227 cannot be characterized as a purposefully or intentionally segregative device. *See Higgins v. Board of Education of City of Grand Rapids*, 508 F.2d 779, 785–86 (6th Cir. 1974).

celeration of residential segregation in the surrounding area as well as vice versa. On the basis of the present record, however, the extent to which this type of failure of action might accelerate residential segregation and natural demographic changes must be regarded as speculative.

In all events, the critical course is not the extent to which defendants may, as a result of their actions and inaction, have contributed to residential segregation and demographic changes. Rather, the critical question is whether the actions and inaction of defendant school officials establish an equal protection violation. In the opinion of this court, they do not.

The record in the present case does not support a legal conclusion that defendant school officials' use of the neighborhood school policy as the basic method of assigning students to schools was motivated by an impermissible segregative purpose or intent. Thus, the record affords no grounds for questioning the good-faith basis of the neighborhood school policy in legitimate concerns over the hazards of long-distance travel and transportation, the benefits of attending school close to home, and the ease of administration by the use of readily ascertainable criteria for pupil assignment—concerns whose legitimacy have been recognized in the courts. *See, e. g., Deal v. Cincinnati Board of Education,* 369 F.2d 55, 60 (6th Cir. 1966), *cert. denied,* 389 U.S. 847, 88 S.Ct. 39, 19 L.Ed.2d 114 (1967). Further, the evidence presented indicates that the neighborhood school policy has been the historical and consistently used basic method of school assignment not only in District 24, but throughout the City school district. Moreover, the evidence establishes that use of the neighborhood school policy predated the extensive population shifts which have

turned the northern part of District 24 into a predominantly minority area. Accordingly, use of that policy may not be viewed fairly as a device deliberately designed to enhance and capitalize upon these more recent demographic trends.[39] Nor is the fact that the *effect* of the use of the neighborhood school policy in this case was, because of the grounding of that policy in underlying, increasingly segregated residential patterns to produce racial segregation in the schools, by itself enough under the present state of the law to establish the impermissible segregative purpose or intent requisite to a finding of an equal protection violation. *See Arlington Heights, supra; Washington v. Davis, supra; Austin Independent School District v. United States,* 429 U.S. 990, 991 and n. 1, 994, 97 S.Ct. 517, 50 L.Ed.2d 603 (Powell, J. concurring); *United States v. Texas Education Agency,* 564 F.2d 162, 168–70 (5th Cir. 1977) (decision after last remand from Supreme Court). *See also Dayton Board of Education v. Brinkman (Dayton I),* 433 U.S. 406, 413, 97 S.Ct. 2766, 2772, 53 L.Ed.2d 851 (1977) ("The finding that the pupil population of the various . . . schools [in a district] is not homogeneous, standing by itself, is not a violation of the Fourteenth Amendment in the absence of a showing that this condition resulted from intentionally segregative actions on the part of the Board").

What has been said is not based on a view that under no circumstances may an equal protection violation be predicated on the use of a neighborhood school policy. To the contrary, there certainly may be situations in which a neighborhood school policy may be shown to have been motivated or accompanied by an impermissible segregative pur-

---

**39.** The findings of fact regarding the creation of the two District 25 annexes to I.S. 61 indicate the potential for manipulation of the neighborhood school policy to perpetuate and create new racial segregation via the use of annexes. However, that existing patterns of racial composition of the schools in a particular district traceable to the underlying use of a neighborhood school policy may be exploited by a device such as the annex to maintain or create racial segregation does not necessarily indicate

that the underlying use of a neighborhood school policy in the first place was or is infected by an invidious and segregative motive in the absence of other evidence such as the deliberate manipulation of attendance and feeder zones or the use of optional attendance zones to permit white students to transfer away from and to avoid predominantly minority schools which would directly place in question the good-faith use and application of the underlying neighborhood school policy itself.

pose or intent. *See United States v. Texas Education Agency, supra.* The record in the instant case, however, simply does not establish such a segregative purpose or intent insofar as defendant school officials' use of the neighborhood school policy as the basic method of assigning students to schools and the segregated conditions resulting therefrom is concerned.[40]

■ That leaves only defendants' past and present failure to take action to reverse segregative trends as a possible basis for establishing an equal protection violation in connection with the general pattern of segregation in the middle-level schools within District 24 or the specific segregation at J 93, J 119 and the main building at I.S. 61. Indeed, much of plaintiffs' argument as to the defendants' legal culpability for the segregated school conditions indicated by the evidence, other than the segregated conditions at the two District 25 annexes, consists essentially of this sort of attack on defendants' failure to take what in the eyes of the plaintiffs would have been appropriate measures not only to reserve segregative tendencies, but further to desegregate the schools.

However, this Circuit has indicated that failure to act by itself may not be the basis of a finding of *de jure* racial segregation:

> "We assume that mere inaction, without any affirmative action by the school authorities, allowing a racially imbalanced school to continue, would amount only to *de facto* rather than *de jure* segregation."

*Hart v. Community School Board, supra,* 512 F.2d at 48. Further, having found that defendants are not legally responsible on account of their use of the neighborhood school policy as the basic means of assigning students to school for the initial and increasingly segregated conditions at District 24's middle school and there being no other evidence that defendants in the past operated a dual school system which they had an obligation to dismantle, I have no basis for concluding that defendants were under any duty to take action either to reverse the segregative trends or more ambitiously actually to desegregate those schools. *See Parent Association of Andrew Jackson High School v. Ambach, supra,* at 713 ("If there is no *de jure* segregated school system, there is no judicially-enforceable constitutional obligation, under existing law, to take affirmative action to remedy racial imbalance.").[41]

In considering the defendants' responsibility for the segregated school conditions discussed in this part of this opinion, I have

---

**40.** This Circuit has recently expressed some doubt as to the continued validity in light of recent Supreme Court decisions of the "natural and foreseeable consequences" test for determining the existence of impermissible segregative intent with its burden-shifting mechanism, and as first elaborated in this Circuit in *Hart v. Community School Board # 12, supra. See Parent Association of Andrew Jackson High School v. Ambach, supra,* at 712. However, even were this court to analyze the defendants' basic use of the neighborhood school policy as shown in this case according to the terms of the *Hart* test, as amplified in *Arthur v. Nyquist, supra*; and *Parent Association of Andrew Jackson High School v. Ambach, supra,* this court's findings that the evidence fails to establish the existence of segregative intent would not be changed. For one thing, to deem the existing segregated conditions at District 24's middle-level schools in general and at J 93, J 199 and I.S. 61 in particular, a "foreseeable effect" of the continued use of the neighborhood school policy would come very close to the purely objective test of intention disavowed in *Arthur v. Nyquist, supra* at 142 n. 15:

> "Since most racial imbalance, once established, is foreseeable, any policy which permits such imbalance to continue would, on a strictly objective theory, amount to a *de jure* segregation. We believe that such a theory sweeps more broadly than necessary, collapsing the distinction between *de jure* and *de facto* segregation."

Moreover, even assuming that the use of the neighborhood school policy by itself could satisfy plaintiffs' initial burden, the evidence permits a finding that defendants have rebutted the initial presumption by showing, as per the discussion of the use of the neighborhood school policy in the body of the text, that their use of the neighborhood school policy was not the result of segregative intent.

**41.** I reject plaintiffs' suggestions that any judicially enforceable constitutional obligation to desegregate all the middle-level schools in District 24 may be derived from the generally worded and essentially hortatory pronouncements of either the State Board of Regents or the City's Central Board of Education with respect to the desirability of integrated schools.

also considered the significance of this court's previous finding that defendants acted with impermissible segregative and discriminatory purpose or intent in connection with the creation and maintenance of the two District 25 annexes to I.S. 61. Such consideration is suggested by the following statements in the Supreme Court's opinion in *Keyes, supra*:

"[P]roof of state-imposed segregation in a substantial portion of the district will suffice to support a finding by the trial court of the existence of a dual system. . ."

413 U.S. at 203, 93 S.Ct. at 2695.

"[W]e hold that a finding of intentionally segregative school board actions in a meaningful portion of a school system, as in this case, creates a presumption that other segregated schooling within the system is not adventitious. It establishes, in other words, a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions."

413 U.S. at 208, 93 S.Ct. at 2697.

However, I conclude that, giving due deference to the abovequoted statements from *Keyes, supra*, the earlier findings of impermissible segregative and discriminatory purpose or intent with regard to the creation and maintenance of the two District 25 annexes to I.S. 61 do not support a further finding either of the operation of a dual school system in District 24 in general or of the existence of impermissible segregative purpose or intent as a factor in the development or maintenance of the other segregated school conditions identified in this part of this opinion.

First, it is problematic whether in terms of the numbers of affected students the two District 25 annexes to I.S. 61 are properly viewed as constituting a "substantial" or "meaningful" portion of the entire District 24 school systems within the sense of the *Keyes* opinion. Secondly, the previously noted differences between the history of the segregated I.S. 61 annexes and the history of the segregated middle school conditions discussed in this part of this opinion, taken together with the relatively small numbers of students directly affected by the two District 25 annexes, in the opinion of this court, undercuts the basis as an evidentiary matter for the application of the *Keyes* presumption to the circumstances of this case.

That the *Keyes* presumption as indicated above is primarily a matter of evidence is apparent from the Supreme Court's opinion:

"This is merely an application of the well-settled evidentiary principle that 'the prior doing of other similar acts, whether clearly a part of a scheme or not, is useful as reducing the possibility that the act in question was done with innocent intent.' 2 J. Wigmore, Evidence 200 (3d ed. 1940). 'Evidence that similar and related offenses were committed . . . tend[s] to show a consistent pattern of conduct highly relevant to the issue of intent.' *Nye and Nisson v. United States*, 336 U.S. 613, 618, 69 S.Ct. 766, 769, 93 L.Ed. 919 (1949). . . ."

413 U.S. at 207, 93 S.Ct. at 2697. In this case, the fact that the District 25 annexes were created *after* the general pattern and specific instances of segregated middle school conditions discussed in this part of this opinion already existed, although perhaps not to the exact same degree as they now exist, reduces the probative value of any findings regarding either the creation or maintenance of the District 25 annexes. The fact that the creation and maintenance of the two District 25 annexes was a response to a particular overcrowding problem under circumstances, which in a real sense *required* some departure from the established methods and policy of school assignment, renders those actions different in kind from the actions and inaction of defendants considered in this part of this opinion. That difference casts substantial doubt upon the propriety of viewing both the application of the established methods and policies of school assignment and the creation and maintenance of the two District 25 annexes as part of one single, con-

tinuous and uninterrupted course or pattern of conduct.

In addition, however, even assuming that the impermissible segregative purpose or intent with regard to the creation and maintenance of the two District 25 annexes properly establishes the predicate for the operation of the above-indicated *Keyes* presumption, the evidence as a whole does not support a further finding of segregative middle school conditions discussed in this part of this opinion. On the contrary, the factors which the evidence shows have, for the most part, caused these other segregated conditions persuade the court that defendants have borne their burden of rebutting any prima facie case of intentionally segregative conduct and of proving that the segregated conditions discussed in this part of this opinion did not result from intentionally segregative actions.

Finally, this court considers plaintiffs' argument that, even without a showing of impermissible segregative purpose or intent, they are entitled to a remedy for the general pattern and specific instances of racial segregation in District 24's middle schools discussed in this part of this opinion pursuant to Title VI of the Civil Rights Act, 42 U.S.C. § 2000d et seq. In that connection, plaintiffs assert that Title VI permits a desegregation remedy upon a showing of segregative *effects* alone without a concomitant showing of segregative purpose or intent. This precise argument regarding the import of Title VI was considered and rejected by the Second Circuit in its decision in *Parent Association of Andrew Jackson High School v. Ambach, supra*:

"Plaintiffs urge, nevertheless, that a desegregation order may be predicated upon the Civil Rights Act of 1964, arguing that under Title VI, 42 U.S.C. § 2000d, segregative *effects* alone without discriminatory intent, establish a prima facie violation. We think, however, that Title VI does not authorize federal judges to impose a school desegregation remedy where there is no *constitutional* transgression—i. e., where a racial imbalance is merely *de facto*. Significantly, Title VI of the Act, which deals comprehensively with school desegregation and authorizes the Attorney General to bring desegregation suits, provides that the substantive powers of the courts in such actions shall be no greater than 'existing powers . . . to enforce the Equal Protection Clause.' *Swann v. Charlotte-Mecklenburg Board of Education, supra*, 402 U.S. [1] at 17, 91 S.Ct. 1267, 1277, 28 L.Ed.2d 554; *see* 42 U.S.C. § 2000c–6. . . . Having denied the Attorney General and the federal judiciary any authority to correct *de facto* imbalances under Title VI, it would have been illogical for Congress to grant broader powers in Title VI to private plaintiffs in the same courts. We must conclude, therefore, that even if there is a *private* right of action to desegregate schools under Title VI, an affirmative judicial desegregation order without a showing of *de jure* discrimination would not be authorized."

At 715–716 (emphasis in original; footnote omitted). Accordingly, this court finds that plaintiffs are not legally entitled to any relief for the segregated school conditions discussed in this part of this opinion pursuant to Title VI of the Civil Rights Act.[42]

---

**42.** In one of their post-trial motions, plaintiffs moved to amend their complaint to add allegations under the Thirteenth Amendment. That motion is hereby granted. However, once again, this court regards the Second Circuit's opinion in *Parent Association of Andrew Jackson High School v. Ambach, supra*, as precluding the grant of any legal relief under this additional substantive allegation. The governing language in the *Andrew Jackson* opinion is the following:

"Plaintiffs have suggested to us that the *de facto* segregated condition of Jackson, although not violative of the Equal Protection Clause as currently understood by the Supreme Court, might transgress the Thirteenth Amendment as a 'badge of slavery.' Inter-

esting though this argument is, plaintiffs have proffered no authority to support the position that those segregative effects upon schools which do not of themselves run afoul of the Fourteenth Amendment may be reached in any event through the Thirteenth Amendment. To apply the Thirteenth Amendment in the fashion suggested by the plaintiffs would effectively outflank the careful doctrinal banners that the Supreme Court has constructed in school desegregation cases. Whatever our own view may be of this doctrine, it is our principled responsibility as an inferior federal court to apply the spirit of the rulings of the Supreme Court without resorting to hairline distinctions."

Having thus decided the question of defendants' legal responsibility for the various segregated school conditions identified in the findings of fact and having found that defendants are legally responsible for some, but not all, of the segregated school conditions, there remains but the issue of remedy. It is to that question which this court now turns.

## REMEDY

The Supreme Court, in its opinion in *Dayton I, supra*, summarized and elaborated upon the legal principles governing the determination of the appropriate scope of a remedy in a school desegregation case:

"The power of the federal courts to restructure the operation of local and state governmental entities 'is not plenary. It "may be exercised 'only on the basis of a constitutional violation.'" [*Milliken v. Bradley*], 418 U.S. [717] at 738, 94 S.Ct. 3112, 3124, 41 L.Ed.2d 1069, 1087, quoting *Swann v. Charlotte-Mecklenburg Board of Education*, 402 U.S. 1, 16, 91 S.Ct. 1267, 1276, 28 L.Ed.2d 554, 556–57. See *Rizzo v. Goode*, 423 U.S. 362, 377, 96 S.Ct. 598, 46 L.Ed.2d 561. Once a constitutional violation is found, a federal court is required to tailor "the scope of the remedy" to fit "the nature and extent of the constitutional violation." 418 U.S. at 744, 94 S.Ct. 3112, 3127, *Swann, supra*, 402 U.S. at 16, 91 S.Ct. 1267, 1276.' . . .

. . . . [T]he District Court in the first instance, subject to review by the Court of Appeals, must determine how much incremental segregative effect [the constitutional] violations had on the racial distribution of the . . . school population as presently constituted, when that distribution is compared to what it would have been in the absence of such constitutional violations. The remedy must be designed to redress that difference and only if there has been a systemwide impact may there be a systemwide remedy. . . ."

433 U.S. 406, 419–20, 97 S.Ct. 2766, 2775, 53 L.Ed.2d 851. The recent Supreme Court decisions in *Columbus Board of Education*

*v. Penick, supra*, and *Dayton Board of Education v. Brinkman (II)*, 443 U.S. 526, 99 S.Ct. 2971, 61 L.Ed.2d 720 (1979) reaffirmed the principles set forth above with respect to the question of remedy, although the several opinions in those two cases indicated disagreement as to the appropriate application of those principles in the specific circumstances there presented.

In the present case, this court has found constitutional violations with respect to the creation of the two segregated District 25 annexes to I.S. 61 and with respect to the continued maintenance of those annexes. The constitutional violation with respect to the continued maintenance of the two District 25 annexes is heightened by the opening of the I.S. 227 facility under a plan which, despite the history of contrary representations that the opening of the I.S. 227 facility would make possible a complete solution to I.S. 61's overcrowding problem, contemplates the continued necessity for the District 25 annexes on account of the chronic overcrowding problem at I.S. 61.

The segregative effect of these constitutional violations is multifaceted. First, the constitutional violations have resulted in additional segregated schools in which predominantly minority children from District 24 have been and are being housed over and above the segregated schools which already existed in District 24 prior to the creation of the two District 25 annexes. Secondly, the predominantly minority children from the I.S. 61 community have been subjected to the stigma of being treated as an unwanted group, shunned, even on a temporary basis, by the white residents of other parts of District 24 and singled out not simply for compulsory bus transportation, but for transportation to facilities in an entirely different school district than the one in which they reside. Third, to the extent that this court has found in general terms and particularly in connection with the discussion of the short-lived "153 Plan" that there was flexibility within District 24 itself to absorb some of the predominantly minority students who could no longer satisfactorily be accommodated at I.S. 61 and

to place those students in a more integrated educational environment within the District, the creation and maintenance of the two District 25 annexes to I.S. 61 has resulted in the loss of that additional degree of integration which would have otherwise resulted within the District itself. Looking at that same phenomenon from a somewhat different perspective, to the extent that the creation and maintenance of the two District 25 annexes to I.S. 61 permitted the basic condition of segregated middle schools within District 24 to continue at a degree of segregation at which they would not have been able to continue had non-discriminatory and non-segregative responses to I.S. 61's overcrowding problem been adopted, the constitutional violations may be said to have caused additional racial segregation within the District which must be remedied.

This court has not attempted to quantify on a district-wide basis this last effect of the constitutional violations as indicated above because, as Superintendent Sanfilippo testified, there being essentially no limit to the possible plans which a school board might have developed and which might have absorbed some of the predominantly minority children from I.S. 61, any such attempt would, of necessity, be rather uncertain and speculative in nature. Moreover, with the I.S. 227 facility apparently ready to open, the need for such an attempt may be obviated because the I.S. 227 facility can and, according to Central Board guidelines governing the opening of new schools, should be used in such a fashion as to provide an added degree of integration in District 24's middle schools at least as great as that which would have been achieved by a non-discriminatory, non-segregative response to I.S. 61's overcrowding problem without I.S. 227 available as an option.

As previously indicated, the legality of the presently approved plan for the use and tenanting of the I.S. 227 facility is not an issue squarely before this court at the present time. The court has considered the evidence regarding the contemplated plan for I.S. 227 as bearing primarily on the intent of defendant school officials in maintaining the two District 25 annexes. Nevertheless, the evidence, that I.S. 227 has historically been held out as the complete answer to I.S. 61's overcrowding problem, that integration of the I.S. 227 facility would at present be "feasible," and that existing Central Board policy thus would appear to require that I.S. 227, as a new school, should open on an integrated basis, forcefully demonstrates the potential represented by the I.S. 227 facility as a remedy for the constitutional violations identified in the creation and continued maintenance of the two District 25 annexes. To the extent that the presently approved plan for the use of the I.S. 227 facility not only betrays past representations that the availability of that facility would eliminate the need for the District 25 annexes, but also provides for a student body at that school which is not integrated, the present incremental segregative effect of defendants' constitutional violations remains unabated."[43]

---

43. This court anticipates that defendants may argue, as was argued by petitioners in *Columbus Board of Education v. Penick, supra, see* 443 U.S. at 504 n. 13, 99 S.Ct. 2982, that, even accepting this court's findings of constitutional violations, those violations could not have had any incremental segregative effect because, had there been a problem with overcrowding at I.S. 61 and with the availability of additional facilities and seating capacity in the surrounding area within District 24, all of the minority children from the I.S. 61 community would have been attending segregated schools in any event because of the use of the neighborhood school policy as the underlying method of assigning students to school. Superficially, such an argument might appear seductive. However, upon examination any such argument must fail. The essential defect of such an argument is that it purposefully and without any basis in legal principles avoids the reality presented by the instant case. The fact of the matter is that there was an overcrowding problem at I.S. 61, and there simply is no warrant in any principle of law for dealing with any aspect of this case as though that overcrowding problem had not existed. Moreover, the argument ignores the significant effect of defendants' actions as stated in the text of subjecting predominantly minority children of the I.S. 61 community to an unmistakable stigma and making them feel essentially unwanted by virtue of the manner in which defendants chose to respond to I.S. 61's overcrowding problem.

Another argument which this court anticipates that defendants hereafter may make in urging the absence of any incremental segregative effect of their actions is that, even under the

Accordingly, this court orders that defendants be and they hereby are enjoined from continuing to take, or from taking any further, action in violation of plaintiffs' Fourteenth Amendment rights. Specifically, this court orders, by way of remedy for the constitutional violations found in this opinion, that defendants forthwith commence formulation of a plan pursuant to which the segregated District 25 annexes be eliminated and the students otherwise programmed to attend those annexes be reabsorbed within District 24 in a fashion which will afford an integrated, educational setting to a number of the predominantly minority students from the present I.S. 61 community corresponding to the number of students which present plans contemplate housing in the two District 25 annexes.

Without intending to impinge on the initial responsibility of school authorities to develop the details of an appropriate plan, I note that one would expect that use of the I.S. 227 facility on an integrated basis would figure prominently in any plan hereafter submitted to this court and that defendants would bear a heavy burden in terms of justifying any plan which did not include use of the I.S. 227 facility on such an integrated basis. At a minimum, de-

fendants will bear a heavy burden of justifying any plan which did not include the assignment to I.S. 227 of an integrated group of students from District 24 large enough in number to make possible, either alone or in conjunction with other intra-district zoning changes within District 24, the prompt elimination of the two District 25 annexes.

I recognize that the terms of its order may require some alteration in the terms and nature of the program presently contemplated for the I.S. 227 facility under the auspices of and in affiliation with Queens College; however, neither the merits of the special program nor the virtues of Queens College's involvement may not be permitted to impede an effective remedy for the constitutional violations found in this opinion. Hopefully, some of the aspects of the contemplated special program may be retained together with the active involvement of Queens College under the terms of an appropriate remedial plan consistent with the present order; and hopefully, too, additional aspects of the contemplated special program may gradually be phased in as patterns of student enrollment continue to change and as the effects of the constitu-

original alternative proposal to use the J 77 facility to eliminate the end-to-end sessions at I.S. 61, the predominantly minority I.S. 61 sixth graders would have been effectively isolated as a segregated group of students in the J 77 facility. Further, defendants may argue the I.S. 61 sixth graders would have been segregated even under the proposal for shared use of the J 77 facility because that proposal contemplated that the white students from the southern part of the District with whom the I.S. 61 sixth graders would share the J 77 building would be from the seventh, not the sixth, grade. Again, this court sees several answers to any argument along these lines. First, use of the J 77 facility to eliminate the end-to-end sessions at I.S. 61 either under the original or shared-use proposal, by indicating acceptance of the I.S. 61 sixth graders on the part of the white communities in the southern part of the District and by constituting an intra-district remedy for I.S. 61's overcrowding problem, would have significantly mitigated the stigma of the actions which defendants ultimately took. Second, although the only proposals for using the J 77 facility to eliminate the end-to-end sessions at I.S. 61 which actually were discussed by the

Community School Board contemplated long-distance bussing and movement of only the predominantly minority children from the northern part of the District, this court has not been convinced on the basis of the evidence introduced that defendants might not feasibly have used the J 77 facility as a terminal for a district-wide rezoning on the middle school level, moving middle school students downward on a district-wide basis in the direction of the J 77 facility. Third, such an argument ignores this court's finding that with flexible and innovative management, District 24 could have absorbed within its own boundaries at least a portion of the minority students who could no longer satisfactorily be accommodated at I.S. 61. Finally, whatever may be said regarding defendants' actions in responding initially to the need to eliminate the end-to-end sessions at I.S. 61, the continued maintenance of those annexes today, when the I.S. 227 facility could be used both to eliminate the annexes and to afford an integrated educational setting for District 24's students, constitutes a clear example of an unnecessary, incremental segregative effect of defendants' actions.

tional violations found in this opinion are dissipated.

I also recognize that if current plans to tenant the I.S. 227 facility on a voluntary basis are not successful in providing an integrated student body of significant numbers, the integration of that facility, consistent with the school authorities' current obligation not to take any action which might adversely affect the racial composition of other schools, may well require the compulsory bussing of some white students from certain areas in the southern part of the District—perhaps along the lines of a plan such as Plan "A" of the plans devised by Central Board officials as fallback positions to District 30's magnet proposal. While I do not welcome the thought of a plan which includes the compulsory bussing of students and share the apparent wish of defendant school officials that such a measure could be avoided, it must be remembered that the predominantly minority sixth-grade children from the I.S. 61 community have been subjected to compulsory bussing since September 1976 with no quick end for that bussing in sight. In addition, as previously suggested in connection with the discussion of another aspect of the situation which now confronts defendant school officials in the aftermath of this court's order, the desire to avoid compulsory bussing of students may not be permitted to thwart an effective remedy for the violation of plaintiffs' constitutional rights. Insofar as school officials may wish to avoid a plan which might appear to place a disproportionate burden of movement on any one segment of the District 24 community, those officials might explore the possibility of "pairing" the I.S. 227 facility with a facility in the southern half of the District—a facility for example such as the J 77 annex to J 93 which played such a large role in the background and history of the two District 25 annexes to I.S. 61.

Again, the preceding two paragraphs are simply suggestive and constitute no more than indications of this court's present thoughts and approach with regard to the details of an appropriate remedial plan in this case. As previously stated, the initial responsibility for formulating such a remedial plan rests with defendant school officials. Defendants are hereby directed to submit to this court the details of what they believe to be an appropriate remedial plan consistent with the terms of this order on or before December 31, 1979. Thereafter, all parties are directed to appear before this court on January 5, 1980, at 9:30 a. m. for further proceedings, including a hearing on the objections, if necessary, with regard to the details of an appropriate remedial plan for the constitutional violations found in this opinion.

SO ORDERED.

## ADDENDUM

After the foregoing opinion had been completed an affidavit was received from the Chancellor in which it is stated that one of the two annexes to I.S. 61 in District 25 (that at J 218) has been closed. Eighty students from I.S. 61, of whom 71 are minority and 9 are white, apparently have been transferred *en bloc* to I.S. 227 in District 30. The school (I.S. 227) is said to be integrated as a result of voluntary transfers of other students from Districts 24 and 30. This tardy and partial response to the overcrowding at I.S. 61 does not require any change in the findings and conclusions set forth above with regard to the ultimate issues in this litigation. To what extent these steps can be carried forward in terms of an overall remedy remains to be developed in further hearings.